**NEIL CARTUSCIELLO (NC-2460)**
**Attorney-at-Law**
104 Mountainside Road
Mendham, NJ 07945
(973) 543-8200
*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL J. MURPHY, MARCUS A. MARTIN, TERRY S. CASEY, INDUSTRIAL RECOVERY CAPITAL HOLDINGS CO., HIGHLAND ENVIRONMENTAL MANAGEMENT, LLC, and EFFICASEY ENVIRONMENTAL, LLC, | |
| Plaintiffs, | Civil Action No. _____ |
| v. | |
| HAROLD C. SIMMONS, WILLIAM J. LINDQUIST, STEVEN L. WATSON, ROBERT D. HARDY, ROBERT D. GRAHAM, KELLY J. LUTTMER, JOHN ALLEN ST. WRBA, GREGORY M. SWALWELL, JAMES W. BROWN, TIMOTHY C. HAFER, NL INDUSTRIES, INC., NL ENVIRONMENTAL MANAGEMENT SERVICES, INC., CONTRAN CORPORATION, and VALHI, INC., | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants. | |

# TABLE OF CONTENTS

LOCAL CIVIL RULE 10.1 DISCLOSURE............................................................. iiv

COMPLAINT.....................................................................................................1

NATURE OF THE ACTION ...............................................................................1

JURISDICTION AND VENUE ............................................................................12

THE PARTIES .................................................................................................13

    Individual Defendants.............................................................................13

    Corporate Defendants ............................................................................22

    Plaintiffs.................................................................................................24

BACKGROUND TO THE RACKETEERING ACTIVITIES OF THE SIMMONS ENTERPRISE ...............25

BACKGROUND OF NL EMS..........................................................................32

I.     NL's Unsuccessful Prior Management of Environmental Liabilities.................................32

II.    The Proposal To Restructure the Management of NL's Environmental Liabilities .........33

III.   Identification of Potential Third-Party Investors .................................................34

IV.   Negotiation of the Terms of Plaintiffs' Investment in NL EMS .....................................36

    A.    Valuation of Assumed Liabilities ......................................................37

    B.    Contribution of Assets to NL EMS.....................................................40

        1.    Cash..........................................................................40

        2.    Valhi Common Stock...................................................41

        3.    Sayreville Property.....................................................42

    C.    Plaintiffs' Rights Upon Redemption of Their Preferred Shares ...........................43

    D.    The Federal Income Tax Treatment of NL EMS...................................................44

        1.    NL EMS Entitlement to Tax Deductions..................................44

        2.    Tax Benefit To NL.................................................45

V.     Plaintiffs' Investment in NL EMS .................................................46

i

**PLAINTIFFS' WORK ON BEHALF OF NL EMS** ............................................................47

**DEFENDANTS' SCHEME TO DEFRAUD PLAINTIFFS** ......................................................51

I.      The IRS's Challenge To NL's Capital Loss Deduction...................................53

        A.      The IRS Audit of NL's Capital Loss Deduction..................................53

        B.      Inclusion of NL EMS in the IRS Audit ................................................54

        C.      Plaintiffs' Involvement as Fact Witnesses ..........................................57

II.     Unlawful Deprivation of NL EMS's Assets Through Fraudulent Tax Agreements .........58

        A.      NL's Settlement with the IRS on Behalf of NL EMS ..........................59

        B.      NL's "Tax Sharing Agreement" with NL EMS....................................62

        C.      Defendants' Fraudulent Concealment of the Sham Tax Agreements....................65

                1.      Failure To Provide Financial Statements....................................66

                2.      False and Fraudulent SEC Disclosures About NL EMS ..........................67

                3.      Failure To Hold Board of Directors Meetings...........................68

III.    Fraudulent Recording of More Than $3.1 Million in Expenses on the Books and Records of NL EMS ....................................................................71

IV.     Fraudulent Valuation of Plaintiffs' NL EMS Shares......................................72

**FRAUDULENT REPRESENTATIONS DESIGNED TO INDUCE  PLAINTIFFS TO RATIFY THE FRAUD** ..........................................................................................75

I.      False Statements at the June 7, 2005 Board Meeting About the IRS Settlement .............75

        A.      Misrepresentation That the IRS Mandated the Closing Agreement.....................76

        B.      Misrepresentation That NL EMS Avoided Federal Tax Penalties .......................76

        C.      False Statements Concerning the Business Purpose of NL EMS .........................77

        D.      Unlawful After-the-Fact Ratification of the Closing Agreement and Tax Sharing Agreement by the Conflicted NL EMS Directors............................79

II.     False Statements at the June 28, 2005 Board Meeting About the Value of Plaintiffs' Shares......................................................................81

        A.      Defendants' Fraudulent Undervaluation of the Sayreville Property.....................83

        1.     The Undervaluation of the Fair Market Value of the Sayreville Property.................................................................................83

        2.     The Fraudulent Overstatement of Costs of Environmental Liabilities of NL EMS's Portion of the Sayreville Property.....................86

    B.     Fraudulent Overstatement of NL EMS's Remaining Liabilities ..........................88

        1.     Monitoring Costs ........................................................................88

        2.     Discount Rate...........................................................................89

    C.     Defendants' Fraudulent Assignment of Liabilities to NL EMS ...........................90

    D.     Fraudulent Understatement of the Value of Valhi Stock......................................91

INTERFERENCE WITH PLAINTIFFS' RIGHT TO REVIEW BY DELOITTE.......................................92

CLAIMS FOR RELIEF .................................................................................................95

    COUNT ONE.........................................................................................................95

    COUNT TWO.........................................................................................................96

    COUNT THREE....................................................................................................102

    COUNT FOUR .....................................................................................................105

    COUNT FIVE.......................................................................................................107

    COUNT SIX.........................................................................................................108

    COUNT SEVEN ...................................................................................................109

    COUNT EIGHT....................................................................................................111

    COUNT NINE......................................................................................................112

    COUNT TEN........................................................................................................113

    COUNT ELEVEN .................................................................................................114

    COUNT TWELVE ................................................................................................115

DEMAND FOR JURY TRIAL....................................................................................118

LOCAL CIVIL RULE 11.2 CERTIFICATION .............................................................119

EXHIBIT A...........................................................................................................A-1

## LOCAL CIVIL RULE 10.1 DISCLOSURE

Pursuant to Rule 10.1 of the Local Civil Rules for the United States District Court for the District of New Jersey, upon information and belief, and to the best of Plaintiffs' knowledge, the names and street addresses of the parties to the case are listed in Exhibit A to the above-captioned Complaint.

**COMPLAINT**

Michael J. Murphy, Marcus A. Martin, and Terry S. Casey, individually and in their capacities as directors and officers of NL Environmental Management Services, Inc. ("NL EMS"), a New Jersey corporation; and Industrial Recovery Capital Holdings Company ("IRCC"), a Delaware corporation, Highland Environmental Management, LLC ("Highland Environmental"), a Colorado limited liability company, and Efficasey Environmental LLC, f/k/a Casey & Young ("Efficasey"), a Texas limited liability company, as holders of the Class D and E Preferred shares of NL EMS (collectively, "Plaintiffs"), on information and belief, allege as follows:

### NATURE OF THE ACTION

1.     This complaint is filed on behalf of the minority shareholders, directors, and officers of NL EMS, against Defendant Harold C. Simmons ("Simmons"), jointly and severally with the above-named individual and corporate defendants, seeking to recover for injuries that Plaintiffs suffered as a result of Defendants' participation in, and conduct of, the Harold C. Simmons Enterprise (the "Simmons Enterprise"), an enterprise under the laws of the United States and the State of New Jersey.

2.     Among other individuals and entities, the Simmons Enterprise consists of:

a.     trusts established for the benefit of certain family members of Defendant Harold C. Simmons, including but not limited to the Serena S. Connelly 1998 Trust, the Harold C. Simmons Family Trust No. 1, the Harold C. Simmons Family Trust No. 2, and the Lisa Simmons Epstein 1998 Trust (collectively, along with their predecessors, "the Simmons Family Trusts");

b.     Contran Corporation ("Contran"), a private holding company organized under the laws of the State of Delaware, substantially all of the voting shares of which are owned by the Simmons Family Trusts;

c.     Valhi, Inc. ("Valhi"), a Delaware corporation traded on the New York Stock Exchange ("NYSE"), approximately 91% of the voting shares of which are owned by Contran;

1

d.      NL Industries, Inc. ("NL"), a New Jersey corporation traded on the NYSE, approximately 82% of the voting shares of which are owned by Valhi; and

e.      NL EMS, a New Jersey corporation whose formation is detailed below.

3.      As set forth below, Defendants conducted and participated in the affairs of the Simmons Enterprise by engaging in a pattern of racketeering activities, and conspired to do the same, in violation of the laws of the United States and the State of New Jersey.  The intent and effect of Defendants' pattern of racketeering activity was to unlawfully strip NL EMS of valuable assets and divert them to entities within the Simmons Enterprise; to deprive Plaintiffs of money and property, including rights and benefits to which Plaintiffs were entitled as minority shareholders, officers, and directors of NL EMS; and to unlawfully prevent Plaintiffs from receiving the full cash value to which they were entitled upon redemption of their shares of NL EMS.  Defendants' pattern of racketeering activity constitutes the regular way the Simmons Enterprise conducts business, as illustrated by similar acts against similar victims detailed in Paragraphs 46 to 59 below.

4.      Plaintiffs also seek to recover from Defendants for acts of minority shareholder oppression, fraud, breach of fiduciary duty, civil conspiracy, aiding and abetting fraud and breach of fiduciary duty, breach of contract, and tortious interference with economic relations, in violation of the laws of the State of New Jersey.

5.      Plaintiffs have been seriously injured in their business and property as a result of Defendants' conduct of and participation in the affairs of the Simmons Enterprise through a pattern of racketeering activity and Defendants' unlawful activities in violation of the laws of the State of New Jersey.  As a result of Defendants' conduct and participation in a pattern of racketeering activity on behalf of the Simmons Enterprise, and their conspiracy to do the same,

as well as their violations of the laws of the State of New Jersey, Plaintiffs have been injured in their money or property in an amount to be determined at trial, but no less than $40 million.

6.      As described more fully below, NL was one of the leading manufacturers of lead paint and pigments and related products, which were a major source of hazardous waste and other environmental contamination and posed severe risks to public health and safety.  As a result, since at least the 1980s, several of NL's former sites were included on "priority lists" prepared by the United States Environmental Protection Agency ("EPA") as being among the worst hazardous waste sites in the United States.  Under applicable United States law, NL was required to pay tens of millions of dollars annually to contribute to the remediation of these sites in order to protect public health and safety.  By 1998, NL faced escalating environmental remediation and management expenses, which NL had difficulty controlling in an efficient and cost-effective manner.

7.      Plaintiffs have expertise and substantial experience in the management and remediation of environmental liabilities.  In early 1998, NL approached Plaintiffs individually with a proposal that offered Plaintiffs substantial economic incentives to help NL reduce the costs of managing these environmental liabilities.  After extensive negotiations, in June 1998 NL and Plaintiffs agreed to enter into a highly structured transaction, whereby NL assigned certain defined environmental liabilities and certain specified assets to NL EMS and whereby Plaintiffs agreed to manage those liabilities in an efficient and cost-effective manner pursuant to service contracts on a fee basis.  In addition, under separate agreements, as a further incentive for Plaintiffs to reduce the cost of managing NL EMS's assumed environmental liabilities, NL offered Plaintiffs the right to become shareholders of NL EMS, under terms that entitled them to redeem their shares after seven years and receive 39% of the equity value (or "net asset value")

of NL EMS.  NL, as NL EMS's majority shareholder, would retain the remaining 61% of any cost savings or other economic benefits achieved by Plaintiffs.

8.     As a fundamental premise of the NL EMS proposal, the parties agreed that the estimated present value of the assets that NL contributed to NL EMS should be approximately equal to the estimated present value of the future payments associated with the liabilities assumed by NL EMS.  Plaintiffs would thus be able to increase the equity value of NL EMS, and thereby increase the value of the 39% interest represented by their minority shares, by reducing the cost of managing these liabilities below the parties' initial estimates, or by increasing the value of NL EMS's assets above the parties' initial projections.  NL represented that it was willing to let Plaintiffs share in the equity value of NL EMS in order to create an "alignment of interests" that would provide strong incentives to Plaintiffs to resolve NL EMS's environmental liabilities in the most cost-effective way.  Plaintiffs, in turn, made a business judgment that their extensive experience and skill in managing environmental liabilities would enable them to reduce these estimated costs, and thus earn substantial profits due to the increase in the equity value of NL EMS.  Plaintiffs' initial and continued willingness to participate in the NL EMS transaction was made in reliance on the repeated representations of NL and Senior NL officers, directly and indirectly, that Plaintiffs would ultimately be entitled to receive the full and fair value of their 39% equity stake in NL EMS.  As NL represented in its filing on Form 10-Q with the United States Securities and Exchange Commission ("SEC") for the quarter ending June 30, 1999:  "[NL] EMS was established in 1998, at which time [NL] EMS contractually assumed certain of the Company's [*i.e.*, NL's] environmental liabilities.  [NL] EMS' earnings are based, in part, upon its ability to favorably resolve these liabilities.  The shareholders of [NL] EMS,

other than the Company, actively manage the environmental liabilities and share in 39% of [NL] EMS' cumulative earnings."

9.      In estimating the future cost of the environmental liabilities to be assumed by NL EMS, which would serve as the target against which Plaintiffs' cost savings would be measured, Plaintiffs relied not only on their own due diligence, but also on materials provided to them by NL, including a valuation report prepared by Deloitte & Touche LLP ("Deloitte"), which was hired by NL to provide a range of cost estimates for the liabilities that the parties contemplated for transfer to NL EMS.   Based in part on the Deloitte report, the parties agreed that an appropriate estimate of the total cost, over time, of managing the specific environmental liabilities assigned to NL EMS was approximately $135.1 million.   To fund the costs associated with managing these environmental liabilities, NL contributed assets to NL EMS (including cash, common stock of Valhi, and approximately 140 acres of waterfront real estate located in Sayreville, New Jersey) with a market value at that time of approximately $104.2 million.   The $104.2 million of cash and other assets that NL contributed to NL EMS was estimated to be equal to the present value of the total future costs of managing NL EMS's environmental liabilities, $135.1 million, discounted at an agreed upon discount rate of 7.2%.

10.      On or about June 1, 1998, Plaintiffs invested in two classes of preferred stock — NL EMS's Class D and Class E Preferred shares.   Because the present value of the total future cost of managing NL EMS's environmental liabilities was estimated to be approximately equal to the present value of NL EMS's assets, the parties estimated that the net equity value of NL EMS in June 1998 was minimal.   As a result, Plaintiffs acquired their equity interests at relatively modest prices ($317,000 in the aggregate).   Pursuant to the terms of NL EMS's First Amended Restated Certificate of Incorporation (dated May 29, 1998) (the "Restated

Certificate"), NL promised Plaintiffs that they could redeem those shares for cash after seven years (*i.e.*, on or after June 1, 2005), and thereby receive 39% of any equity they created for NL EMS.  Specifically, the Restated Certificate provides that, upon redemption, the holders of NL EMS's Class D and Class E Preferred shares were entitled to receive, in the aggregate, 39% of NL EMS's "Current Corporation Value," defined generally as the "Gross Assets of the Corporation . . . , less the present value of the remaining Liabilities."  The Restated Certificate further specifies that "the same methodology and assumptions" that had been used in determining the present value of NL EMS's assumed environmental liabilities in June 1998 would be used "[i]n determining the present value of the remaining Liabilities for purposes [of Current Corporation Value] upon redemption."

11.      According to these terms, and consistent with the basic business purpose of NL EMS, the cash amounts that Plaintiffs were entitled to receive upon redemption of their NL EMS preferred shares were directly related to the extent to which Plaintiffs were successful in reducing the estimated $135.1 million costs of managing those liabilities, and the extent to which NL EMS's assets increased in value over original estimates.  For the next seven years, from June 1998 to June 2005, through skill and hard work, Plaintiffs substantially reduced the amount of NL EMS's expenditures for its environmental liabilities from the parties' initial estimates.

12.      By no later than December 2002, Defendants came to realize that, for at least two reasons, the NL EMS transaction had turned out to be extremely profitable for Plaintiffs and was going to require a substantial cash payment by the Simmons Enterprise to the minority shareholders.  First, it was clear by late 2002 that Plaintiffs had, through the effective management of NL EMS's environmental liabilities, increased the equity value of NL EMS by tens of millions of dollars.  Plaintiffs had already significantly reduced the costs of resolving a

number of NL EMS's environmental liabilities at less than the estimated costs.  Moreover, Plaintiffs successfully managed NL EMS's interest in real property located in Sayreville, New Jersey — which by 2002 had skyrocketed in value due to a plan by the Sayreville Economic Redevelopment Authority ("SERA"), in which Plaintiffs were actively involved, to redevelop the Sayreville waterfront area.  Defendants understood that, under the terms of the Restated Certificate, NL EMS was obligated to redeem Plaintiffs' shares for a cash payment of tens of millions of dollars, a significant liability for NL, its parent companies (Contran and Valhi), and the Simmons Enterprise.  Second, in early 2002, the IRS commenced an audit challenging a capital loss of approximately $114.5 million that NL had reported on its 1998 federal income tax return and attributed to the sale of NL EMS's Class D shares to IRCC.  The IRS audit threatened to require NL and its consolidated tax group (including Contran and Valhi) to incur a cash payout of more than $40 million to cover the tax deficiency to the federal government.  By in or about December 2002, NL faced a significant federal income tax liability arising out of the NL EMS transaction.

13.     As a result, by no later than December 2002, Defendants understood that their financial arrangement with Plaintiffs in the NL EMS transaction would require NL to make cash payments of tens of millions of dollars to Plaintiffs to redeem their shares, as well as tens of millions of dollars to the IRS to resolve the tax audit.  As Defendant Lindquist stated in June 2005, NL EMS "blew up as a big business transaction" for the entire Simmons Enterprise.

14.     Beginning at a time unknown, but by no later than December 2002, in response to these and related events, and continuing to the date of the filing of this Complaint, Defendants devised and executed a scheme and artifice to defraud, the objective of which was to infiltrate NL EMS's senior management and board of directors; secretly loot NL EMS of its assets by

causing NL EMS to transfer them to NL and the Simmons Enterprise through a series of sham agreements; and deprive Plaintiffs of the full value of their minority equity interest in NL EMS through a fraudulent valuation of their Class D and Class E Preferred shares — all in order to unwind the NL EMS transaction and deprive Plaintiffs of the substantial promised benefits of that transaction.

15.     Defendants conspired to conduct and participate in, and did conduct and participate in, the Simmons Enterprise through a pattern of racketeering activity for the purpose of depriving Plaintiffs of money and property, and to unlawfully enrich the Simmons Enterprise and themselves, by, among other things:

   a.     **committing mail fraud in violation of Title 18, United States Code, Section 1341:**  as described more fully in this Complaint, having unlawfully, willfully, and knowingly devised and intending to devise a scheme and artifice to defraud Plaintiffs and for obtaining their money and property by means of false and fraudulent pretenses and promises, and for the purpose of executing such scheme and artifice and attempting to do so, placing and causing to be placed in post offices and authorized depositories for mail matter, records and documents to be sent and delivered by the United States Postal Service and by private or commercial interstate carriers;

   b.     **committing wire fraud in violation of Title 18, United States Code, Section 1343:**  as described more fully in this Complaint, having unlawfully, willfully, and knowingly devised and intending to devise a scheme and artifice to defraud Plaintiffs and for obtaining their money and property by means of false and fraudulent pretenses and promises, and for the purpose of executing such scheme and artifice and attempting to do so, transmitting or causing to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds;

   c.     **committing money laundering in violation of Title 18, United States Code, Section 1957:**  unlawfully, willfully, and knowingly engaging and attempting to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from violations of Title 18, United States Code, Sections 1341 and 1343;

16.     In addition, Defendants unlawfully obtained Plaintiffs' money and property, in breach of their obligations in their capacity as fiduciaries, made false or misleading written

statements for the purposes of obtaining Plaintiffs' property, all in violation of Title 2C, chapter 20, of the New Jersey Statutes, and further engaged in acts constituting fraud, minority shareholder oppression, breach of fiduciary duty, civil conspiracy, aiding and abetting, breach of contract, and tortious interference with economic relations, in violation of the laws of the State of New Jersey.

17.     Among the manner and means by which Defendants executed and agreed to execute this unlawful scheme and artifice to defraud Plaintiffs and to obtain, by means of false and fraudulent pretenses and representations, money and property from Plaintiffs were the following:

a.      beginning no later than December 2002 and continuing to the date of the filing of this Complaint, entering into a conspiracy unlawfully to deprive Plaintiffs of the full equity value of their Class D and Class E Preferred shares;

b.      between on or about December 2002 and June 29, 2005, unlawfully misappropriating from NL EMS more than $30 million of cash, assets, and other things of value for the purpose of depriving Plaintiffs, upon redemption, of the full equity value of their Class D and Class E Preferred shares of NL EMS;

c.      between approximately January 2005 and June 2005, making false entries in the books and records of NL EMS, including more than $3.1 million of expenses that were in truth and in fact made for the benefit of NL, including a contribution to a political lobbying group and payments for environmental liabilities of NL that had not been transferred to NL EMS;

d.      beginning at least as early as December 2002 and continuing to the date of the filing of this Complaint, making false and fraudulent statements to Plaintiffs, and failing to make required truthful, complete, and timely disclosures to Plaintiffs, about the financial condition and performance of NL EMS, the value of NL EMS's assets and liabilities, and the value of Plaintiffs' minority interest in NL EMS;

e.      beginning in or about December 2002, falsely representing to the IRS that Defendant Hardy and lawyers representing NL were authorized to act on behalf of NL EMS in connection with a proceeding before the IRS, and thereafter entering into settlement discussions with the IRS, knowing that a conflict of interest existed between NL and NL EMS, and knowing that the NL EMS Board of Directors had not previously authorized negotiations to be conducted by NL and its attorneys on behalf of NL EMS;

f.      between in or about February 2004 and at least June 2004, negotiating and
        executing with the IRS, in violation of fiduciary and other duties owed to NL
        EMS and to Plaintiffs as officers, directors, and minority shareholders of NL
        EMS, a "Closing Agreement" involving NL, NL EMS, Contran, and the IRS,
        pursuant to which Contran and NL fraudulently obtained tens of millions of
        dollars of net operating losses, tax deductions, and other valuable tax benefits
        from NL EMS;

g.      in or about March 2005, causing NL EMS to execute a Tax Sharing Agreement
        with NL, pursuant to which NL unlawfully deprived NL EMS of more than $11.1
        million in cash, an amount that represented virtually all of the tax deductions that
        NL EMS had previously claimed on its state and federal tax returns for
        expenditures made by NL EMS between 1998 and 2005 to manage its
        environmental liabilities;

h.      concealing the Closing Agreement and the Tax Sharing Agreement from Plaintiffs
        until on or about June 3, 2005, shortly after Plaintiffs provided notice of their
        intent to redeem their Class D and Class E Preferred shares in June 2005, by,
        among other things:

        (i)     between approximately early 2003 and June 2005, making false and
                misleading statements and material omissions in periodic reports filed
                with the SEC about the terms and conditions of the Closing Agreement
                and Tax Sharing Agreement as they related to NL EMS;

        (ii)    between approximately March 2004 and June 2005, unlawfully refusing to
                provide Plaintiffs with annual financial statements of NL EMS, as
                required by federal securities laws and the laws of the State of New
                Jersey;

        (iii)   between January 2003 and June 2005, unlawfully refusing to hold
                meetings of the Board of Directors of NL EMS as required by the laws of
                the State of New Jersey, despite repeated requests by Plaintiffs;

        (iv)    between January 2003 and June 2005, falsely representing to Plaintiffs
                that no actions had been taken on behalf of NL EMS since January 2003
                that required the approval of the Board of Directors of NL EMS;

i.      on June 7, 2005, shortly after receiving notice of Plaintiffs' intent to redeem their
        shares, holding a meeting of the NL EMS's Board of Directors in which the
        Closing Agreement and Tax Sharing Agreement were disclosed for the first time,
        and in which the NL EMS Board was asked to provide after-the-fact ratification
        of those agreements on behalf of NL EMS;

j.      in connection with the June 7, 2005 NL EMS Board meeting, making false and
        misleading representations and omissions of material fact to the NL EMS Board
        of Directors, including Plaintiffs, about the facts and circumstances surrounding
        the IRS audit, the Closing Agreement, and the Tax Sharing Agreement, with the

specific intent of fraudulently portraying these agreements as being in the interests of and in furtherance of legitimate corporate goals of NL EMS;

k.    on June 7, 2005, through these misrepresentations and material omissions, fraudulently obtaining the votes of a majority of the NL EMS directors to ratify, in violation of fiduciary and other duties owed to Plaintiffs and over Plaintiffs' strong objections, the Closing and Tax Sharing Agreements;

l.    prior to June 28, 2005, preparing a valuation of the Class D and Class E Preferred shares of NL EMS that, among other things: (i) undervalued, by tens of millions of dollars, NL EMS's interest in the Sayreville, New Jersey real property; (ii) overvalued, by tens of millions of dollars, the estimated present value of the cost of managing NL EMS's remaining environmental liabilities; (iii) intentionally misapplied the valuation methodology set forth in the Restated Certificate of NL EMS; and (iv) fraudulently relied on purported unwritten "understandings" among the parties regarding the scope of NL EMS's liabilities; the intent of which was to deprive Plaintiffs of the full equity value of their Class D and Class E Preferred shares;

m.    on June 28, 2005, holding another meeting of the NL EMS Board of Directors at which Defendants made false and misleading representations and omissions of material fact to the NL EMS Board of Directors, including Plaintiffs, about (among other things) the assets, liabilities, and financial condition of NL EMS, with the specific intent of fraudulently inducing Plaintiffs to ratify Defendants' valuation and deprive Plaintiffs of the right to the full value of their minority shares;

n.    between no later than June 7, 2005, and August 2005, fraudulently depriving Plaintiffs' of their rights under the Restated Certificate to an independent, impartial review by Deloitte of NL EMS's valuation of the Class D and Class E Preferred shares by, among other things, preemptively, and without Plaintiffs' knowledge or consent, engaging Deloitte to provide advice to NL and NL EMS regarding the valuation of the Class D and Class E Preferred shares; providing false, misleading, and incomplete information to Deloitte about the financial performance and operations of NL EMS on an ex parte basis; and, based on the foregoing, causing Deloitte to render an opinion letter in which it purportedly concurred in certain aspects of the valuation prepared by NL EMS, all for the unlawful purpose of depriving Plaintiffs of the full equity value of their Class D and Class E Preferred shares.

18.    As a result of these violations, Plaintiffs seek to recover more than $40 million in compensatory damages, subject to mandatory trebling under federal and state racketeering laws, plus punitive and exemplary damages, prejudgment interest, and the costs of suit, including attorneys' fees.  In addition, Plaintiffs seek various forms of equitable relief, including the

judicially mandated sale pursuant to New Jersey Statutes Annotated 14A:12-7, of all right, title, and interest held by Defendants in NL EMS for $5.31 million, the value of NL's 61% interest in NL EMS based on the $8.77 million valuation of NL EMS prepared by and at the direction of Defendants in June 2005; and the judicially ordered divestiture, pursuant to Title 18, United States Code, Section 1964(a), of all direct and indirect interests held by Defendants of any entity within the Simmons Enterprise.

### JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

20.     Venue is proper in this District under 28 U.S.C. § 1391 because "a substantial part of the property that is the subject of the action is situated" in the District of New Jersey.  Among other things, Plaintiffs allege that Defendants unlawfully, willingly, and knowingly devised and intended to devise a scheme and artifice to fraudulently deprive Plaintiffs of the full value of their minority shares in NL EMS.  Under New Jersey law, the situs of Plaintiffs' stock in NL EMS, a New Jersey corporation, is the State of New Jersey.  Moreover, the 140-acre real property in Sayreville, New Jersey, was one of the most significant assets that was transferred to NL EMS, the value of which Defendants fraudulently understated in furtherance of their scheme.

21.     Venue is also proper in this District under 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim occurred" in New Jersey.  NL transferred environmental liabilities associated with eight sites located in New Jersey, and Plaintiffs devoted enormous professional energy to resolve those liabilities in a cost-efficient manner, in reliance on Defendants' representations that they would be entitled to a cash payout of 39% of the cost savings upon redemption of their shares.  Defendants took a number of actions in the State of New Jersey in connection with their scheme and artifice to defraud

Plaintiffs of shareholder value they had created in their NL EMS shares through their efforts, including but not limited to the following:  (1) attending a meeting at the New Jersey Department of Environmental Protection ("NJDEP") concerning litigation regarding the Sayreville property; (2) filing repeated applications signed by Defendants Hardy and St. Wrba to the NJDEP, sworn under penalty of perjury, regarding the estimated cost of remediating the Sayreville property; (3) causing filings to be made on behalf of NL in New Jersey courts regarding the fair market value of Sayreville; and (4) commissioning expert reports prepared by environmental consultants located in New Jersey.

22.     Venue in this District is further appropriate under 18 U.S.C. § 1965.

## THE PARTIES

### Individual Defendants

23.     Defendant Harold C. Simmons is a resident of Dallas, Texas.  Simmons has served as the Chairman of the Board of NL since 1986.  In or around July 2003, Defendant Simmons took over management control of NL, assuming the title of Chief Executive Officer ("CEO") in addition to Chairman of the Board.  Simmons is also Chairman of the Board of Valhi and Contran, and Chairman of the Board and CEO of Kronos, Inc., an NL subsidiary (later renamed Kronos Worldwide, Inc.) (NYSE: KRO) ("Kronos").  Simmons has served as an executive officer or director of various companies related to Valhi and Contran since 1961. Simmons is the sole trustee of the Simmons Family Trusts, which own the vast majority of the voting stock of Contran.  As sole trustee of the Simmons Family Trusts, Simmons has the power to vote and direct the disposition of the shares of Contran stock held by each of the trusts. Contran indirectly or directly owns controlling interests in NL, Valhi, and the other entities of the Simmons Enterprise.  Simmons thus controls, and is otherwise associated with and employed by, the Simmons Enterprise.  Simmons is employed by and associated with, and conspired to

conduct and participate, directly and indirectly, in the affairs of the Simmons Enterprise through a pattern of racketeering activity by knowingly agreeing to promote the objectives of the Simmons Enterprise and to commit or to aid and abet the commission of the racketeering activities described in this Complaint, including mail fraud, wire fraud, and money laundering.

24.      Defendant William J. Lindquist is a resident of Plano, Texas.  Lindquist is the senior tax advisor to the Simmons Enterprise and a member of the "inner circle" of Defendant Harold Simmons.  He is a Senior Vice President of Contran and one of its four directors, as well as a Senior Vice President of Valhi, whereupon he was responsible for the management and supervision of all tax issues for Valhi and its subsidiaries, including NL and NL EMS.  In these capacities, and as an agent of Valhi and Contran, Lindquist was employed by and associated with, and conducted and participated, directly and indirectly, in the conduct of the affairs of the Simmons Enterprise by causing, aiding, abetting, counseling, commanding, inducing, and procuring the pattern of racketeering activity described in this Complaint, including mail fraud, wire fraud, and money laundering.  As described more fully below, Lindquist knowingly devised and participated in the unlawful scheme and artifice to defraud Plaintiffs and to deprive them of money and property, including their right to receive the full equity value of their shares of NL EMS.  Among other things, Lindquist (i) signed the Closing Agreement with the IRS on behalf of Contran that unlawfully diverted tens of millions of dollars in value from NL EMS to other companies in the Simmons Enterprise; (ii) drafted the sham, backdated Tax Sharing Agreement between NL and NL EMS and later caused it to be retroactively ratified by the NL EMS Board of Directors in violation of Plaintiffs' rights as minority shareholders of NL EMS; (iii) used the Tax Sharing Agreement as the purported justification for the Simmons Enterprise to unlawfully strip approximately $11.1 million in cash from NL EMS; (iv) caused this unlawful transfer of

14

approximately $11.1 million to be falsely described and improperly recorded in the books and records of NL, NL EMS, and other entities within the Simmons Enterprise; (v) made false and misleading representations at the June 7, 2005 NL EMS Board of Directors meeting about the Closing Agreement and the Tax Sharing Agreement, for the purpose of deceiving Plaintiffs and inducing them to ratify the Closing Agreement and the illegal transfer of tens of millions of dollars from NL EMS; and (vi) caused Defendants Brown, Graham, Hafer, Luttmer, St. Wrba, and Swalwell, in their capacities as directors of NL EMS, to retroactively ratify the Closing Agreement and Tax Sharing Agreement on behalf of NL EMS, knowing that this after-the-fact ratification was intended to fraudulently deprive Plaintiffs of the full cash value of their shares of NL EMS upon redemption.

25.    Defendant Steven L. Watson is a resident of Dallas, Texas.  Watson has served as a director of NL since approximately 2000.  Watson has served as President and a director of Valhi and Contran since 1998, and as CEO of Valhi since 2002.  Watson has served as an executive officer or director of various companies affiliated with NL, Contran, and Valhi since at least 1981.  Watson is also the Vice Chairman of the Board of Directors of Kronos, a director of CompX, and CEO and Vice Chairman of the board of Titanium Metals Corp. (NYSE: TIE) ("Timet"), a subsidiary of Valhi.  Although Watson is not an attorney, the employees of the legal departments of Contran and Valhi, including Defendant Graham, are overseen by Watson.  In these capacities, and as an agent of NL, Valhi, and Contran, Watson is employed by and associated with the Simmons Enterprise and conspired to conduct and participate, directly and indirectly, in the affairs of the Simmons Enterprise through a pattern of racketeering activity by knowingly agreeing to promote the objectives of the Simmons Enterprise and to commit or to aid

and abet the commission of the racketeering activities described in this Complaint, including mail fraud, wire fraud, and money laundering.

26.     Defendant Robert D. Hardy is a resident of Spring, Texas.  Between 1992 and 2003, Defendant Hardy held various positions in NL's tax, accounting, and finance departments, including service as Chief Financial Officer, Treasurer, Vice President, Controller, and Tax Director.  From approximately June 1998 to July 2003, Hardy served as Assistant Treasurer and then Treasurer of NL EMS; and from October 2003 through at least November 2004, as a consultant to NL, in which capacities he was responsible for the management and supervision of tax issues involving NL and NL EMS.   In these capacities, Hardy was employed by and associated with, and conducted and participated, directly and indirectly, in the conduct of the affairs of the Simmons Enterprise by causing, aiding, abetting, counseling, commanding, inducing, and procuring the pattern of racketeering activity described in this Complaint, including mail fraud, wire fraud, and money laundering.  By no later than December 2002, Defendant Hardy, in collaboration with Defendants Simmons, Watson, and Lindquist, had devised and was executing the scheme to defraud and to deprive Plaintiffs of the full equity value of their Class D and Class E Preferred shares.  Among other things, Hardy (i) made material misrepresentations and fraudulently concealed material information from Plaintiffs concerning the right and interest of NL EMS to obtain separate representation in tax proceedings before the IRS; (ii) participated in the negotiations with the IRS and others over the terms of a Closing Agreement that resulted in tens of millions of dollars of assets being unlawfully diverted from NL EMS to NL; and (iii) assisted Defendant Graham in preparing the valuation of the Class D and Class E Preferred shares of NL EMS that understated, by tens of millions of dollars, the value of Plaintiffs' minority interest in NL EMS.

27.     Defendant Robert D. Graham is a resident of Dallas, Texas, and an attorney licensed to practice law in the State of Texas.  Since approximately 2002, Graham has served as a Vice President of Contran and Valhi.  Beginning on July 17, 2003, Graham was appointed to serve as Vice President, Secretary, and General Counsel of NL.  Graham currently serves as President and Secretary and a member of the Board of Directors of NL EMS.  Graham has been assigned to serve as an officer of other corporations in the Simmons Enterprise, including as Vice President, Secretary, and General Counsel of Kronos.  In these capacities, and as an agent of Contran, NL, NL EMS, Valhi, and Kronos, Graham was employed by and associated with, and conducted and participated, directly and indirectly, in the conduct of the affairs of the Simmons Enterprise by causing, aiding, abetting, counseling, commanding, inducing, and procuring the pattern of racketeering activity described in this Complaint, including mail fraud, wire fraud, and money laundering.  As described more fully below, Graham knowingly devised and participated in Defendants' unlawful scheme and artifice to defraud Plaintiffs and to deprive them of money and property, including their right to receive the full equity value of their shares of NL EMS, and violated his fiduciary obligation to NL EMS and its minority shareholders. Among other things, Graham (i) signed the sham Tax Sharing Agreement on behalf of NL on March 18, 2005, pursuant to which approximately $11.1 million in assets were misappropriated from NL EMS and unlawfully diverted to NL for the benefit of the Simmons Enterprise; (ii) three weeks later, on April 7, 2005, sent a letter to Plaintiffs in which he falsely misrepresented that he "[did] not know of any specific action requiring a formal meeting of the Board of Directors at this time"; (iii) on June 7, 2005, several days after Plaintiffs notified him of their intent to redeem their shares, convened a Board meeting of NL EMS for the purpose of ratifying the Closing Agreement and Tax Sharing Agreement; (iv) made false and misleading

17

representations to Plaintiffs at the June 7, 2005 NL EMS Board of Directors meeting in order to conceal this illegal conduct; and (v) prepared and caused to be ratified by the NL EMS Board a fraudulent valuation of Plaintiffs' Class D and Class E Preferred shares, which knowingly and intentionally understated the value of Plaintiffs' shareholder equity in NL EMS.

28.    Defendant Kelly J. Luttmer is a resident of Coppell, Texas.  Beginning in no later than 2000, Luttmer served as the Tax Director of Contran.  On or about March 15, 2004, Luttmer was assigned to serve as Tax Director of NL EMS.  She currently serves as Vice President and Tax Director and a member of the Board of Directors of NL EMS.  She has held tax accounting positions at various companies related to Valhi and Contran since 1989, and has held executive officer positions in other corporations within the Simmons Enterprise, including Tax Director of Valhi, CompX, and Kronos.  In these capacities, and as an agent of Contran, Valhi, NL EMS, CompX, and Kronos, Luttmer was employed by and associated with, and conducted and participated, directly and indirectly, in the conduct of the affairs of the Simmons Enterprise by causing, aiding, abetting, counseling, commanding, inducing, and procuring certain of the racketeering activity described in this Complaint, including mail fraud, wire fraud, and money laundering.  As described more fully below, Luttmer knowingly devised and participated in Defendants' unlawful scheme and artifice to defraud Plaintiffs and to deprive them of money and property, including their right to receive the full equity value of their shares of NL EMS.  Among other things, Luttmer (i) signed the Closing Agreement with the IRS on behalf of both NL and NL EMS, while knowing that there was a clear conflict of interest between the two companies and that the agreement was unfair to NL EMS and its minority shareholders; (ii) signed the Tax Sharing Agreement on behalf of NL EMS, knowing that the intent and effect of that agreement was unlawfully to misappropriate tens of millions of dollars from NL EMS; (iii) voted at the

June 7, 2005 Board of Directors to ratify the Closing Agreement, knowing that the Closing Agreement violated Plaintiffs' rights as minority shareholders of NL EMS and was negotiated and executed without the separate representation of or disclosure to Plaintiffs; and (iv) voted at the June 28, 2005 meeting to approve NL EMS's valuation of Plaintiffs' shares, knowing that the valuation was part of an ongoing fraud to deprive Plaintiffs of the value of their Class D and Class E Preferred shares.

29.     Defendant John Allen St. Wrba is a resident of Flower Mound, Texas.  St. Wrba currently serves as a Vice President of Contran.  On or about March 15, 2004, St. Wrba was assigned to serve as Assistant Treasurer of NL EMS.  He currently serves as Vice President and Treasurer and a member of the Board of Directors of NL EMS.  St. Wrba has served as an executive officer in several other corporations within the Simmons Enterprise, including Vice President and Treasurer of NL and Valhi.  In these capacities, and as an agent of NL, NL EMS, Contran, and Valhi, St. Wrba was employed by and associated with, and conducted and participated, directly and indirectly, in the conduct of the affairs of the Simmons Enterprise by causing, aiding, abetting, counseling, commanding, inducing, and procuring certain of the racketeering activity described in this Complaint, including mail fraud, wire fraud, and money laundering.  As described more fully below, St. Wrba actively participated in litigation with the NJDEP regarding the Sayreville site.  In particular, St. Wrba made statements to the NJDEP, sworn under penalty of perjury, that the estimated cost of the remaining environmental liabilities on the Sayreville site was *at most* $10.5 million.  With specific intent to defraud Plaintiffs of money and property, including their right to receive the full equity value of their shares of NL EMS, and in violation of his fiduciary and other duties under federal and state law, St. Wrba voted at the June 28, 2005 NL EMS Board meeting to approve a $3.42 million valuation for

Plaintiffs' shares that was based, in part, on (i) the fraudulent misrepresentation that the estimated cost of the Sayreville liabilities was *at least* $10.5 million, and more likely as high as $42 million, and (ii) an intentional misapplication of the agreed-upon valuation formula.

30.     Defendant Gregory M. Swalwell is a resident of Dallas, Texas.   Swalwell is a Vice President and Controller of Contran.   In or about October 2003, Swalwell was appointed to serve as Treasurer of NL EMS.   He currently serves as Vice President and Chief Financial Officer and a member of the Board of Directors of NL EMS.   Swalwell served as an executive officer of several corporations within the Simmons Enterprise, including Vice President and Chief Financial Officer of NL, and Principal Accounting Officer, Vice President, and Controller of Valhi.   In these capacities, and as an agent of Contran, Valhi, NL, and NL EMS, Swalwell was employed by and associated with, and conducted and participated, directly and indirectly, in the conduct of the affairs of the Simmons Enterprise by causing, aiding, abetting, counseling, commanding, inducing, and procuring the pattern of racketeering activity described in this Complaint, including mail fraud, wire fraud, and money laundering.   As described more fully below, as NL EMS's Chief Financial Officer, Swalwell was responsible for the preparation of NL EMS's financial statements and for providing them to Plaintiffs.   Among other things, Swalwell fraudulently recorded more than $3.1 million in expenses of NL on the books and records of NL EMS, in order to deprive Plaintiffs of their 39% minority equity interest in NL EMS.   Also, and among other things, Swalwell (i) voted at the June 7, 2005 Board of Directors to ratify the Closing Agreement, knowing that the Closing Agreement violated Plaintiffs' rights as minority shareholders of NL EMS and was negotiated and executed without the separate representation of or disclosure to Plaintiffs; and (ii) voted at the June 28, 2005 Board meeting to

approve NL EMS's valuation of Plaintiffs' shares, knowing that the valuation was part of an ongoing fraud to deprive Plaintiffs of the value of their Class D and Class E Preferred shares.

31.     Defendant James W. Brown is a resident of the State of Texas.  Brown is an employee of Contran and has served as an executive officer of other companies in the Simmons Enterprise, including, from at least May 2004 to the present, the Principal Accounting Officer, Vice President, and Controller of NL.  Shortly before June 7, 2005, Brown was appointed to serve as a member of the Board of Directors of NL EMS.  In these capacities, and as an agent of Contran, NL, and NL EMS, Brown was employed by and associated with, and conspired to conduct and participate, directly and indirectly, in the affairs of the Simmons Enterprise by agreeing to commit or to aid and abet the commission of the racketeering activities described in this Complaint, including mail fraud, wire fraud, and money laundering.  As described more fully below, Brown became a director of NL EMS shortly before Plaintiffs informed NL and NL EMS that they intended to redeem their Class D and Class E Preferred shares.  Thereafter, among other things, Brown (i) voted at the June 7, 2005 Board of Directors meeting to ratify the Closing Agreement, knowing that the Closing Agreement was part of an ongoing fraud to deprive Plaintiffs of the value of their Class D and Class E Preferred shares; and (ii) voted at the June 28, 2005 Board meeting to approve NL EMS's valuation of Plaintiffs' shares, knowing that the valuation was part of an ongoing fraud to deprive Plaintiffs of the value of their Class D and Class E Preferred shares.

32.     Defendant Timothy C. Hafer is a resident of Dallas, Texas, and an employee of Contran.  On or about May 27, 2005, shortly before Plaintiffs exercised their right to redeem their Class D and Class E Preferred shares, Hafer was appointed to serve as a director of NL EMS.  In these capacities, and as agent of Contran and NL EMS, Hafer was employed by and

associated with, and conspired to conduct and participate, directly and indirectly, in the affairs of the Simmons Enterprise by agreeing to commit or to aid and abet the commission of the racketeering activities described in this Complaint, including mail fraud, wire fraud, and money laundering.   Thereafter, among other things, Hafer (i) voted at the June 7, 2005 Board of Directors meeting to ratify the Closing Agreement, knowing that the Closing Agreement was part of an ongoing fraud to deprive Plaintiffs of the value of their Class D and Class E Preferred shares; and (ii) voted at the June 28, 2005 Board meeting to approve NL EMS's valuation of Plaintiffs' shares, knowing that the valuation was part of an ongoing fraud to deprive Plaintiffs of the value of their Class D and Class E Preferred shares.

Corporate Defendants

33.   Defendant NL (formerly National Lead Company) has been a New Jersey corporation since 1891.   NL's business address as registered with the New Jersey Secretary of State's office is 5 Cedar Brook Drive, Cranbury, New Jersey, 08512.   NL's common shares are publicly traded on the New York Stock Exchange ("NYSE"), under the symbol "NL."   Since its inception in 1891, NL has been one of the nation's leading manufacturers of lead-based products, including lead pigments and lead paint.   In 1916, it purchased the Titanium Pigment Corporation and Titan Co., AS, and became one of the world's leading producers of titanium dioxide pigments (TiO2), which is used to whiten paper, plastics, and paints.   Defendant Harold C. Simmons acquired a controlling interest in NL through a hostile tender offer completed in 1987. Thereafter, NL's TiO2 operations were reorganized into a separate subsidiary, Kronos, a Delaware corporation whose North American sales office is in Cranbury, New Jersey.   NL has a majority-owned subsidiary, CompX International (NYSE: CIX), also a Delaware corporation, that manufactures ball bearing and security products.   From approximately 1987 to 1998, Rheox

International, Inc. ("Rheox"), a Delaware corporation headquartered in Hightstown, New Jersey, was a subsidiary of NL that manufactured rheological additives and other specialty chemicals.

34.      Defendant NL EMS is a New Jersey corporation the principal place of business of which is in Dallas, Texas.  The circumstances of its formation and operation are described more fully in this Complaint.

35.      Defendant Contran Corporation is a privately-held corporation organized in 1944 under the laws of the State of Delaware, the principal place of business of which is Dallas, Texas.  Defendant Simmons gained control of Contran in 1968, and since that time has used Contran as a holding company for various business interests used in connection with the Simmons Enterprise.  Contran has four directors:  Harold C. Simmons, Steven L. Watson, William J. Lindquist, and Simmons's brother Glenn R. Simmons.  Substantially all of Contran's outstanding preferred and common (voting) stock is currently held by Simmons, the Simmons Family Trusts, certain individual Simmons family members, or other persons or entities affiliated with the Simmons Enterprise.  Contran also is the nominal employer of NL and Valhi's senior executive officers, whose services are provided to the corporations in the Simmons Enterprise pursuant to certain inter-corporate service agreements.

36.      Defendant Valhi Inc. (NYSE: VHI) is a corporation organized under the laws of Delaware, the principal place of business of which is in Dallas, Texas.  Defendant Simmons has controlled Valhi since 1975.  As of September 2005, according to NL's January 2006 Form 10-Q filing with the SEC, Contran and its subsidiaries held approximately 91% of the outstanding common stock of Valhi, which in turn held approximately 82% of NL's outstanding common stock.   Valhi also owns 100% of the shares of Tremont LLC, the successor to Tremont Corporation ("Tremont").

37.     NL, NL EMS, Contran, and Valhi conducted and participated in the affairs of the Simmons Enterprise by and through the acts of their agents, as set forth herein.  Because Contran and Valhi directly or indirectly own NL, they benefited from the pattern of racketeering activity by which Defendants fraudulently and unlawfully obtained tens of millions of dollars and equity value of Plaintiffs' shares and transferred it to NL.

38.     The term "Director Defendants" refers to Defendants Brown, Graham, Hafer, Luttmer, St. Wrba, and Swalwell.  The term "Corporate Defendants" refers to Contran, Valhi, NL, and NL EMS.   References to "Defendants" may denote the Director Defendants, the Corporate Defendants, or certain specific Defendants, depending on context and subject to reasonable further investigation.

Plaintiffs

39.     Plaintiff Michael J. Murphy is a resident of the Commonwealth of Virginia.  He has been working in the field of environmental remediation services since the 1970s.  He is a founder, shareholder, and the former President and Chief Executive Officer of Plaintiff IRCC. Murphy became an officer and director of NL EMS in June 1998 when Plaintiff IRCC purchased its Class D Preferred shares.

40.     Plaintiff IRCC is a Delaware corporation the principal place of business of which is in Reston, Virginia.  IRCC is the holder of all 1,250 of the Class D Preferred shares of NL EMS, representing a 15% equity stake in NL EMS.   IRCC specializes in the forecasting, investigation, and remediation of environmental liabilities.

41.     Plaintiff Marcus A. Martin is a resident of the State of Colorado.  He is a duly licensed Colorado attorney with professional expertise in environmental liability management. He is the sole shareholder of Plaintiff Highland Environmental.  Martin became an officer and

director of NL EMS in June 1998, when Highland Environmental purchased its Class E Preferred shares of NL EMS.

42.     Plaintiff Highland Environmental is a Colorado limited liability company the principal place of business of which is in Boulder, Colorado.  Highland Environmental holds 1,280 shares of Class E Preferred shares of NL EMS, representing a 16% equity stake in NL EMS.

43.     Plaintiff Terry S. Casey is a resident of the State of Texas.  He has decades of experience in environmental policy, management, and remediation.  Plaintiff Casey has a degree in environmental studies, has been a senior environmental professional in charge of environmental policy and programs for several large manufacturing companies.  Casey is the sole shareholder of Plaintiff Efficasey.  Casey became an officer and director of NL EMS in June 1998, when Efficasey bought its Class E Preferred shares.

44.     Plaintiff Efficasey is a Texas limited liability company the principal place of business of which is in Tomball, Texas.  Efficasey holds 640 Class E Preferred shares of NL EMS, representing an 8% stake in NL EMS.

45.     As used in this complaint, the term "Shareholder Plaintiffs" refers to Plaintiffs IRCC, Highland Environmental, and Efficasey, collectively.  The term "Individual Plaintiffs" refers to Plaintiffs Murphy, Martin, and Casey, collectively.  References to "Plaintiffs" may denote Shareholder Plaintiffs, Individual Plaintiffs, or all Plaintiffs, as indicated by context.

### BACKGROUND TO THE RACKETEERING ACTIVITIES OF THE SIMMONS ENTERPRISE

46.     At all times relevant to this Complaint, the Simmons Enterprise was an enterprise as defined in Title 18, United States Code, Section 1961(4), and Title 2C, New Jersey Statutes, Section 41-1(c), comprised of a group of individuals associated in fact, although not a legal entity, that was engaged in, and the activities of which affected, interstate commerce.  As

described more fully below, the Simmons Enterprise includes, but is not limited to, Defendants Harold C. Simmons, William J. Lindquist, Steven L. Watson, Robert D. Hardy, Robert D. Graham, Kelly J. Luttmer, John Allen St. Wrba, Gregory M. Swalwell, James W. Brown, Timothy C. Hafer, and NL Industries, Inc., NL EMS, Inc., Contran Corporation, Valhi Inc., other public and private corporations controlled by Contran, Valhi, and NL, and the Simmons Family Trusts (including the Serena S. Connelly 1998 Trust, the Harold C. Simmons Family Trust No. 1, the Harold C. Simmons Family Trust No. 2, and the Lisa Simmons Epstein 1998 Trust).

47.     The overarching purpose of the Simmons Enterprise is to enrich Defendant Simmons and certain of his family members who are the beneficiaries of the Simmons Family Trusts.  Simmons' salary from the Simmons Enterprise is approximately $4 million annually. Simmons also uses the Simmons Enterprise to increase his political and social influence.  For example, Simmons has established various political action committees (PACs), including the NL Industries PAC and the Contran Political Action Committee (CONPAC), through which he has contributed tens of thousands of dollars to federal elected officials, their campaigns, and other PACs.

48.     Beginning at least as early as 1968, when Simmons gained control of Contran, Simmons has managed and operated the Simmons Enterprise as a single organizational structure under his control.  Simmons is the sole trustee of the Simmons Family Trusts, which in turn own substantially all of Contran's voting shares.  Simmons, through his control of Contran, thus exercises effective control over publicly traded NYSE-listed companies including Valhi, NL, CompX, Kronos, and Titanium Metals, as well as numerous other public and private companies.

49.     Simmons manages Contran, Valhi, NL, and their subsidiaries as a single ongoing business enterprise.  Contran, Valhi, and NL all share the same business address at Three Lincoln

Center, 5430 LBJ Freeway, Suite 1700, in Dallas, Texas.  Simmons serves as chairman of the board of directors of all of these companies.  Simmons also controls all appointments to the board of directors of these three companies.

50.     Contran, Valhi, NL, and their subsidiaries routinely engage in intercorporate transactions, such as mutual financial guarantees, management and expense sharing agreements, joint ventures, partnerships, loans, option agreements, advances of funds, leases, and exchanges of assets, including exchanges of the securities issued by the three companies, or securities of related companies and unrelated companies owned by the three companies.  Simmons also routinely restructures the Simmons Enterprise by, among other things, engaging in transactions such as acquisitions, reorganizations, recapitalizations, and securities purchases, repurchases, or sales – all of which are designed to move operating subsidiaries, business divisions, or other business units among the various holding companies within the Simmons Enterprise.  Contran, Valhi, and NL are also part of the same "consolidated group" for federal tax purposes.

51.     Simmons controls the affairs of the Simmons Enterprise through a tight network of senior executive officers.  Defendants Watson and Lindquist have been senior advisors to Simmons since at least 1981.  Most of Simmons's senior executives hold executive positions in more than one company within the Simmons Enterprise.  All of the senior executives of Valhi are actually employees of Contran, and have been so since at least 2001 (some since 2000).  Similarly, as of 2005, all of NL's senior executive officers have been employees of Contran.  Contran provides the services of these senior executives to Valhi and NL (and other entities within the Simmons Enterprise) pursuant to intercompany services agreements, and charges those companies a fee for those officers' services.  This arrangement allows Contran and

Simmons to exert direct superintendence over the officers of its subsidiaries, and permits the Simmons Enterprise to allocate earnings and expenses among those companies.

52.     Defendant Simmons has a well-documented history of abusing the rights of minority shareholders within the Simmons Enterprise, as well as others to whom Defendant Simmons or the Simmons Enterprise owed fiduciary duties, in order to unlawfully promote the financial interests of Defendant Simmons and the Simmons Enterprise.  Defendant Simmons has been found liable in or has paid substantial sums to settle federal and state lawsuits accusing him and entities within the Simmons Enterprise of abusing the rights of minority shareholders in order to enrich himself and the Simmons Enterprise.  As one of Simmons's former senior investment advisors stated in a 1981 interview:  "The worst thing is to be a minority shareholder to Harold Simmons."

53.     In 1978, the minority shareholders of Valhi sued Contran, Valhi, and Simmons to stop the merger of Valhi into Contran, on the ground that the merger price of $22.50 per Valhi share was grossly unfair.  The plaintiffs also alleged that Simmons had taken steps — namely, first merging Valhi into a wholly owned subsidiary, and then merging the subsidiary with Contran — that were designed for no purpose other than unlawfully to circumvent minority shareholder protections set forth in Valhi's corporate charter.  The Delaware Chancery Court enjoined the merger, finding that Simmons had engaged in acts of self-dealing that were "unfair to minority stockholders."  *Young v. Valhi, Inc.*, 382 A.2d 1372 (Del. Ch. 1978).  The Court called Simmons' proposed merger "the prototype of the kind which [Delaware law] now seeks to prevent by its application of strict standards of fiduciary behavior to the conduct of majority stockholders in their dealings with the minority."  *Id*. at 1378.  The Delaware Chancery Court further found that Contran's two-step merger was a "devious corporate action" that was nothing

28

more than an effort "to manipulate corporate machinery to accomplish an inequitable result." *Id*. at 1378-79.

54.     In 1985, the United States District Court for the Central District of Illinois ruled that, in September 1982, Simmons had violated his fiduciary duties under ERISA with regard to former employees of Keystone, a Contran subsidiary, by unlawfully using nearly $10 million from the Keystone Master Pension Trust ("KMPT") to purchase shares of Amalgamated Sugar Company ("Amalgamated").  *See Sandoval v. Simmons*, 622 F. Supp. 1174, 1193 (C.D. Ill. 1985).  The district court found that "Simmons' use of KMPT assets to purchase Amalgamated stock in September 1982 was an integral part of Simmons' efforts to defeat [a proposed merger between Amalgamated and another company] in order to protect his Companies' $14.7 million investment in Amalgamated."  *Id*.  Based on this finding, the district court ruled that Simmons had unlawfully used the Keystone pension plan's funds for his own benefit and that of his companies, and acted with dual loyalties by pursuing the interests of one of his own companies, National City Lines, which were adverse to the pension plan's.  *See id.*

55.     In 1986, the Delaware Chancery Court held that former minority shareholders of Contran had stated a valid claim of fraud against Contran and Simmons, among others.  *See Edick v. Contran Corp.*, 12 Del. J. Corp. L. 244 (Del. Ch. 1986).  The 49 shareholders alleged that a reverse stock split in which Contran cashed out their 91 total shares at $5,000 per share was "so grossly unfair as to constitute fraud."  *Id*. at 246.  They also alleged that the price was set unilaterally, without any independent expert analysis, and ignored the true value of Contran's assets.  The Chancery Court further found that Contran had withheld material information by failing to disclose to minority shareholders certain sales and real estate appraisals that had been obtained by Contran and its subsidiaries.  *See id*.  The Delaware Chancery Court held that the

shareholders had stated a valid claim for both fraud and breach of fiduciary duty, after which Simmons and Contran ultimately settled the litigation by valuing the holdings of the minority shareholders at two times the original appraisal.  *Id.*

56.    In 1991, minority shareholders of Tremont challenged "a series of improper transactions, beginning in 1990, which had been orchestrated by Simmons for his own benefit." Specifically, Simmons caused Tremont to purchase 7.8 million shares of NL common stock from Valhi at an allegedly inflated price.  Valhi was eager to rid itself of these shares because prices for NL's principal product, titanium dioxide (TiO2) were plummeting, and NL's profits along with them.  Moreover, by reducing its holdings of NL to less than 50%, Valhi stood to "receive a tax savings of approximately $11.8 million" from the sale.  In need of a willing buyer, Simmons sought out Tremont, which he also controlled (Simmons owned 90% of Valhi through Contran, and Valhi owned 44% of Tremont).  By causing Valhi to sell the NL shares to Tremont at well above the market price, Simmons caused Valhi to obtain a significant tax benefit, and caused Valhi to avoid suffering a future loss on its NL stock holdings, all at the expense of Tremont's minority shareholders.

57.    The Delaware Supreme Court found that Simmons had acted unlawfully by failing to defend the interests of Tremont's minority shareholders, and by allowing rampant conflicts of interest to compromise the independence of the Special Committee of Tremont's Board of Directors that was in charge of reviewing Tremont's purchase of the NL stock.  *See Kahn v. Tremont Corp.*, 694 A.2d 422 (Del. 1997).  The Delaware Supreme Court found that the chairman of that committee was "most beholden to Simmons," and his "independence was most suspect," because he had had "a long and personally beneficial relationship with . . . [Simmons-controlled companies]."  *Id.* at 429-30.  The financial advisor to the Special Committee had also

"derived significant fees from Simmons controlled companies" in the past.  And the Committee's legal advisor "had previously been retained by Valhi . . . and by NL."  *Id.* at 430.  Simmons subsequently paid Tremont an additional 1.2 million NL shares worth approximately $20 to $25 million.

58.     In 1997, two of Simmons' daughters, Scheryle Patigian and Andrea Swanson, beneficiaries of certain Simmons Family Trusts, sued Simmons in Dallas Probate Court, alleging that he had violated his fiduciary duties to them as trustee.  Among other things, Simmons allegedly used trust funds for his own personal luxury purchases, as well as to make unlawful political contributions.  In a deposition conducted on April 24, 1997, Simmons admitted that he had made political contributions out of trust assets in his daughters' names, without their consent.  In a sworn affidavit, Ms. Patigian testified that Simmons "continued to make large political contributions in [her] name, using Trust assets" despite the fact that she had "never authorized" him to do so, and had specifically "requested that he make no further contributions, in [her] name or out of Trust assets, to political candidates, political action committees, or political causes."  Moreover, Simmons caused his other daughter, Ms. Swanson, to sign blank political contribution letters, which he then repeatedly mailed to candidates without her knowledge or consent to make contributions from Trust assets in her name.  Simmons' fraudulent use of his daughters' names without their consent and against their wishes was intended to evade federal campaign contribution limits.  As Simmons stated in a December 1995 letter:  "Max'd out.  The enclosed is from my daughter."  Simmons had previously been fined nearly $20,000 by the Federal Election Commission for exceeding those limits.  After trial, the jury unanimously concluded that Simmons had breached his fiduciary duties to his two daughters, but did not reach a verdict.  Simmons subsequently settled the case before the retrial,

by agreeing to pay each daughter $50 million in exchange for his daughters' agreement to withdraw their claim to have Simmons removed as sole trustee of the Simmons Family Trusts.

59.     The violations of the federal racketeering laws alleged in this Complaint are thus a continuation of a longstanding pattern of unlawful conduct.  This Complaint alleges conduct that is strikingly similar to the foregoing conduct in which Defendant Simmons and other employees of the Simmons Enterprise have conducted and participated in the affairs of the Simmons Enterprise by engaging in a pattern of racketeering activity and other unlawful acts against minority shareholders and others to whom Simmons and his companies owed fiduciary duties.  The racketeering and other claims set forth in this Complaint involve conduct by Defendant Simmons and other Defendants employed by or associated with the Simmons Enterprise including: (1) engaging in self-dealing transactions that benefited the entities comprising the Simmons Enterprise at the expense of minority shareholders; (2) appointing as directors to the entities within the Simmons Enterprise individuals who were beholden to Defendant Simmons, and causing those directors to breach their fiduciary and other duties to minority shareholders; (3) falsely claiming that minority shareholders were consulted about and approved self-dealing transactions orchestrated to benefit the Simmons Enterprise; (4) fraudulently understating the value of shares held by minority investors; and (5) falsifying the books and records of public companies and other entities within the Simmons Enterprise in order to conceal unlawful conduct by Defendant Simmons and other individuals acting for the benefit of the Simmons Enterprise.

## BACKGROUND OF NL EMS

## I.    NL's Unsuccessful Prior Management of Environmental Liabilities

60.     NL, formerly known as the National Lead Company, was first incorporated in New Jersey in 1891.  NL became part of the Simmons Enterprise in approximately 1987, when

companies directly or indirectly controlled by Defendant Simmons acquired NL in a hostile

takeover.  NL's historical business operations, which included, among other things, lead mining,

lead processing, secondary lead smelting, and titanium dioxide manufacturing, caused substantial

environmental damage.  Under federal and state law, NL remained responsible for significant

amounts of these "legacy liabilities" after NL became part of the Simmons Enterprise in 1987.

As a result, NL has been the subject of scores of environmental lawsuits, either as a defendant or

a Potentially Responsible Party ("PRP"), seeking to impose financial responsibility on NL under

environmental laws such as the federal Comprehensive Environmental Response, Compensation,

and Liability Act ("CERCLA") (known as the "Superfund" law) and its state equivalents.

61.     At least as early as 1994, NL began to outsource management of these

environmental liabilities to third parties, in the hope of reducing the costs associated with

managing these expenses.  From April 1994 to 1998, NL outsourced certain oversight functions

associated with certain environmental liabilities to the law firm of Bartlit Beck Herman

Palenchar & Scott ("Bartlit Beck"), where Plaintiff Martin was formerly a partner.   Martin was

assigned to provide limited environmental management services to NL during this time.  Despite

this arrangement, however, NL was unable to significantly reduce its environmental liability

expenditures.

## II.     The Proposal To Restructure the Management of NL's Environmental Liabilities

62.     In the fall of 1997, with assistance from Deloitte, NL developed a restructuring

plan designed to reduce the costs associated with managing certain defined environmental

liabilities, by assigning these environmental liabilities to a special purpose subsidiary, which

would then assume responsibility for managing those liabilities and pay all expenses associated

therewith as such expenses came due.  NL would also contribute an amount of assets calculated

to equal the estimated present value of the future expenditures associated with the assigned environmental liabilities.

63.    A critical component of this restructuring plan was to recruit third-party investors with expertise in managing environmental liabilities, and charge them with the responsibility to resolve the assumed liabilities as cost efficiently as possible.  The restructuring plan would provide these investors with substantial financial incentives, principally in the form of an equity interest in the special purpose subsidiary, that would encourage them to reduce the expenses of managing these environmental liabilities by permitting them to share in any increase in the value of the subsidiary.  According to NL's January 20, 1998 written presentation describing the restructuring plan, "[a]ligning the service provider's interest with NL's interest [would] provide long term incentives for the provider to minimize NL's future environmental cash out-flows." The special purpose subsidiary would thus "achieve management's objective of reducing future remediation and legal costs by offering [certain outside service providers] an equity interest [in the subsidiary] specifically designed to financially reward the service provider if future environmental cash outflows are reduced (which indirectly increases the value of [the subsidiary's stock]."  NL would also share in any cost savings that the service providers were able to achieve by virtue of its own equity interest in the special purpose subsidiary.

64.    In or about June 1998, NL EMS was identified by NL as the special purpose entity selected to effect this restructuring plan.  NL and Deloitte identified 47 sites at which NL had been named as a defendant or PRP, with the intent of assigning certain defined liabilities associated with those sites to NL EMS for purpose of the restructuring.

## III.    Identification of Potential Third-Party Investors

65.    From at least February through May of 1998, NL conducted an extensive search process to identify qualified environmental service providers who were willing to invest in NL

EMS, and who were also capable of managing the assigned environmental liabilities.   NL determined that to manage these transferred liabilities most effectively, it was necessary to find equity investors who collectively had expertise in both environmental litigation management and in the technical aspects of environmental project management and remediation.

66.     On or about February 17, 1998, NL evaluated proposals submitted by numerous environmental consulting candidates, including well-known companies such as Bechtel, Fluor Daniel, AIG, Radian, and Woodward-Clyde, with respect to the technical aspects of environmental project management and remediation (including negotiation of the technical aspects of anticipated clean-up, remediation work, and management and oversight of the contaminated sites).   NL elected not to accept any of these proposals.

67.     On or about February 24, 1998, IRCC was identified as a possible investor in NL EMS.   In early March 1998, IRCC, along with its affiliated company, Environmental Strategies Corporation ("Environmental Strategies"), initiated discussions with NL.   Like IRCC, Environmental Strategies was also founded by Plaintiff Murphy, and is one of the premier environmental remediation service providers in the United States.   On or about March 26, 1998, IRCC and Environmental Strategies submitted a formal proposal to NL for participation in the new special purpose subsidiary.   NL ultimately selected IRCC and Environmental Strategies to be an investor and technical support service provider, respectively, to NL EMS.

68.     In or about February 1998, NL also offered Plaintiff Casey and his company, Efficasey (then known as Casey & Young), with an opportunity to invest in NL EMS and to help manage its environmental liabilities.   In 1990, Kronos had hired Casey as an employee to serve as one of its senior environmental engineers.   Beginning in 1996, Casey was assigned responsibility within NL for managing many of the same legacy liabilities that NL intended to

transfer to NL EMS.   Casey had a detailed institutional understanding of the approaches and strategies that NL had previously taken to address these sites.   NL, citing Casey's familiarity with some of the environmental sites and his demonstrated skills and experience in effectively managing those sites, asked Casey to participate in NL EMS as an investor and technical service provider.

69.     In addition, in or about February 1998, NL also solicited proposals from different candidates for the management of legal and other aspects of servicing NL EMS's liabilities. Bartlit Beck submitted a proposal, which NL ultimately did not accept.   NL thereafter approached Plaintiff Martin individually, and inquired whether he would be interested in becoming an investor and a service provider responsible for litigation management.   After obtaining written permission from Bartlit Beck on March 12, 1998 to proceed individually, Martin submitted a formal proposal to NL.   NL ultimately accepted Martin's proposal to become an equity investor in NL EMS, and to manage the legal and other aspects of the NL EMS's assigned environmental liabilities.

## IV.   Negotiation of the Terms of Plaintiffs' Investment in NL EMS

70.     Pursuant to the overall restructuring plan, Plaintiffs agreed to become shareholders in two preferred classes of NL EMS securities.   NL represented to Plaintiffs that, as NL EMS's investors, Plaintiffs would be "rewarded based on the financial results of [NL EMS], not NL."   NL EMS's profitability depended in significant part on Plaintiffs' ability to manage the environmental liabilities assumed by NL EMS at less than the value of the assets contributed to NL EMS.

71.     Between approximately March and May of 1998, Plaintiffs and NL negotiated and agreed upon four critical terms of the NL EMS transaction:   (1) the exact liabilities that NL would assign to NL EMS; (2) the specific assets that would be contributed to NL EMS; (3) the

terms of Plaintiffs' right of redeeming their equity interest in NL EMS, and the methodology for valuing Plaintiffs' shares upon redemption; and (4) NL EMS's entitlement to tax deductions associated with its environmental expenses.

**A.  Valuation of Assumed Liabilities**

72.     All parties viewed a precise estimate of the likely future costs of managing the environmental liabilities assumed by NL EMS, and the likely future value of NL EMS's assets, to be essential to determining the financial risks and potential benefits of the transaction.  These estimates would establish a series of benchmarks (colloquially referred to as the "bogey") by which cost savings — and of any increase in NL EMS's equity — would, in the aggregate, be measured.

73.     IRCC stated in its March 1998 proposal to NL that "[b]ecause the NAV [*i.e.*, net asset value] of the sites in [NL EMS] is so critical to the success of the business purpose, IRCC will need to verify the accuracy of the liability estimates and fully understand their basis." IRCC's proposal further stated, "[w]e believe that a solid baseline of costs must be established for each site in order to effectively evaluate the NAV of [NL EMS] in future years."  "Therefore in establishing the NAV, we believe the basis for the liability estimates should be identified up front and agreed to by all parties."

74.     NL also agreed that the valuation was critical to establishing the standard by which savings and future equity value would be measured.  As NL stated, a proper cost estimate was "[c]ritical to the economics of the transaction because the valuation of the contingent environmental liabilities sets the standard by which the service providers' equity stakes will be measured."

75.     All parties also believed that it was essential to agree upon and identify with painstaking precision the exact environmental liabilities that were being assumed by NL EMS, as

well as the specific actions that NL EMS was expected to take consistent with the precise definition of these liabilities. As IRCC stated in its proposal to NL, "[t]he estimated environmental liabilities must be based on specific action items such as conducting an investigation and implementing a certain type of remedial technology. This will enable all parties to accurately measure the progress made in addressing a site as well as the cost savings achieved over time."

76.     The restructuring proposal also contemplated that NL EMS would be responsible for certain "environmental monitoring costs." "Monitoring" is a term that NL began using in 1997, and refers to certain legal and "in house" management costs associated with tracking and reviewing the progress of the remediation of environmental sites, such as an evaluation of the remedial action required for a particular site, or determining the proper allocation of costs among PRPs.

77.     In light of these concerns, two steps were taken by the parties. First, starting on or around March 15, 1998, with NL's approval, Plaintiffs engaged in extensive due diligence in order to independently assess the environmental liabilities that would be assumed by NL EMS. Second, all parties agreed it was vital to commission a rigorous, impartial evaluation by a reputable accounting firm of the estimated cost of the liabilities that were to be transferred to NL EMS. NL had accounting reserves for the contingent liabilities that were based on historical information developed by NL over several years and had been reviewed by its regular auditors, Coopers & Lybrand (now PricewaterhouseCoopers). However, all parties agreed that it was appropriate to seek an independent, outside opinion from Deloitte regarding the estimated cost of managing the assumed environmental liabilities. Accordingly, a team of Deloitte environmental

valuation experts engaged in an independent expert analysis of the estimated cost of the NL's contingent environmental liabilities.

78.     On May 19, 1998, Deloitte issued a draft report entitled *NL Industries, Inc.:  A Cost Evaluation of Certain Environmental Matters* (hereinafter referred to as the "Deloitte Valuation Report").  For each of the 47 sites for which liabilities would be transferred to NL EMS, the Deloitte Valuation Report provided Deloitte's expert opinion, based on its own extensive file and site reviews, as to the "reasonable range" of costs (undiscounted to present value) that would be required to resolve the defined environmental liabilities.  Taking all 47 sites together, the Deloitte Valuation Report's range for the expected future costs of managing the environmental liabilities assumed by NL EMS was between $76.7 million and $135.5 million. NL delivered the Deloitte Valuation Report to Plaintiffs as part of the negotiation process and offered it to them as an inducement to participate in the transaction.

79.     These negotiations culminated in the Exchange, Subscription, Assignment, and Assumption Agreement (dated June 1, 1998) (hereinafter referred to as the "Assignment Agreement") pursuant to which NL executed the transfer of assets and liabilities to NL EMS. The Assignment Agreement contains the parties' agreed list of NL EMS's assumed environmental liabilities.  For each site, the Assignment Agreement precisely identifies the specific environmental liabilities assumed by NL EMS, and the specific activities that NL EMS is responsible for in relation to those specified liabilities.  Ultimately, all parties agreed that the environmental liabilities and monitoring responsibilities assumed by NL EMS from NL would require an estimated $135.1 million in gross payouts over the period from June 1, 1998 to the year 2030.   The parties' estimated amount was within the valuation range of the Deloitte

Valuation Report.  The parties also agreed on a cash flow analysis detailing exactly how much NL EMS would be expected to pay to manage these environmental liabilities in each future year.

**B.      Contribution of Assets to NL EMS**

80.      Having established an estimate for NL EMS's future cash outflows, the parties proceeded to negotiate the exact amount of assets that would be contributed by NL to NL EMS to effectuate the restructuring.  The parties agreed that the amount of assets to be contributed by NL should be approximately equal to the present value of NL EMS's estimated future environmental expenses of $135.1 million.  The parties agreed on a contribution of $104.2 million in assets — an amount equal to the $135.1 million in estimated future expenses discounted at an agreed-upon discount rate of 7.2%.  Exhibit B-1 to the Assignment Agreement states that $104.2 million "[r]epresents the present value of all contingent liabilities, as these assets will be used to fund the liabilities."  Thus, at the commencement of the restructuring plan, NL EMS's net asset value would initially be basically zero, and would increase in so far as Plaintiffs succeeded in achieving cost savings or in increasing the value of NL EMS's assets.

81.      As described further herein, the $104.2 million in assets consisted of (1) approximately $92.66 million in liquid assets in the form of cash and a note receivable from NL that paid interest of 7.65% annually; (2) 1,186,200 shares of Valhi's publicly traded common stock, with a market value as of June 1998 of $11,639,588; and (3) three parcels of real property, which together constituted approximately 140 acres of an approximately 410-acre waterfront site at the mouth of the Raritan River in the Borough of Sayreville, Middlesex County, New Jersey (the "Sayreville property").

**1.      Cash**

82.      NL EMS planned to invest a substantial portion of the $92.66 million in liquid assets in certain fixed income investments, including loans to entities within the Simmons

Enterprise.  After the consummation of the NL EMS transaction, NL EMS entered into a number of such loan agreements, including but not limited to the following:

83.     In May 2001, a wholly owned subsidiary of NL EMS loaned $20 million to the Harold C. Simmons Family Trust No. 2, under a $25 million revolving credit agreement, collateralized by 13,749 shares, or approximately 35%, of Contran's outstanding Class A voting common stock and 5,000 shares, or 100%, of Contran's Series E Cumulative preferred stock, both of which are owned by the Trust.

84.     In the first quarter of 2001, NL EMS loaned $13.4 million to Tremont, which held 21% of NL's outstanding common stock at September 30, 2001, under a reducing revolving loan agreement.  The loan bore interest at prime plus 2% (or 8.0% as of September 30, 2001), and was collateralized by 10.2 million shares of NL common stock owned by Tremont.

85.     On December 2, 2002, NL EMS loaned $51.0 million to Kronos under a $55 million revolving credit agreement.  The loan bore interest at U.S. LIBOR plus 1.75% (or 3.5% at December 31, 2002), and was due on December 31, 2005.  An additional $8 million was loaned to Kronos in the first quarter of 2003 under this credit agreement.

86.     At some time prior to 2004, NL EMS entered into a $30 million revolving loan agreement with NL.  The loan facility bore interest at U.S. LIBOR plus 1.75% (or 2.92% as of December 31, 2003).  NL borrowed $22.3 million under the revolving agreement, which was repaid during 2004.

### 2.     Valhi Common Stock

87.     NL also contributed 1,186,200 shares of Valhi common stock to NL EMS with a market value in June 1998 of approximately $11.64 million.   These shares were to be sold if NL EMS required additional liquidity to pay for the assumed environmental expenses.  If the Valhi shares remained unsold upon redemption of Plaintiffs' Class D and Class E shares, the Restated

41

Certificate provides that the market value of the unsold Valhi shares shall be counted toward the net asset value of NL EMS for purposes of valuing Plaintiffs' shares, subject to a collar of no less than 80% and no more than 120% of the June 1998 market price, as increased by an annual rate of return of 6.4%.

### 3.    Sayreville Property

88.    The Sayreville property was the only parcel of real property that NL transferred to NL EMS, because the other assumed environmental liabilities were associated with properties that NL no longer (or never) owned.  Specifically, NL transferred three parcels — Lots 1, 4, 5, and 6 of Block 257.01 and approximately 25 acres on the southern end of Block 257.02, Lot 1 — consisting of approximately 140 acres of a 410-acre site owned by NL, the metes and bounds of which are fully described in Exhibit A of the Assignment Agreement.  The Assignment Agreement states that NL EMS was given "all of the beneficial interest in and economic rights in and to such assets."  In Exhibit B-2 of the same Assignment Agreement, NL also transferred to NL EMS certain enumerated "[a]ssumed [l]iabilities" associated with the "[a]ssigned real property."  These environmental liabilities stemmed from NL's operation of a titanium dioxide production facility on that site from 1935 until 1982.

89.    In the negotiations leading up to the formation of NL EMS, NL believed the fair market value of the Sayreville parcels (taking into account the cost of remediating environmental liabilities) was close to zero, and it was effectively willing to "give away" the 140-acre portion of the Sayreville site to NL EMS rather than contribute additional cash or securities to NL EMS in order to fund the future payments associated with the transferred environmental liabilities. The Sayreville parcels were thus essentially treated as a "wash" in the NL EMS transaction, and they were considered a modest net liability in arriving at the $104.2 million in assets that were transferred to NL EMS.

### C.    Plaintiffs' Rights Upon Redemption of Their Preferred Shares

90.    One of the significant issues in the negotiations over Plaintiffs' investment in NL EMS concerned the ability of Plaintiffs to be able to realize the cash value of their interest in NL EMS's future equity value, and the methodology by which that equity interest would be calculated.  The Restated Certificate provides that Plaintiffs' Class D and Class E shares shall be subject to redemption by NL EMS as of June 1, 2003, and by Plaintiffs as of June 1, 2005.  The Restated Certificate also sets forth a precise formula for valuing Plaintiffs' shares upon redemption.  After paying to the preferred shareholders any accumulated and unpaid dividends and the par value of their preferred shares, the Plaintiffs shall receive the "Formula Value," which is defined as the Class D and Class E shareholders' respective percentage shares (totaling 39%) of the "Current Corporation Value."  The Current Corporation Value, in turn, is defined as "Gross Assets of the Corporation (as hereinafter defined) as determined as of the business day preceding the Measurement Date, less the present value of the remaining Liabilities (as hereinafter defined) as determined as of the most recent quarter preceding the Measurement Date."  The Measurement Date later became June 29, 2005, the date preceding the effective date of Plaintiffs' subsequent redemption of their shares.

91.    The Restated Certificate defines Gross Assets to mean: (1) "the aggregate amount of cash and cash equivalents owned by the Corporation;" plus, (2) the "fair market value" of the Valhi common stock, subject to the "collar" limiting its value to no less than 80% and no more than 120% of the market price the Valhi shares would have had, assuming a 6.4% annual return from the date of issuance of the preferred shares to Plaintiffs; plus, (3) the fair market value of any other assets of NL EMS, including the NL EMS portion of the Sayreville property.

92.    For purposes of calculating the Current Corporation Value according to the terms of the Restated Certificate, the present value of NL EMS's remaining Liabilities must be

43

computed using "the same methodology and assumptions used in the NL EMS, Inc. Cash Flow Analysis dated the date of the first issuance of [Plaintiffs' preferred shares]."

93.    All parties agreed in the negotiations that using the "same methodology and assumptions" to value NL EMS's remaining Liabilities was essential to ensure that Plaintiffs did in fact "share in 39% of [NL] EMS' cumulative earnings."  As IRCC stated in its proposal to NL, "[t]his [same methodological] approach must also be used to calculate the NAV when [NL EMS] is liquidated."

### D.    The Federal Income Tax Treatment of NL EMS

#### 1.    NL EMS Entitlement to Tax Deductions

94.    Pursuant to the restructuring plan put forth by NL, NL EMS was to be a separate company, with separate legal obligations, a separately constituted Board of Directors, and separate officers.  According to NL's January 1998 presentation, because NL "own[ed] less than 80% of [NL EMS]," NL EMS was deemed a separate, deconsolidated company for federal tax purposes.  Among other things, for example, NL EMS had a separate obligation to file corporate income tax returns.  In contrast, NL and Valhi are both part of the "Contran consolidated tax group" because Contran directly or indirectly controls more than 80% of each company.

95.    The NL EMS transaction was carefully structured so as to preserve NL EMS's status as a separate tax entity.  When NL EMS contractually assumed the defined environmental liabilities from NL, NL EMS became obligated to pay the costs of resolving those assigned environmental liabilities.  Under the applicable tax laws, the contractual transfer of liabilities also entitled NL EMS to take income tax deductions for the costs it paid, and to use those deductions to offset investment income on its assets.  As NL represented in its January 1998 presentation:   "The environmental and legal expenditures incurred by NL EMS are tax deductible as payments are made.  Because NL and NL EMS, Inc. are not consolidated for tax

purposes, these payments are not tax deductible by NL."  To the extent NL EMS incurred deductible expenses in excess of its investment income in any given year, the excess deductions would constitute net operating losses ("NOLs"), a valuable tax asset of the company, which could be carried forward and used to offset future income of NL EMS.

### 2.    Tax Benefit To NL

96.    Under applicable internal revenue laws in effect at the time, and based on the IRS's own public pronouncements, including IRS Revenue Rule 95-74, 1995-2 C.B. 36, NL was entitled to take a capital loss of $114.5 million for the 1998 tax year due to the assignment of its contingent environmental liabilities to NL EMS and the sale by one of its subsidiaries (NL Capital) of its NL EMS Class D Preferred stock to IRCC.  (A contingent liability is one that is not yet fixed but depends on an uncertain event, such as the settlement of a lawsuit.)  NL sought to use the capital loss deduction resulting from NL Capital's sale of the Class D shares to IRCC to offset part of the approximately $280 million capital gain that resulted from NL's January 1998 sale of the net assets of its Rheox subsidiary to Elementis Specialties for $465 million. Elementis Specialties is a division of Elementis plc (f/k/a Harrisons and Crosfield, plc) and is headquartered in Jersey City, New Jersey.

97.    Between approximately March 1998 and May 1998, NL and its agents and officers, including Defendant Hardy, repeatedly represented to Plaintiffs that the tax consequences to NL resulting from this transaction were irrelevant to NL EMS, and therefore irrelevant to Plaintiffs.  In particular, Defendant Hardy, as well as other senior officers of NL, repeatedly and consistently represented to Plaintiffs in various meetings and interstate telephone calls that NL assumed the risk of any challenge to its capital loss deduction.  NL EMS's ability to claim the tax deductions associated with the expenses it incurred to manage the environmental

liabilities it assumed from NL was not expressly or impliedly conditioned on NL's ability to obtain the contemplated capital loss.

## V.    Plaintiffs' Investment in NL EMS

98.    The NL EMS transaction, as generally described above, was approved by the NL Board of Directors, including Defendants Simmons and Watson, on May 6, 1998.

99.    On June 1, 1998, Plaintiffs Highland Environmental and Efficasey purchased 1,280 shares and 640 shares, respectively, of NL EMS's Class E Preferred shares, for $128,000, and $64,000, respectively, in cash and other consideration.  Pursuant to the Restated Certificate, Highland Environmental's 1,280 Class E shares entitle it to 16% of the Current Corporation Value of NL EMS upon redemption.  Efficasey's 640 Class E shares entitle it to 8% of NL EMS's Current Corporation Value upon redemption.  Plaintiffs Martin and Casey were appointed to serve as Class E directors of NL EMS by Highland Environmental and Efficasey, respectively.  On June 15, 1998, by vote of the NL EMS Board, each was elected a Vice President of NL EMS.

100.    On June 4, 1998, Plaintiff IRCC purchased all of NL EMS's Class D Preferred shares from NL Capital for $125,000.  Pursuant to the Restated Certificate, IRCC's Class D Preferred shares entitle it to 15% of NL EMS's Current Corporation Value upon redemption.  The same day, Plaintiff Murphy was appointed by IRCC as NL EMS's Class D Director.  Plaintiff Murphy was also elected a Vice President of NL EMS by the NL EMS Board on June 15, 1998.

101.    The capital investment made by the Shareholder Plaintiffs reflected NL EMS's low net asset value at the time of the transaction.  Pursuant to the valuation formula in the Restated Certificate, Plaintiffs expected to receive 39% of any aggregate cost savings they achieved relative to the $135.1 million projection for future environmental expenditures, and

39% of any aggregate increase in the value of NL EMS's assets beyond the projected rate of return.

<strong>PLAINTIFFS' WORK ON BEHALF OF NL EMS</strong>

102.    For the next seven years, Plaintiffs made extraordinary efforts on behalf of NL EMS. Plaintiff Martin resigned his partnership at Bartlit Beck and, having invested a substantial amount of his net worth into his NL EMS shares, doggedly pursued the successful and cost-effective resolution of many of NL EMS's assumed environmental liabilities, with the expectation that he would share in approximately 16% of any cost savings he achieved on behalf of NL EMS. To reduce NL EMS's monitoring costs, Plaintiff Martin transferred some cases from NL EMS's existing high-priced outside counsel to other outside counsel willing to work under less costly fee arrangements. He made decisions to settle certain cases rather than incur additional legal fees and expenses. Moreover, Martin wound up personally managing dozens of environmental lawsuits, crisscrossing the United States on behalf of NL EMS in an effort to reduce the expenses associated with NL EMS's environmental liabilities.

103.    Having given up his secure employment with NL and Kronos, and having invested a substantial amount of his net worth into his ownership of NL EMS's Class E Preferred shares Plaintiff Casey undertook the enormously difficult task of managing the technical aspects of NL EMS's assumed environmental liabilities. Likewise, Plaintiffs Murphy, IRCC, Environmental Strategies, and their employees devoted substantial time and expertise to assisting Casey and Martin on how to pursue the most cost effective approaches to managing the environmental liabilities assumed by NL EMS.

104.    In ongoing reliance on NL's representations that Plaintiffs would "share in 39% of [NL EMS's] cumulative earnings" and that they would be "rewarded based on the financial results of [NL EMS], not NL," Plaintiffs devoted tens of thousands of professional hours

between 1998 and 2005 to the management, cost effective investigation, and remediation of the environmental liabilities that NL EMS assumed.

105.    The approached worked.  Plaintiffs were extremely effective in managing the costs of NL EMS's assumed environmental liabilities, in spite of the enormous risks and uncertainties inherent in managing environmental liabilities.  As NL itself has acknowledged in submissions to the SEC and the IRS, as set forth below, Plaintiffs' initiative and efforts led to a dramatic reduction in the financial costs of managing NL's environmental liabilities.  The following sets forth a non-exclusive list of examples where Plaintiffs' efforts led to substantial cost savings for NL EMS and therefore to an increase in the equity value of NL EMS:

A.    *Lipari Landfill (Mantua, New Jersey)*

106.    NL EMS was assigned NL's liability for claims asserted against it as a third-party defendant in a then-pending environmental lawsuit brought by the United States Department of Justice ("DOJ") and the State of New Jersey under CERCLA, regarding the Lipari Landfill in Mantua Township, Gloucester County, New Jersey.  Over the course of nearly 15 years, from 1958 to 1971, the Lipari Landfill had accepted chemical wastes and other industrial materials, and it was ranked No.1 on the EPA's National Priorities List for Superfund sites — a list of the worst hazardous waste sites in the United States.  The DOJ estimated that the total clean-up cost exceeded $140 million.  The primary defendants in the DOJ case, Owens-Illinois, Inc., and Rohm & Haas Company, sought a contribution of nearly $20 million from NL.  Despite this $20 million demand, NL's "bogey" was only $2.5 million, thus creating significant exposure on the part of NL EMS and, correspondingly, significant risk to Plaintiffs' shareholder equity.  Nevertheless, Plaintiff Martin, with the assistance of the other Plaintiffs, litigated the case tenaciously, refusing to accede even to a $3 million settlement.  Ultimately, after a lengthy bench trial, Plaintiff Martin and his legal team, with advice and assistance from Plaintiffs Murphy and

Casey, secured a total victory for NL EMS before the Honorable Joseph H. Rodriguez of the United States District Court for the District of New Jersey, which was affirmed on appeal by the United States Court of Appeals for the Third Circuit. *See United States v. Rohm & Haas Co.*, 47 Fed. Appx. 125 (3d Cir. 2002). NL EMS's outstanding liabilities therefore were reduced by $2.5 million, of which 39% should have been included in the equity value of Plaintiffs' minority shares of NL EMS.

   B.    *Pedricktown Superfund Site (Pedricktown, New Jersey)*

107.    NL was assigned certain liabilities belonging to NL with respect to the Pedricktown Superfund Site, located at Pennsgrove-Pedricktown Road, in Pedricktown, Oldmans Township, Salem County, New Jersey — a 44-acre site consisting of a closed landfill and a secondary lead smelting facility which, until 1984, recovered lead from spent automotive batteries. The DOJ's estimate of the clean-up for the site was more than $21 million. The parties' estimate of the cost to resolve NL EMS's contractually assumed liabilities associated with that site was $14.1 million. However, Plaintiffs were able to negotiate a settlement whereby a small handful of other PRPs agreed to perform the clean-up. NL EMS paid $6 million, which included NL's liability of $2.5 million for stream sediment removal action, which was not a liability assigned to NL EMS. This settlement alone resulted in cost savings to NL EMS, and the reduction of NL EMS's outstanding environmental liabilities, of at least $11.6 million.

   C.    *Pedricktown Landfill (Pedricktown, New Jersey)*

108.    The Pedricktown Landfill, which is adjacent to the Pedricktown Superfund site, was a separate liability assumed by NL EMS. The principal cost to NL EMS was the expense of engaging a contractor to operate and maintain the landfill, and the expense of disposing of hazardous leachate generated by the landfill. Since NL EMS's inception in June 1998, Plaintiffs have achieved significant cost savings related to the landfill. Overall monthly average costs for

the Pedricktown Landfill have declined significantly since 1998, resulting in significant cost savings to NL EMS over a seven year period.

### D.  *Cherokee County Superfund Site (Kansas)*

109.  NL EMS assumed certain environmental liabilities associated with the Cherokee County Superfund Site located in the extreme southeast portion of the State of Kansas near the Missouri and Oklahoma borders.  The site is part of an inactive lead and zinc mining area known as the Tri-State Mining District.  NL EMS assumed responsibility for monitoring and remediation of a portion of the Cherokee site known as the Baxter Springs subsite.  In June 1998, the parties agreed to a "bogey" of $5.302 million for NL EMS's assumed portion of the clean-up. As a result of Plaintiffs' efficient project management, NL EMS was able to fulfill its assumed environmental obligations for the site for approximately $3.5 million, thus creating equity value to NL EMS in the amount of approximately $1.8 million (and increasing Plaintiffs' shareholder value by approximately $700,000).

### E.  *New Jersey Transit Site (Matawan, New Jersey)*

110.  The New Jersey Transit ("NJT") site, located in Matawan, Aberedeen Township, Monmouth County, New Jersey, is a former secondary lead smelter currently owned by the New Jersey Transit Authority ("NJTA") and is currently being used as an electrical substation for their commuter train line.  As part of a settlement between NL and the NJTA in 1994, NL agreed in a Memorandum of Understanding with the New Jersey Department of Environmental Protection to perform a remedial investigation and feasibility study for the NJT Site.  The "bogey" for completing the study was $150,000.  Plaintiffs were able to complete the study for less than the expected cost.

F.      *NL/Taracorp Superfund Site (Granite City, Illinois)*

111.   NL EMS assumed NL's liabilities in a lawsuit brought by the United States relating to the NL/Taracorp Superfund Site in Granite City, Illinois, where NL had operated a secondary lead smelter from the turn of the century until 1979.  The "bogey" for the Granite City site was $30 million (roughly one-third of the overall environmental liabilities assigned to NL EMS).  In 1999, Plaintiffs agreed in principle with the Justice Department to settle the lawsuit for slightly above the "bogey" — $29.8 million to the Superfund to reimburse cleanup costs incurred by the government at the site plus an additional $1 million in civil penalties.  However, for various reasons the government did not finalize the settlement for over three years, during which time NL EMS continued to earn income on the settlement funds.  Plaintiff Martin successfully rebutted the government's claim that it was entitled to interest from NL EMS going back to 1999, which resulted in NL EMS being able to retain investment income of approximately $7 million over the three year period.

DEFENDANTS' SCHEME TO DEFRAUD PLAINTIFFS

112.   By about 2002, Plaintiffs' efforts in managing NL EMS's environmental liabilities since 1998 had generated at least $30 million in cost savings in comparison to the parties' original estimates.  Defendants also came to realize that the Sayreville property, which NL had estimated at the time of the NL EMS transaction to have minimal fair market value (after taking into consideration necessary remedial costs), was valued at considerably more than the estimated cost of environmental liabilities associated with it.   Under the provisions of the Restated Certificate, NL EMS could, as early as June 2005, be required to make payments, in cash, to Plaintiffs in the amount of their 39% equity interest in NL EMS.  Defendants thus came to understand that it was likely that Plaintiffs' 39% interest was going to be valued at tens of millions of dollars.  The Simmons Enterprise was thus facing a multi-million cash outlay upon

redemption of Plaintiffs' shares.   Moreover, by this time, a substantial portion of the environmental liabilities transferred to NL EMS had already been resolved, and NL had therefore already reaped most of the economic benefit from Plaintiffs' management of those liabilities.

113.   In addition, in or about early 2002, the IRS initiated an audit into the $114.5 million capital loss deduction claimed by NL on its 1998 income tax return.   The tax audit threatened to eliminate one of the most significant benefits that NL had sought from the NL EMS restructuring, namely, the avoidance of more than $40 million of federal income tax liability arising from the sale of NL's Rheox subsidiary in January 1998.   Defendants understood that the IRS audit could potentially result in NL's being assessed a tax deficiency to the IRS for as much as $40 million, plus interest and penalties under applicable federal tax laws and IRS regulations.

114.   Beginning at a time unknown to Plaintiffs, but no later than December 2002, Defendants realized that the NL EMS transaction that they had architected had turned out to be a significant error in business judgment.   Under the terms of the Restated Certificate, Plaintiffs stood to receive a cash payment amounting to tens of millions of dollars upon redemption of their shares, while the Simmons Enterprise was facing significant cash payments to the IRS as well as to Plaintiffs.   Defendants thus conspired to devise and execute a scheme and artifice to unlawfully defraud Plaintiffs and to obtain their money and property by fraudulently diverting most of the equity value of NL EMS to the Simmons Enterprise.   As described more fully below, the Defendants identified herein executed this unlawful scheme by, among other things, engaging in fraudulent financial and accounting transactions that unlawfully transferred assets from NL EMS to the Simmons Enterprise; they concealed these defalcations from Plaintiffs by refusing to provide Plaintiffs with timely, complete, and truthful information concerning the

financial and operational performance of NL EMS; and they thereby deprived Plaintiffs of the full value of their Class D and Class E shares.

I.      **The IRS's Challenge To NL's Capital Loss Deduction**

115.    As part of this scheme and artifice to defraud, Defendants Lindquist, Hardy, and Luttmer unlawfully entered into negotiations and an eventual settlement involving the IRS that effectively stripped NL EMS of the income tax deductions to which it was entitled by virtue of the payment, out of its own assets, of expenses associated with the environmental liabilities assumed from NL.  Once the IRS audit placed NL's 1998 capital loss deduction in jeopardy, Defendants Simmons, Lindquist, Watson, Hardy, Luttmer, and others concluded that, from a tax perspective, NL would be better off claiming for itself the tax deductions that NL EMS had claimed arising from the payments it made to manage the environmental liabilities assumed from NL.  Because NL and NL EMS were not consolidated for federal income tax purposes, these Defendants agreed to cause NL EMS to enter into sham and unlawful agreements designed to strip valuable tax benefits from NL EMS so that they could be used by NL to reduce its own taxable income for the benefit of the Simmons Enterprise and to the detriment of Plaintiffs and NL EMS.

A.      **The IRS Audit of NL's Capital Loss Deduction**

116.    On January 18, 2001, the IRS published Notice 2001-17, which announced that the IRS intended to challenge a broad array of transactions involving capital losses for contingent liabilities, including contingent environmental liabilities.  The Notice indicated that the IRS intended to "disallow losses claimed by the transferor [of the contingent liabilities] with respect to these transactions" on a variety of possible grounds.  The Notice also raised the possibility that the income tax deductions of the transferee company might be disallowed "depending on the facts of the particular case."

117.    In early 2002, NL became the subject of a tax audit by the IRS.  In that audit, the IRS challenged the $114.5 million capital loss reported by NL on its 1998 tax return, arising from the sale of NL EMS's Class D shares to IRCC.  Based in part on advice from Deloitte, NL believed from the outset of the transaction that it was entitled under the federal tax laws to take the capital loss deduction.  However, the IRS's audit sought to disallow the capital loss deduction and to impose a substantial tax deficiency on NL.  In response, NL retained Morrison & Foerster in February 2002 to represent NL in connection with the IRS's tax audit.

118.    In October 2002, the IRS published Revenue Procedure 2002-67, which established various procedures pertaining to the types of contingent liability transactions described in Notice 2001-17.  Among them was a Fast Track Dispute Resolution Procedure that, in general terms, calls for expedited, mediated settlement negotiations between the taxpayer and the IRS, followed by binding arbitration, if necessary.   In December 2002, NL elected to enter into the Fast Track Dispute Resolution Procedure.

### B.    Inclusion of NL EMS in the IRS Audit

119.    In or about December 2002, the precise time being unknown to Plaintiffs, the IRS's tax audit was expanded to include the 1998 federal tax return of NL EMS.  Because NL EMS was not part of NL's consolidated tax group, it was treated as a separate entity for tax purposes and separate action was needed to cause NL EMS to become subject to the IRS audit.  As of the filing of this Complaint, all Defendants have consistently refused to disclose to Plaintiffs the circumstances under which the IRS audit came to include NL EMS.

120.    In or around December 2002, as a direct or indirect result of the actions of Defendant Hardy and Lindquist, Morrison & Foerster, and possibly Defendant Luttmer and others, NL EMS was included in NL's negotiations with the IRS pursuant to the Fast Track Dispute Resolution Procedure.  These actions were taken without the knowledge or consent of

and without disclosure to Plaintiffs or the Board of Directors of NL EMS, in violation of the fiduciary duties imposed by applicable New Jersey law.

121.    Specifically, on December 16, 2002, Defendant Hardy, acting in his capacity as NL EMS's Treasurer, signed an engagement letter purportedly on behalf of NL EMS to retain Morrison & Foerster to represent NL EMS's interests, in addition to those of NL, in the IRS audit of NL and NL EMS's 1998 federal income tax return.  On or about December 16, 2002, Defendant Hardy, inaccurately claiming the title of NL EMS's Vice President and Chief Financial Officer, also delivered to Morrison & Foerster a signed IRS Form 2848, entitled "Power of Attorney and Declaration of Representative," which purported to give Morrison & Foerster authority to represent NL EMS with respect to NL EMS's "U.S. Corporate Income Tax," IRS Form 1120, for the period "12-31-98."  Defendant Hardy executed the Power of Attorney knowing that it would be delivered to the IRS, and would cause the IRS to erroneously conclude that NL EMS and its minority shareholders had consented to engage Morrison & Foerster to represent NL EMS in the tax proceeding.

122.    Also on December 16, 2002, Defendant Hardy caused NL EMS to enter into a Joint Defense Cooperation and Confidentiality Agreement (hereinafter "Joint Defense Agreement") with NL and Valhi.  The agreement was signed on behalf of Valhi by Defendant Lindquist in his capacity as Senior Vice President, by Defendant Hardy on behalf of NL EMS, and by a senior NL officer on behalf of NL.  The Joint Defense Agreement allowed the sharing of NL EMS's confidential business information with NL and Valhi, based on a perceived common interest among the parties.  The Joint Defense Agreement falsely represents that "[e]ach Party . . . sought and obtained the legal advice it deems necessary from its own *separate* counsel," when in fact NL EMS did not have counsel separate from NL's.  In addition Defendant

Hardy recognized that there was an inherent conflict between the interests of NL and NL EMS, in connection with the tax proceeding, and, by executing this agreement, purported to cause NL EMS to waive any conflict of interest that existed.  Defendant Hardy had no authorization from the Board of Directors to effect any such waiver of NL EMS's right to conflict-free representation in the settlement discussions with the IRS.

123.    These actions by Defendant Hardy constituted a blatant violation of his fiduciary duty to NL EMS and Plaintiffs under applicable New Jersey law in that Defendant Hardy intentionally undermined NL EMS's interests in the IRS tax audit for the purpose of advancing the interests of NL and other entities within the Simmons Enterprise.  After NL EMS's tax return was included in the IRS audit, Defendants Hardy, Lindquist, and others caused NL EMS's tax position — in particular, its entitlement to tax deductions — to be compromised for the benefit of NL.  Defendants Hardy and Lindquist, as well as Morrison & Foerster, failed to adequately represent NL EMS's separate interests in the tax proceeding because they were advancing the interests of the Simmons Enterprise.  Defendant Hardy's engagement of Morrison & Foerster to simultaneously represent NL and NL EMS, and his decision to enter into the Joint Defense Agreement on NL EMS's behalf thus deprived NL EMS of an advocate with undivided loyalty to the interests of NL EMS, and enabled NL to use the Fast Track Dispute Resolution Procedure to advance its economic interests to the detriment of NL EMS.  For example, counsel with undivided loyalty to NL EMS would have taken the position, consistent with the agreement of the parties, that NL EMS was a separate taxable entity that had no outstanding tax liability to the IRS because it was entitled to claim deductions and carry forward net operating losses arising from the expenditures it made to manage the environmental liabilities assigned to it by NL.

124.    On or about January 22, 2003, at a meeting of the NL EMS Board of Directors, Defendant Hardy and the other NL officers involved in the IRS audit, in clear violation of the fiduciary duties imposed under New Jersey law, failed to make any disclosure of the facts and circumstances of the IRS audit.  Among other things, on or about January 22, 2003, Defendant Hardy and other NL officers failed to disclose to Plaintiffs or the NL EMS Board that the IRS audit was expanded to include a formal review of NL EMS's tax returns; that NL EMS had agreed to participate in the Fast Track Dispute Resolution Procedure along with NL; that NL EMS was represented by Morrison & Foerster, which was also serving as NL's counsel; or that NL EMS had entered into a Joint Defense Agreement with NL and Valhi.  None of these material facts was disclosed in the Board materials delivered to Plaintiffs by Federal Express on or about January 17, 2003.  Defendant Hardy and other NL officers similarly failed to ask the Board of Directors of NL EMS to ratify or approve any of these decisions.  The formal minutes of the Board meeting taken by NL EMS's Secretary confirm that no such disclosures were made.  NL EMS's Board of Directors was never asked to approve any waiver of Morrison & Foerster's conflicted representation of both NL and NL EMS.  On the contrary, between December 2002 and June 2005, Defendants Lindquist, Hardy, and the Director Defendants unlawfully concealed these matters from Plaintiffs in order to prevent Plaintiffs from discovering their efforts to strip NL EMS of valuable tax deductions and other assets.

## C.    Plaintiffs' Involvement as Fact Witnesses

125.    After NL elected to participate in the Fast Track Dispute Resolution Procedure, Defendant Hardy and another then-NL officer asked Plaintiffs Murphy, Martin, and Casey to assist NL by giving testimony to help NL defend against the IRS's challenge to its $114.5 million capital loss deduction.  Specifically, NL asked Plaintiffs to testify that NL EMS was a separate corporate entity, created through an arms-length negotiation between Plaintiffs and NL,

with a distinct and successful business purpose.  The purpose of eliciting this testimony from Plaintiffs was to support NL's legal position that NL EMS was a separate bona fide corporation with a legitimate business purpose, and that the capital loss deduction of NL was proper.  At no time did Defendant Hardy or any of the other Defendants disclose to Plaintiffs that the tax audit had been expanded to include an audit of NL EMS's 1998 federal income tax return.

126.    Between December 2002 and at least October 2003, as part of their scheme to defraud Plaintiffs by fraudulently stripping NL EMS of its assets and transferring them to the Simmons Enterprise, Defendant Hardy and others involved in the tax proceeding on behalf of NL made numerous false statements and material misrepresentations to Plaintiffs.  During Plaintiffs' preparations for their oral and written testimony to the IRS, Defendant Hardy, the NL EMS Board of Directors, and others falsely represented to Plaintiffs that the IRS proceeding was in substance limited to NL's 1998 capital loss, that NL EMS's tax position, and in particular its tax deductions, were not implicated in the IRS proceeding, and that the IRS proceeding would therefore have no financial effect whatsoever on NL EMS or the value of Plaintiffs' minority shares.  These fraudulent misrepresentations and material omissions were intended to prevent Plaintiffs from taking steps, such as seeking separate counsel for NL EMS, disclosing to the IRS that neither the NL EMS Board nor Plaintiffs had authorized NL or Morrison & Foerster to represent NL EMS in the tax proceeding, or otherwise seeking to disrupt the scheme and artifice to obtain NL EMS's tax deductions and other assets to which it was entitled as a bona fide corporation separate and independent from NL.

## II.    Unlawful Deprivation of NL EMS's Assets Through Fraudulent Tax Agreements

127.    As part of Defendants' scheme and artifice to defraud Plaintiffs and unlawfully to obtain their money and property, Defendants Lindquist, Graham and Luttmer, acting with the knowledge, approval, and substantial assistance of Defendants Simmons, Watson, Hardy and

possibly other Defendants, fraudulently caused NL EMS to enter into two tax agreements that significantly reduced the equity value of NL EMS.  First, in June 2004, Defendant Luttmer, purportedly acting in her capacity as Tax Director of NL EMS, signed a "Closing Agreement" with NL and the IRS, in which NL claimed for itself the right to take income tax deductions that, according to the terms of the NL EMS transaction, belonged to NL EMS.  The effect of this agreement was to deprive NL EMS of valuable assets, and impose uncompensated state and federal income tax liability, in the aggregate amount of $18.5 million.

128.   Second, on March 2005, Defendant Luttmer signed a sham "Tax Sharing Agreement" with NL on behalf of NL EMS, pursuant to which NL EMS became contractually obligated to pay for approximately $11.1 million of NL's previously incurred income taxes.  Defendants Lindquist, Luttmer, and Graham, acting on behalf of Contran, Valhi, and NL, caused NL EMS to enter into these agreements without notifying Plaintiffs, and without procuring separate representation for NL EMS, in violation of their fiduciary and other duties under federal and New Jersey law.  As alleged herein, various Defendants also fraudulently concealed these agreements from Plaintiffs through intentionally false and misleading statements regarding the nature of the IRS proceeding, made with the intent to prevent Plaintiffs from intervening in that proceeding to protect NL EMS's interests.  The objective of the scheme and artifice was to enrich the Simmons Enterprise by obtaining valuable tax deductions and other assets from NL EMS to offset NL's anticipated tax deficiency to the IRS arising from its capital loss deduction, and by avoiding payment to Plaintiffs of the full equity value of their NL EMS shares.

A.     **NL's Settlement with the IRS on Behalf of NL EMS**

129.   In February 2004, Defendants Lindquist and Hardy, accompanied by Morrison & Foerster, attended a settlement conference with the IRS.  At that conference, Defendants Hardy and Lindquist agreed in principle to the terms of a resolution of the IRS audit regarding NL's

capital loss.   As part of this agreement in principle, these Defendants, acting on behalf of Defendants NL and Contran, unlawfully caused NL EMS to agree to:  (i) allow NL to obtain the benefit all of NL EMS's net operating losses for the years 1998 through the effective date of the closing agreement; and (ii) incur additional tax liability of approximately $1 million that would otherwise have been borne by NL.

130.   In June 2004, Defendants Lindquist, Luttmer, and Hardy, and others unknown to Plaintiffs, caused NL EMS to sign a Closing Agreement with the IRS, NL, and Contran.  The Closing Agreement documented the terms of the settlement agreed to at the February 2004 meeting.   At the direction of Defendant Hardy, Defendant Luttmer signed the agreement on behalf of both NL and NL EMS, despite the obvious conflict between the two companies' interests, in breach of her fiduciary and other duties to NL EMS under applicable New Jersey law.  Defendant Lindquist executed the Closing Agreement on behalf of Contran.

131.   Defendant Luttmer holds the position of Tax Director in various companies in the Simmons Enterprise, including NL, Contran, and Valhi.   At the time of the February 2004 settlement conference with the IRS, Defendant Luttmer had never held any position with NL EMS and had never obtained authorization from NL EMS's Board to act on NL EMS's behalf.  On March 11, 2004, an employee in the Contran Tax Department faxed Plaintiffs a resolution appointing Defendant Luttmer as NL EMS Tax Director, backdated as of February 1, 2004.  In requesting this authorization, Defendants Contran, Hardy, Luttmer, and other NL officers intentionally refused to disclose and concealed the fact that Defendant Luttmer was actively involved in the Fast Track Dispute Resolution process by which Defendants sought to unlawfully divert for NL's benefit of tens of millions of dollars of valuable assets from NL EMS, in order to deprive Plaintiffs of the full value of their minority shares.

132.     At some point after June 2004, at a time unknown to Plaintiffs, the Closing Agreement was ratified by the Board of Directors of both NL and Contran, including Defendants Simmons, Watson, and Lindquist.  As part of Defendants' ongoing scheme to deprive Plaintiffs of the equity value of their NL EMS shares, the Closing Agreement was signed without the knowledge or approval or Plaintiffs, and without being first presented for approval by the NL EMS Board.

133.     Through their fraudulent misrepresentations and concealment of material facts from Plaintiffs, Defendants Lindquist, Hardy, Luttmer, and Graham, acting on behalf of and for the benefit of Contran, Valhi, and NL, unlawfully compromised NL EMS's interests in the tax audit, and caused NL EMS to agree to transfer to NL all of NL EMS's net operating losses ("NOLs") for the years 1998 through the effective date of the Closing Agreement.  These NOLs constituted valuable assets of NL EMS because they were income tax deductions that could be used in future years to offset other income that would otherwise be taxed at federal corporate income tax rates (currently 35%).  For the tax years covered by the Closing Agreement, NL calculated that NL EMS had NOLs of approximately $50 million.

134.     Through the Closing Agreement, NL unlawfully availed itself of these NOLs — with a value to the Simmons Enterprise of approximately $17.5 million in reduced federal income tax liability — without payment or other consideration to NL EMS.  In contrast, NL received a substantial benefit from stripping NL EMS of its NOLs, as it enabled to NL to offset a significant taxable gain in connection with its December 8, 2003 distribution of 49% of the outstanding common shares of Kronos to its shareholders — principally Valhi, which owned approximately 83% of NL's shares.  The Closing Agreement thus permitted NL to utilize NL EMS's NOLs to offset NL's capital gains, including those resulting from the Kronos distribution.

135.    The Closing Agreement also unlawfully allowed NL to misappropriate the value of NL EMS's income tax deductions for the time period after the effective date of the Closing Agreement to NL.  The effect of this provision was to deprive NL EMS of deductions needed to offset its investment income, which effectively caused NL EMS to bear, and allowed NL to avoid, additional state and federal income tax liability in an amount unknown, but believed to be approximately $1 million.

136.    In January 2005, the IRS gave final approval to the Closing Agreement, which became effective in or about March 2005.  The IRS was presumably unaware that (i) Defendants Lindquist, Hardy and Luttmer, as well as Morrison & Foerster, had negotiated the settlement agreement on behalf of NL EMS without notification to or authorization from the NL EMS Board and without any disclosure to Plaintiffs as NL EMS's minority shareholders and directors, in violation of Plaintiffs' rights as minority shareholders and directors under New Jersey law and in blatant disregard of NL EMS's status as a separate corporation and applicable corporate governance principles, or that (ii) the execution of the Closing Agreement on behalf of NL, NL EMS, Contran, and Valhi was done in furtherance of a scheme and artifice to use the proceeding with the IRS to fraudulently deprive Plaintiffs of the full value of their NL EMS shares.

**B.    NL's "Tax Sharing Agreement" with NL EMS**

137.    On March 18, 2005, Defendants Lindquist, Graham, Luttmer and possibly others unknown to Plaintiffs, acting on behalf of and for the benefit of Contran, Valhi, and NL, fraudulently and in violation of their fiduciary and other duties to Plaintiffs caused NL EMS to enter into a sham "Tax Sharing Agreement" that served as the basis for transferring $11.1 million in cash from NL EMS to NL without any consideration.  Defendant Luttmer signed the Tax Sharing Agreement on behalf of NL EMS, and Defendant Graham, who was then Vice President of NL EMS, signed on behalf of NL, all in breach of their fiduciary duties to Plaintiffs as officers

and directors of NL EMS.  Defendant Lindquist drafted the Tax Sharing Agreement on behalf of Contran and Valhi, which are in the same consolidated tax group as NL, and directed Defendants Graham and Luttmer to sign it.  Although it was signed on March 18, 2005, it was backdated to February 2, 1998, prior to Plaintiffs' participation in NL EMS as shareholders, directors, and officers.

138.    The terms of the Tax Sharing Agreement provided that NL EMS was obligated to pay NL an amount equal to the liability for federal, state, and local taxes that NL EMS would have incurred on its investment income had its income tax deductions been applied to offset NL's income, rather than NL EMS's.  By means of the Tax Sharing Agreement, Defendants Lindquist, Luttmer, and Graham thereafter unlawfully caused approximately $11.1 million in NL EMS's assets to be transferred to NL in furtherance of Defendants' scheme to offset NL's tax deficiency to the IRS and to prevent Plaintiffs from receiving the equity value of their NL EMS shares.

139.    Defendants Lindquist, Graham, Luttmer, and others unknown to Plaintiffs, acting on behalf of and for the benefit of Contran, Valhi, and NL, purposefully executed the Tax Sharing Agreement and caused it to be executed on behalf of NL EMS, without providing notice to Plaintiffs, and without presenting the agreement to the NL EMS Board of Directors for approval.  On the contrary, as alleged herein, Defendants Lindquist, Graham, Luttmer, and others unknown to Plaintiffs, fraudulently concealed the existence and terms of the Tax Sharing Agreement from Plaintiffs.

140.    In or around late March 2005, the exact date being unknown to Plaintiffs, pursuant to the terms of the Tax Sharing Agreement, NL EMS transferred approximately $11.1 million from NL EMS's bank account to NL's bank account.  As alleged herein, Defendants

Swalwell, Graham, and others concealed this payment from Plaintiffs from approximately March 2005 until in or around June 1, 2005, when Plaintiffs gave notice of their intent to redeem their shares, by refusing to provide Plaintiffs with copies of NL EMS's financial statements and other financial information, and by falsely representing to Plaintiffs that no material actions had been taken on behalf of NL EMS that required approval by the NL EMS Board.

141.    On or before April 11, 2005, the exact date being unknown to Plaintiffs, Defendant NL, acting through its officers and agents, the identities of whom are unknown to Plaintiffs, knowingly engaged in or attempted to engage in a monetary transaction, to wit, the transfer of $20.8 million from NL to the IRS.  The purpose of this transfer was to satisfy the IRS's March 28, 2005, demand for payment by April 11, 2005, of back taxes and interest owed by NL, arising out of the disallowance of NL's $114.5 million capital loss for the 1998 tax year. At the time of the transfer, Defendant NL knew that these funds were the proceeds of Defendants' ongoing scheme to defraud Plaintiffs of the full and fair value of their minority interest in NL EMS.  Because these funds consisted in part of the $11.1 million fraudulently obtained from NL EMS, they were derived from specified unlawful activity as defined in Title 18, United States Code, Section 1957, to wit, mail and wire fraud in violation of Title 18, United States Code, Sections 1341, and 1343.

142.    The actions by Defendants Lindquist, Graham, Luttmer and others to strip NL EMS of the economic value of its income tax deductions were unlawful, and were directly contrary to the terms of the NL EMS transaction, the accounting for the payment of NL EMS's environmental liabilities as recorded on the unaudited financial statements of NL EMS, NL's public filings with the SEC, and the repeated representations made by Defendant Hardy and other NL officers to Plaintiffs during the negotiation of the NL EMS transaction.  From the

outset of Plaintiffs' participation in the NL EMS transaction, NL had represented that NL EMS was entitled to all applicable tax deductions associated with the payments made by NL EMS to manage the assumed liabilities.  NL EMS's expenditures were projected to exceed income, and therefore NL EMS was not expected to incur any tax liability.  Moreover, Defendant Hardy and other NL officers represented at the time of the formation of NL EMS that NL EMS, and Plaintiffs' minority interest in NL EMS, would not be affected by NL's tax treatment of the NL EMS transaction.  Contrary to these representations, NL caused NL EMS to enter into a sham agreement that required NL EMS to bear the expense of its assumed environmental liabilities but deprived NL EMS of the income tax deductions associated with these payments, which decreased the equity value of NL EMS by $11.1 million and deprived Plaintiffs of the full value of their minority equity interest in NL EMS.

### C.    Defendants' Fraudulent Concealment of the Sham Tax Agreements

143.    In furtherance of their scheme, as alleged herein, various Defendants concealed from Plaintiffs this fraudulent conduct — including but not limited to NL EMS's involvement in the tax proceeding beginning in December 2002, the existence of the Closing Agreement signed by NL EMS in June 2004, and the existence of the Tax Sharing Agreement signed in March 2005 — until after June 1, 2005, when Plaintiffs notified the NL EMS Board of their intent to redeem their shares.  Each of these acts taken in furtherance of Defendants' fraudulent scheme was done without disclosure to Plaintiffs, and without Plaintiffs' knowledge or approval.

144.    Moreover, in furtherance of Defendants' fraudulent scheme, Defendants Graham, Swalwell, Luttmer, and St. Wrba failed to faithfully discharge their management duties as senior officers of NL EMS and members of its Board of Directors, in violation of applicable corporate governance principles under applicable New Jersey law, with the specific intent to prevent

Plaintiffs from discovering Defendants' ongoing fraudulent scheme to divert tens of millions of dollars in Plaintiffs' shareholder equity to the Simmons Enterprise.

### 1.     Failure To Provide Financial Statements

145.    Each of the Shareholder Plaintiffs had an absolute right under New Jersey law, N.J. Stat. Ann. 14A:5-28(2), to be provided with the previous year's balance sheet and income statements upon written request.  All of the Plaintiffs also had a statutory and common law right, as directors and shareholders, to inspect the books and records of NL EMS, including its financial statements.  Defendants Graham, Swalwell, Luttmer, and St. Wrba withheld NL EMS's financial statements for the fiscal years 2003 and 2004 from Plaintiffs in violation of applicable New Jersey law, with the specific intent to conceal their theft of NL EMS's assets.

146.    Under the federal securities laws and regulations, every issuer of an exchange-registered security, including NL, has a duty to file an annual report within 90 days after the close of the fiscal year.  *See* 17 C.F.R. § 240.13a-1.  A parent and its subsidiaries must file consolidated financial statements.  *See* 17 C.F.R. §§ 210-3.01, 210-3.02.  The consolidated financial statements for the fiscal year, filed with the SEC on Form 10-K, must be audited by an independent auditor.  *See* 17 C.F.R. § 210-2.01.

147.    On March 9, 2004, and March 30, 2005, NL filed its annual report, including consolidated financial statements covering NL EMS and its other subsidiaries, for the fiscal years 2003 and 2004, respectively.   In each annual report, PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") certified that "the consolidated financial statements . . . present[ed] fairly, in all material respects, the financial position of NL Industries, Inc. and Subsidiaries" as of December 31st of the previous year.

148.    Throughout 2004, Plaintiffs made specific and repeated requests to Defendant Graham for the previous year's financial statements.  In violation of their fiduciary and other

duties under New Jersey law, Defendant Graham refused to provide these financial statements to Plaintiffs until January of 2005, notwithstanding the fact that PricewaterhouseCoopers must have reviewed those financial statements no later than March 9, 2004, when NL filed its 2003 annual report with the SEC.

149.    In 2005, Plaintiffs also made written requests for NL EMS's year-end 2004 financial statement to Defendants Graham and St. Wrba.  With the knowledge and approval of Defendant Swalwell, Defendants Graham and St. Wrba refused to provide these financial statements, and lied about their existence, until after Plaintiffs had given notice of their intention to redeem their shares on or around June 1, 2005.  In violation of their fiduciary and other duties under New Jersey law, Defendants Graham and St. Wrba refused to provide these financial statements to Plaintiffs until June of 2005, notwithstanding the fact that PricewaterhouseCoopers must have reviewed those financial statements no later than March 30, 2005, when NL filed its 2004 annual report with the SEC.

150.    In order to prevent Plaintiffs from obtaining NL EMS's 2004 financial statements, and to prevent Plaintiffs from discovering their scheme to loot NL EMS, Defendant Graham represented to Plaintiffs that the financial statements were not yet ready.  Among other things, in a May 13, 2005, e-mail message to Plaintiffs Martin and Casey, copied to Defendant Swalwell, Defendant Graham stated that the 2004 financials had not yet been prepared but would be "completed soon."

## 2.    False and Fraudulent SEC Disclosures About NL EMS

151.    Between approximately March 2003 and at least May 2005, Defendants Simmons, Watson, Swalwell, and Brown, acting as NL's CEO, director, CFO, and Controller, respectively, signed periodic reports with the SEC that contained false and misleading statements concerning NL EMS's involvement and interest in the tax proceedings with the IRS.  NL's

disclosures stated only that NL (which was referred to sometimes as "NL" and at other times as "the Company") had entered into a settlement with the IRS pursuant to the Fast Track Dispute Resolution Procedure.  NL's public filings with the SEC failed to disclose specifically that NL EMS was the subject of an IRS audit, that NL EMS had been made a party to the IRS Fast Track Dispute Resolution Procedure, or that NL EMS to had been made to enter into a binding settlement agreement with the IRS, all of which thereby misleadingly suggested that only NL's capital loss was at issue.

### 3.    Failure To Hold Board of Directors Meetings

152.    Under applicable New Jersey law, and the By-Laws of NL EMS, the business and affairs of NL EMS are to "be managed by or under the direction of its board [of directors]."  N.J. Stat. Ann. 14A:6-1(1).  Moreover, under applicable New Jersey law, a board may not abdicate its duties to senior management, nor may it delegate extraordinary business decisions to senior management, since it would be abandoning its mandate that the business of the corporation shall be managed by or under the direction of the board.  In performing its managerial duties, the board may only act collectively; an individual board member has no power to act on behalf of a corporation.

153.    NL EMS's signing of the Closing Agreement in June 2004 was an extraordinary business decision, outside the ordinary course of NL EMS's business, for which the approval of the NL EMS Board was required under applicable New Jersey law.  The Closing Agreement purported to agree to material changes in NL EMS's tax status and undermined the most basic assumptions of the participants in NL EMS going back to the company's formation in 1998. Despite their duty under New Jersey law to secure the approval of the Board of Directors before committing NL EMS to the Closing Agreement, the then-majority members of the NL EMS Board, including Defendants Graham and Swalwell, refused to call a Board of Directors meeting

in 2004.  In 2004, Plaintiffs made numerous inquiries to Defendant Graham as to why no Board meeting was scheduled.  In furtherance of Defendants' scheme to deprive Plaintiffs of the full value of their minority shares, Defendant Graham fraudulently misrepresented to Plaintiffs in various interstate telephone calls in 2004 that there were no specific actions requiring a meeting of the Board of Directors.

154.   The Tax Sharing Agreement between NL and NL EMS was also an extraordinary business decision, in that it stripped NL EMS of its right to the income tax deductions associated with its payment of environmental expenses and obligated NL EMS to pay a substantial amount of its equity value, $11.1 million, to NL, without consideration.  The terms of the Tax Sharing Agreement were directly contrary to NL's representations to Plaintiffs at the formation of NL EMS.  Nevertheless, Defendants Graham, Luttmer, Swalwell, and St. Wrba intentionally delayed convening a Board of Directors meeting until June 7, 2005, after Plaintiffs had notified the NL EMS Board of their intention to redeem their shares under the Restated Certificate.  The Tax Sharing Agreement was signed by Defendants Graham and Luttmer on March 18, 2005.  On April 7, 2005, in response to inquiries by Plaintiff Murphy as to why no Board meeting had been held for more than two years, and requesting that such a meeting be held, Defendant Graham still refused to convene a Board meeting.  On or about April 7, 2005, Defendant Graham fraudulently stated in a letter to Plaintiff Murphy, with copies to Plaintiffs Martin and Casey, that NL "[did] not know of any specific action requiring a formal meeting of the Board of Directors at this time."

155.   On or about June 1, 2005, Plaintiffs formally notified NL EMS of the exercise of their rights pursuant to the Restated Certificate to redeem their shares of NL EMS stock as of June 30, 2005.  By on or about June 1, 2005, as described above, Defendants had already taken

significant steps to execute their fraudulent scheme to deprive Plaintiffs of the full value of their minority shares of NL EMS, in particular by causing NL EMS to enter into the Closing Agreement and Tax Sharing Agreement, and to execute the Tax Sharing Agreement by transferring approximately $11.1 million into the bank account of NL, which acts deprived NL EMS of approximately $30 million in assets, and caused a corresponding reduction in the value of Plaintiffs' 39% equity interest in NL EMS.

156.    On Friday, June 3, 2005, after having concealed NL EMS's participation in the tax proceeding, the Closing Agreement, and the Tax Sharing Agreement over the course of more than two years, Defendant Graham sent a letter to Plaintiffs by Federal Express for delivery on June 6, 2005, in which he notified Plaintiffs of a NL EMS Board of Directors meeting scheduled for Tuesday morning, June 7, 2005 — one business day later.  Also enclosed under cover of the June 3, 2005 letter was a set of board materials for the June 7 meeting.  Copies of the letter were sent by e-mail to Defendant Lindquist, who was invited to attend the Board meeting in his capacities as Senior Vice President of Contran and Valhi.  Those materials disclosed to Plaintiffs for the first time that NL EMS's tax deductions were implicated in the IRS audit, that Morrison & Foerster had been engaged to represent NL EMS's interests, despite the blatant conflict of interest between NL EMS and NL, and that NL EMS had entered into the Closing Agreement and the Tax Sharing Agreement.

157.    At the June 7, 2005 Board meeting, contrary to his representations just two months earlier that NL EMS had engaged in no transactions requiring Board approval, Defendant Graham introduced a resolution in which the NL EMS Board was asked to ratify the Closing Agreement, which had been signed by Defendant Luttmer purportedly on behalf of NL EMS on June 24, 2004, nearly a year earlier, as well as to ratify the retention of Morrison & Foerster and

the Tax Sharing Agreement.   Defendant Graham intentionally delayed holding the Board meeting until after June 1, 2005, with the specific intent to conceal Defendants' scheme until Plaintiffs had already submitted notice to NL EMS of the redemption of their shares.

### III.   Fraudulent Recording of More Than $3.1 Million in Expenses on the Books and Records of NL EMS

158.   At sometime in or around early 2005, the precise time being unknown to Plaintiffs, Defendants Graham, Swalwell, and Hardy made a series of false entries in the books and records of NL and NL EMS in order to deprive Plaintiffs of the full value of their minority interest in NL EMS.   Among other things, these Defendants recorded more than $3.1 million in environmental monitoring and other expenses on the books and records of NL EMS, fully knowing that these entries were improper because these expenditures had in fact been made on behalf of, and for the benefit of, NL.

159.   Defendants Graham, Swalwell, and Hardy posted expenses in the books and records of NL EMS, related to expenditures made by NL, on behalf of NL, and for the benefit of NL, for items such as:

a.   An $8,000 contribution to the "Superfund Action Coalition," a Washington, D.C.-based lobbying firm;

b.   More than $3 million of costs associated with environmental remediation obligations that NL EMS had not contractually assumed and were the responsibility of NL;

c.   Costs associated with remediation of the portion of the Sayreville property owned by NL; and

d.   Liability associated with a toxic tort case against NL.

160.   Defendants Graham, Swalwell, and Hardy knowingly and unlawfully posted these and other expenses on the books and records of NL EMS, knowing that they were making false entries in the books and records of NL and NL EMS, with the specific intent of fraudulently

reducing the value of Plaintiffs' 39% interest in the equity value of NL EMS.  At the June 7, 2005 NL EMS Board meeting, Defendant Swalwell falsely represented to Plaintiffs that these expenditures were properly recorded on the books and records of NL EMS.

161.    On or about June 29, 2005, NL sent Plaintiffs letters by Federal Express, signed by Defendant Graham and sent with the knowledge and approval of the other Director Defendants, in which Graham falsely represented to Plaintiffs that NL had paid $3.1 million of expenses "in error" on behalf of NL EMS.  In that letter, Defendant Graham identified each of the individual payments that comprised the $3.1 million, and falsely described them as expenses "previously absorbed by NL that should have been allocated to and paid for by [NL EMS]." Defendant Graham knew that the representations contained in the letter were untrue, and made them, in violation of his fiduciary duties to Plaintiffs as minority shareholders of NL EMS, with the specific intent of furthering the scheme to deprive Plaintiffs of the full and fair value of their 39% interest in NL EMS.

**IV.    Fraudulent Valuation of Plaintiffs' NL EMS Shares**

162.    After on or about June 1, 2005, under the terms of the Restated Certificate, NL EMS was required to determine "in good faith" the equity value of NL EMS and, upon redemption, make a cash payment to Plaintiffs in the amount of 39% of that equity value (the "Formula Valuation").  NL and its officers and directors, including the Director Defendants, also had fiduciary duties as NL EMS's majority shareholders and directors to perform the required valuation in good faith.

163.    Despite these duties under New Jersey law and the Restated Certificate, between approximately July 2003 and at least June 2005, Defendants Hardy, Graham and Swalwell, and possibly other Defendants, had extensive discussions in which they agreed to fraudulently understate the value of Plaintiffs' shares upon redemption in order to further deprive Plaintiffs of

their equity interest in NL EMS.  As set forth herein, pursuant to these discussions, after Plaintiffs provided notice of their intent to redeem their Class D and Class E shares on or about June 1, 2005, various Defendants, in breach of their fiduciary and other duties, agreed to further continue to execute the unlawful scheme and artifice to defraud by, among other things:

    a.    making additional false entries in the books and records of NL and NL EMS, with the specific intent of fraudulently increasing the amount of total expenses, and decreasing the amount of total assets, recorded in the financial records of NL EMS;

    b.    fraudulently misapplying the formula valuation, with the specific intent of unlawfully reducing the value of Plaintiffs' Class D and Class E shares;

    c.    presenting that fraudulent valuation to Plaintiffs, representing that it was prepared in good faith and in accordance with the Restated Certificate;

    d.    providing false memoranda and other supporting documentation to Plaintiffs about the value of the assets and remaining liabilities of NL EMS, in order to induce Plaintiffs to accept the improper valuation of their Class D and Class E shares;

    e.    refusing to consent to a review of the fraudulent valuation by disinterested directors, as required by the laws of the State of New Jersey, and instead voting to confirm the valuation over any objections raised by Plaintiffs; and

    f.    refusing to allow Plaintiffs as directors of NL EMS to examine the books and records of the company in order to review the valuation.

164.   In or about June 2005, Defendant Graham prepared a Formula Valuation that concluded that a good faith determination in accordance with the terms of the Restated Certificate resulted in a $3.42 million Formula Value for the Class D and Class E shares, based on a total Current Corporation Value for NL EMS of $8.77 million.  All Defendants knew that this calculation of the value of NL EMS was fraudulent and was not prepared in good faith, because, among other things:

    a.    NL had previously made numerous written representations that the total equity value of NL EMS was substantially higher than the $3.42 million Formula Valuation fraudulently prepared by Defendant Graham, including:

(i) representations in NL's Form 10-K filing with the SEC for the year ending December 31, 2002 that Plaintiffs' "minority interest" in NL EMS was approximately $8.5 million;

(ii) representations to the IRS in late 2003 that NL EMS's Current Corporation Value was more than $33 million, of which Plaintiffs' minority share comprised 39%, or approximately $13.1 million; and

(iii) representations in NL EMS's annual financial statements for the period ending December 31, 2003, that the total equity value of NL EMS was more than $30 million.

b. The $8.77 million Current Corporation Value was reached by assigning a "zero" value to NL EMS's interest in the Sayreville property, notwithstanding the knowledge of all Defendants that:

(i) NL's lawyers had stated publicly in March 2005 that the total value of the Sayreville property was estimated to be more than $100 million;

(ii) between 2002 and 2005, Defendants Hardy and St. Wrba had submitted sworn statements to the New Jersey Department of Environmental Protection, under penalty of perjury, representing that the estimated maximum total cost of remediating the Sayreville property was:

(a) approximately $9.7 million as of April 2002 (Hardy);

(b) approximately $9.7 million as of April 2003 (St. Wrba);

(c) approximately $10.5 million as of April 2004 (St. Wrba);

(d) approximately $10.5 million as of March 2005 (St. Wrba); and

(e) the most valuable portion of the 410-acre Sayreville property was the 140 acres owned by NL EMS, and as a result NL EMS's interest in the Sayreville property alone was substantially more than $50 million.

165. Having already participated in a scheme and artifice to divert tens of millions of dollars of NL EMS's assets to the Simmons Enterprise, Defendant Graham prepared this fraudulent Formula Valuation, with the knowledge and agreement of the other Defendants, in an effort to further deprive Plaintiffs of their share of the remaining equity value of NL EMS, and further reduce the cash payment that the Simmons Enterprise would be required to pay to Plaintiffs in order to redeem their Class D and Class E shares.

**FRAUDULENT REPRESENTATIONS DESIGNED TO INDUCE
PLAINTIFFS TO RATIFY THE FRAUD**

## I.     False Statements at the June 7, 2005 Board Meeting About the IRS Settlement

166.    On or about June 7, 2005, after concealing from Plaintiffs the interests of NL EMS in the IRS proceeding, and the existence and terms of the Closing Agreement and Tax Sharing Agreement, Defendants Lindquist and Graham, on behalf of Contran, Valhi, and NL, made a series of false and materially misleading representations in a fraudulent effort to obtain Plaintiffs' after-the-fact ratification of the Closing Agreement, as well as the subsequent Tax Sharing Agreement.   These Defendants made these false and misleading representations to Plaintiffs, and the NL EMS Board as a whole, in violation of their fiduciary duty to Plaintiffs and as part of the scheme to defraud Plaintiffs and insulate all Defendants, each of whom conspired to promote and knowingly and substantially assisted in the scheme, against any future claims against them under applicable state and federal laws.

167.    As part of the materials for the June 7, 2005 Board meeting, Defendant Graham caused to be delivered to the NL EMS Board, including Plaintiffs, a false and misleading memorandum written by Defendant Lindquist, acting as an agent of Contran and Valhi (the "Lindquist Memorandum").   At the June 7, 2005 Board meeting, Defendant Lindquist also gave an extensive presentation about the facts and circumstances surrounding the Closing Agreement and Tax Sharing Agreement.   Both the Lindquist Memorandum and his oral presentation were specifically intended to fraudulently convince Plaintiffs and the NL EMS Board of Directors that the Closing Agreement and Tax Sharing Agreement were purportedly fair and lawful, and thus to obtain after-the-fact ratification of the Closing Agreement and Tax Sharing Agreement by Plaintiffs and the NL EMS Board.

### A.   Misrepresentation That the IRS Mandated the Closing Agreement

168.   On or about June 7, 2005, in furtherance of the scheme, and in violation of his fiduciary and other duties to Plaintiffs as minority officers, shareholders, and directors of NL EMS, Defendant Lindquist made oral and written misrepresentations and omissions by which he fraudulently asserted that the IRS had mandated in the tax proceeding that NL was required to take the income tax deductions associated with the transferred environmental liabilities, even though NL EMS had paid for and remained responsible for the costs associated with those liabilities.  According to Lindquist, "[t]he IRS's position was *unequivocal*":  "the IRS . . . was unwilling to discuss and negotiate which taxpayer, NL or NL EMS, could take the deductions for the environmental liabilities and monitoring costs when paid."   Defendant Lindquist's representations were false and fraudulent, and are contradicted by the IRS's own policy pronouncement in the Fast Track Dispute Resolution Procedure, which states that "[e]lecting taxpayers *may negotiate or arbitrate* the identity of the corporation that is entitled to the tax benefits associated with the deduction [resulting from] the assumed liability."  Rev. Proc. 2002-67, 2002-1 C.B. 304 (Dec. 22, 2001), § 6.03.

### B.   Misrepresentation That NL EMS Avoided Federal Tax Penalties

169.   On or about June 7, 2005, Defendant Lindquist made oral and written misrepresentations, in furtherance of the scheme to defraud, and in violation of his fiduciary and other duties to Plaintiffs as minority officers, shareholders, and directors of NL EMS, that NL EMS obtained a substantial tax benefit from the Closing Agreement because it avoided penalties that the IRS was seeking to impose under the federal tax laws.  Defendant Lindquist's statements were false and fraudulent, and are contradicted by NL's filings with the SEC, in which NL consistently represented that the IRS sought interest, but not penalties, in the course of the tax proceeding.  In its Form 10-Q filings for the 1st, 2nd, and 3rd quarters of 2003, which were

submitted by interstate wires prior to the execution of the Closing Agreement, NL reported that, as to NL, it "anticipated that the IRS would propose a substantial tax deficiency, including penalties and interest, related to [the NL EMS] transaction."  Subsequently, beginning with its Form 10-Q filing for the 2nd quarter of 2004, during the ongoing negotiations with the IRS, NL represented that, as to NL, "[d]uring the course of the examination, the IRS proposed a substantial tax deficiency, including interest," conspicuously omitting any reference to penalties.

170.   As Defendant Lindquist well knew, under the federal income tax laws, and applicable IRS regulations and procedures, including the Fast Track Resolution Procedure, NL EMS faced no realistic prospect of being subject to federal tax penalties.  Defendant Lindquist's misrepresentations to Plaintiffs that the IRS had demanded penalties against NL EMS, and that there was a significant risk of federal penalties being imposed on NL EMS, were knowingly false and fraudulent, and made with the specific intent to induce Plaintiffs to ratify the Closing Agreement, and thereby to fraudulently obtain Plaintiffs' after-the-fact consent to the reduction of at least $18.5 million in the net asset value of NL EMS.

**C.    False Statements Concerning the Business Purpose of NL EMS**

171.   On or about June 7, 2005, Defendant Lindquist made oral and written misrepresentations, in furtherance of the scheme to defraud, and in violation of his fiduciary and other duties to Plaintiffs as minority officers, shareholders, and directors of NL EMS, that the Simmons Enterprise always considered NL EMS as a "tax shelter," and as a result of the Closing Agreement, Defendant NL and its appointees to the NL EMS Board of Directors no longer had any obligation to respect NL EMS as a separate corporation or to respect Plaintiffs' rights as minority shareholders and directors.  Also, among other things, Defendant Lindquist further stated that NL EMS's business activities had always been mere "window dressing" for NL's capital loss deduction.

172.    As Defendant Lindquist knew, these statements were false and fraudulent, and were at odds with the representations made by NL and various officers and agents of NL to Plaintiffs, the IRS, and the SEC about NL EMS's business over the course of the previous seven years.   During NL's tax proceeding, through, among other things, affidavits that Defendant Hardy caused Plaintiffs to submit on NL's behalf, Defendant NL represented to the IRS that it regarded NL EMS as a separate corporation, with a legitimate business purpose, and not as a mere "tax shelter" or "window dressing" to justify NL's 1998 capital loss.   Defendant Lindquist's statements are also inconsistent with NL's public securities filings with the SEC, which represented that NL EMS was a separate subsidiary, with independent equity value, and with minority shareholders entitled to collect 39% of that equity value.   In a further effort to mislead Plaintiffs, Defendant Lindquist also intentionally refused to disclose to Plaintiffs at the June 7, 2005 Board meeting the material fact that Deloitte had provided NL EMS with a tax opinion dated February 8, 2002, in which Deloitte concluded that NL EMS "more likely than not" would be entitled to be the tax deductions associated with its environmental expenses. Defendants Graham and Luttmer also intentionally and fraudulently omitted any disclosure of this material fact at the June 7, 2005 NL EMS Board meeting.

173.    Defendant NL and its appointees as directors and officers of NL EMS lulled and misled Plaintiffs into believing that they would be afforded their full rights as minority shareholders of a separate legal entity, that they would receive the cash value of 39% of any increase in the equity of NL EMS, and that NL would faithfully discharge its  fiduciary obligation as the majority shareholder of NL EMS in good faith, consistent with the agreement of the parties, and in compliance with their fiduciary and other duties under New Jersey law. Among other things, until the commencement of the scheme to defraud in no later than

December 2002, Defendant NL caused regular board meetings to be held to review and track the progress of NL EMS's business, and prepared and provided Plaintiffs with financial statements showing that Plaintiffs were achieving these cost savings and would receive a significant economic benefit. At all times during the period 1998 to 2005, Plaintiffs devoted their energies to increasing the equity value of NL EMS by reducing expenditures for environmental liabilities, in reliance on repeated statements by then-officers and directors of Defendants NL and NL EMS that they would, upon the redemption of their shares, receive a cash payment of 39% of the equity value of NL EMS.

### D. Unlawful After-the-Fact Ratification of the Closing Agreement and Tax Sharing Agreement by the Conflicted NL EMS Directors

174. At the June 7, 2005 Board meeting, the Director Defendants (Brown, Graham, Hafer, Luttmer, St. Wrba, and Swalwell) knowingly and intentionally violated their fiduciary duties under New Jersey to NL EMS and to Plaintiffs as minority shareholders and directors of NL EMS. The Director Defendants, knowing that the foregoing statements were untrue, and in furtherance of the scheme and artifice to defraud, voted to approve the resolution ratifying the Closing Agreement over the strenuous objections and dissenting votes of Plaintiffs Murphy, Martin, and Casey. As part of the same resolution, the Director Defendants further voted to ratify "all agreements, instruments, reports, and documents executed, delivered or filed through the date hereof by any officer of [NL EMS], in the name of [NL EMS], including the retention of legal counsel and other advisors, in connection with the Closing Agreement."

175. All six Director Defendants — Defendants Brown, Graham, Hafer, Luttmer, St. Wrba, and Swalwell — voted in favor of the resolution, despite their knowledge that the Closing Agreement and Tax Sharing Agreement stripped NL EMS of at least $30 million in valuable income tax deductions and transferred them to the Simmons Enterprise without any offsetting

benefit to NL EMS.  As employees of Contran and officers of NL, the Director Defendants were beholden to the Simmons Enterprise.  Given the Director Defendants' obvious conflict of interest, they had a duty under applicable New Jersey law, N.J. Stat. Ann. 14A:6-8, and the By-Laws of NL EMS to appoint a committee of special disinterested directors to approve the resolution.  In violation of their fiduciary and other duties under New Jersey law, the Director Defendants refused strenuous requests by Plaintiffs Murphy, Martin, and Casey that the NL-appointed directors abstain due to their conflict of interest and appoint a special committee to consider the fairness of the Closing Agreement and Tax Sharing Agreement to NL EMS.

176.    Defendant NL not only refused to appoint disinterested directors, as required by New Jersey law and the NL EMS By-Laws, but approximately 11 days before the June 7, 2005 Board meeting, it stacked the NL EMS Board with two new conflicted directors who were directed to vote with the other four NL-appointed directors to ratify the Closing Agreement and Tax Sharing Agreement.  On or around May 27, 2005, the then-Class B directors of NL EMS — who were not employees of NL — were replaced by Defendants Brown and Hafer, both of whom were Contran employees assigned to work for NL.

177.    At the June 7, 2005 Board meeting, the Director Defendants refused Plaintiffs' request for additional information about the IRS proceeding, and for a modest delay in the vote so as to allow them time to review the complicated agreements with their own counsel and tax advisors.  Defendant Graham also refused a written request submitted by Plaintiffs Murphy and IRCC by letter dated June 27, 2005, for information regarding the involvement of NL and NL EMS in the tax proceeding, to which they were entitled as shareholders, directors, and officers of NL EMS under applicable New Jersey law.

## II.    False Statements at the June 28, 2005 Board Meeting About the Value of Plaintiffs' Shares

178.    On Friday June 24, 2005, Defendant Graham, in his capacity as President of NL EMS, finalized the Formula Valuation and sent it to Plaintiffs by Federal Express.  Two business days later, on June 28, 2005, Defendant Graham convened a meeting of the NL EMS Board of Directors to vote on NL EMS's calculation of the Formula Value.  Defendants Brown, Graham, Hafer, Luttmer, and Swalwell attended the meeting in Dallas in person; Defendants St. Wrba and Lindquist attended by interstate telephone call from Las Vegas.  In the written Board materials sent to Plaintiffs on June 24, 2005, and in his oral statements at the June 28, 2005 Board meeting, Defendant Graham made a series of false and materially misleading statements about the assets, liabilities, and financial performance of NL EMS, as well as about the proper methodology under the Restated Certificate, all in furtherance of the scheme to defraud, and in violation of his fiduciary and other duties to Plaintiffs as minority officers, shareholders, and directors of NL EMS.

179.    At the June 28, 2005 Board meeting, Plaintiff Martin stated that Plaintiffs had not received their Board materials until the day prior to the meeting, Monday, June 27, 2005, and all Plaintiffs indicated that they needed additional time to review the Formula Valuation, and to express their views to the entire NL EMS Board of Directors prior to any vote on the Formula Valuation.  Plaintiffs also indicated that there was extensive lack of clarity in the Board materials regarding the methodology used by Defendant Graham in calculating the Formula Value.  In addition, Plaintiffs expressed doubts that Graham had engaged in a "good faith" application of the same "methodology and assumptions" the parties had used in 1998, as required by the Restated Certificate.  Plaintiffs also made a request to review the books and records of NL EMS so that they could review the Formula Valuation in a fully informed manner.  Defendant

Graham, in violation of their absolute right to such information under applicable New Jersey law, rejected Plaintiffs' requests for additional time, repeatedly rejected Plaintiffs' requests for information and refused to entertain Plaintiffs' inquiries about the Formula Valuation.  Over Plaintiffs' objections, Defendant Swalwell moved that the discussion be closed and that the Formula Valuation be voted on.

180.    On June 28, over the vigorous dissent of Plaintiffs, the Director Defendants voted to approve the $3.42 million redemption price for Plaintiffs' Class D and Class E shares.  The Director Defendants refused to appoint disinterested directors to review the valuation, in breach of their duties under applicable New Jersey law.  The next day, June 29, 2005, Defendant Graham also sent Plaintiffs a letter via Federal Express in which he refused their requests for additional information, in violation of Plaintiffs' right as directors to obtain such information under New Jersey law.

181.    In voting to approve the $3.42 million valuation of the Class D and Class E shares, Defendants Brown, Graham, Hafer, Luttmer, Swalwell, and St. Wrba acted with the agreement and approval of Defendants Simmons, Lindquist, and Watson, all of whom shared the specific intent to defraud Plaintiffs and to deprive them of the full and fair value of the Class D and Class E shares, and in breach of their fiduciary and other duties to Plaintiffs as minority shareholders of NL EMS.  For the reasons set forth below, the Director Defendants fraudulently approved the Formula Valuation knowing that it arrived at a total equity value of NL EMS of $8.77 million, by:

      a.     undervaluing, by more than $50 million, the fair market value of the NL EMS portion of the Sayreville property;

      b.     overvaluing, by more than $20 million, NL EMS's estimated remaining environmental Liabilities, by:

           (i)     overstating the cost of remaining Liabilities for monitoring costs;

      (ii)     using a discount rate contrary to the discount rate required by the Restated Certificate and consistently recorded on NL EMS's financial statements;

      (iii)    attributing to NL EMS environmental liabilities that had not been assumed by NL EMS and thus were the economic responsibility of NL; and

c.     understating, by more than $3.5 million, NL EMS's Current Corporation Value, by fraudulently reducing the fair market value of NL EMS's Valhi shares based on a purported 40.85% tax rate on the stock's appreciation.

**A.     Defendants' Fraudulent Undervaluation of the Sayreville Property**

     **1.     The Undervaluation of the Fair Market Value of the Sayreville Property**

182.    On or about June 28, 2005, Defendant Graham made oral and written misrepresentations, in furtherance of Defendants' scheme, and in violation of his fiduciary and other duties to Plaintiffs as minority officers, shareholders, and directors of NL EMS, that NL EMS's 140-acre interest in the Sayreville property, after consideration of associated environmental expenses, was "nil."  As the Director Defendants well-knew, the "zero" valuation for NL EMS's interest in the Sayreville property was not prepared in good faith, and was part of the fraudulent scheme to deprive Plaintiffs of the full value of their Class D and Class E shares. A good faith estimate of the value of NL EMS's interest in the Sayreville property, prepared in accordance with the formula in the Restated Certificate and consistent with the Director Defendants' exercise of their fiduciary duties to Plaintiffs, would have resulted in a total value of more than $50 million.

183.    Defendant Graham's written memorandum, which was delivered to Plaintiffs as part of the June 28, 2005 Board materials, falsely represented that the fair market value of the entire Sayreville property (both NL and NL EMS's parcels), if remediated, was $33.55 million. Defendant Graham further falsely claimed that the estimated total cost to remediate the Sayreville property was between $10.5 million and $42 million.  On this basis, Defendant

Graham falsely asserted that NL EMS's portion of the Sayreville property had a net value of zero. Defendant Graham's fraudulent representations as to fair market value, expected clean-up cost, and the relative value of NL EMS's portion of the property, are flatly contradicted by NL's prior representations made in proceedings before the New Jersey courts and the New Jersey Department of Environmental Protection.

184.   Between June 1998 and January 1999, Plaintiffs had worked closely with the Sayreville Borough Council to adopt a Waterfront Redevelopment Plan for the Sayreville area. This plan included a change in the zoning for the Sayreville property that would permit more profitable uses for the property. The property was formerly zoned as "Special Economic Development-2," ("SED-2"), but was rezoned by the Sayreville Borough Council in or about 1999 to "RA-W." An "RA-W" zoning designation allows for increased retail, restaurant, and unrestricted hotel and convention, center uses, and therefore resulted in a higher fair market value for the Sayreville property.

185.   Moreover, the original Waterfront Redevelopment Plan did not envision condemnation of the Sayreville property. Rather, the Borough designated the Sayreville Economic and Redevelopment Agency ("SERA") to encourage voluntary, private redevelopment efforts. In 2000, SERA, in conjunction with the Sayreville Borough Council, implemented a modified redevelopment plan that involved condemnation of the entirety of the 410-acre Sayreville property. On October 26, 2000, SERA passed a resolution to acquire the NL and NL EMS property through condemnation. A formal condemnation complaint was filed on July 1, 2002. Plaintiff Martin was actively involved in managing NL EMS's litigation position in these condemnation proceedings, in order to ensure that NL EMS's maximized the value of this property.

186.    In 2004, the Appellate Division of the New Jersey Superior Court held, based on an existing New Jersey Supreme Court decision, *Housing Authority of the City of New Brunswick v. Suydam Investors*, 177 N.J. 2 (2003), that the Sayreville property should be valued for compensation purposes as if it were completely remediated.  The Appellate Division thus ordered that a preliminary estimate of the as-remediated value of Sayreville be put in escrow pending the condemnation proceedings.  Accordingly, on March 23, 2005, SERA was ordered to deposit $33,550,000 into an escrow account with the Clerk of the New Jersey Superior Court, representing an estimate of the entire value of the Sayreville property.

187.    Defendant Graham fraudulently relied on the court's $33.55 million set-aside in preparing the Formula Valuation, knowing that this estimate understated the as-remediated value of the Sayreville site by at least $70 million to $110 million.  As Defendant Graham knew, SERA's March 23, 2005 appraisal was premised on the applicability of the more restrictive SED-2 zoning designation.  However, in May 2005, before Defendant Graham assigned a "zero" valuation to Sayreville in the Formula Valuation, the New Jersey Superior Court vindicated NL's longstanding position that "just compensation" for the Sayreville property must be calculated based on the RA-W zoning designation, which went into effect before SERA filed its condemnation complaint.  Defendants Simmons, Watson, and Graham were all actively involved in the condemnation litigation and other aspects of the Sayreville property.  Among other things, on or around March 17, 2005, Defendants Graham and Watson personally attended a meeting with the NJDEP in Trenton, New Jersey, regarding the Sayreville property.

188.    On March 31, 2005,  NL's attorney in the condemnation proceedings, Christopher Gibson of Archer & Greiner, a law firm in Haddonfield, New Jersey, was quoted in the Sayreville Suburban newspaper that "NL's experts have estimated the property to be valued in

excess of over $100 million."  NL EMS's 140-acre portion of the 410-acre parcel, which NL valued in the aggregate at "in excess of over $100 million," is disproportionately valuable because of its suitability for development.  Accordingly, Defendant Graham's representation to Plaintiffs that the entirety of the NL EMS portion of the Sayreville property was valued at $33.55 million was knowingly false, and undervalued this asset by more than $70 million.

> ## 2. The Fraudulent Overstatement of Costs of Environmental Liabilities of NL EMS's Portion of the Sayreville Property

189.    Defendant Graham sought to justify the "zero" value he assigned to NL EMS's interest in the Sayreville property by fraudulently representing in the June 28, 2005 Board materials that the estimated cost of remaining environmental liabilities associated with NL EMS's portion of the Sayreville property was at least $10.5 million, and more likely was as high as $42 million.  Defendant Graham knew that these statements were false, and his basis for making these representations was cost estimates that were prepared by SERA (NL's litigation adversary) that NL had publicly stated were inaccurate.

190.    Under New Jersey Administrative Code § 7:26C-7.2, NL is required to guarantee a remediation funding source to the NJDEP in "an amount *equal to or greater than* the estimated cost of implementing the remediation."  N.J.A.C. § 7:26C-7.2(c)(1) (emphasis added).  Between 2002 and 2005, on four separate occasions, NL submitted applications to the NJDEP in which it represented that the worst case scenario for clean-up of the entirety of the Sayreville property was between $9.7 million and $11.2 million:

a.    On April 30, 2002, Defendant Hardy submitted, under penalty of perjury, an application for corporate "self-guarantee" under N.J.A.C. § 7:26C-7.7 in satisfaction of NL's financial assurance obligation in an amount of $9,767,044.

b.    On April 28, 2003, Defendant St. Wrba submitted, under penalty of perjury, a renewal application for corporate self-guarantee in which he stated that the estimated cost of remediation of the 410-acre Sayreville site was $9,767,044.

c.   On April 30, 2004, Defendant St. Wrba submitted, under penalty of perjury, another self-guarantee renewal request on behalf of NL in which he stated that the revised estimated cost of remediation of the 410-acre Sayreville site was $10,517,044.

d.   On March 31, 2005, Defendant St. Wrba submitted, under penalty of perjury, a renewal request in which he reaffirmed that the estimated cost of remediation of the 410-acre Sayreville site was $10,517,044.

e.   In September 2005, Defendant NL submitted a report in support of its self-guarantee application in which it represented that the cost of remediation of the Sayreville site was approximately $11.2 million.

191.   Defendant Graham's representations that a good faith estimate for the expenses associated with the Sayreville property was $10.5 million at the *low* end of the range, and $42 million at the high end of the range, were fraudulent and made with the specific intent to defraud Plaintiffs of the full value of minority equity interest in the value of NL EMS.  Based on the prior sworn statements of Defendants St. Wrba and Hardy, Defendant Graham knew that a good faith estimate of these expenses was no more than $11.2 million.

192.   Contrary to Defendant Graham's knowingly false representation that the value of NL EMS's portion of the Sayreville property was "nil," in truth and in fact, as the Director Defendants well knew, the value of the overall Sayreville site (as remediated) was substantially greater than $100 million, and a good faith estimate of the net value of NL EMS's portion of the Sayreville property was at least $50 million, which would have increased the value of Plaintiffs' shares by more than $20 million.  Defendant Graham's fraudulent representation was specifically intended to induce the NL EMS Board of Directors to approve a "zero" valuation for the NL EMS portion of the Sayreville property in order to deprive Plaintiffs of their 39% share of the fair market value of that property, as required by the Restated Certificate.

**B.      Fraudulent Overstatement of NL EMS's Remaining Liabilities**

193.    On or about June 28, 2005, Defendant Graham made oral and written misrepresentations, in furtherance of Defendants' scheme, and in violation of his fiduciary and other duties to Plaintiffs as minority officers, shareholders, and directors of NL EMS, that the estimated undiscounted (*i.e.*, gross) value of NL EMS's remaining expenses associated with its assumed environmental liabilities was approximately $32.9 million.  This $32.9 million estimate included an $19.7 million in estimated remaining Liabilities associated with monitoring costs. As Defendant Graham then and there well knew, the $32.9 million estimate overvalued NL EMS's remaining Liabilities by at least $20 million, in violation of the terms of the Restated Certificate, and Defendant Graham's fiduciary duties to Plaintiffs as minority officers, shareholders, and directors under applicable New Jersey law.

**1.      Monitoring Costs**

194.    On or about June 28, 2005, Defendant Graham knowingly and fraudulently overstated the net present value of NL EMS's monitoring costs for purposes of calculating the value of Plaintiffs' shares.  In the Board materials sent to Plaintiffs just prior to the June 28, 2005 NL EMS Board meeting, Defendant Graham falsely and fraudulently represented that, for purposes of the Formula Valuation, "monitoring costs [must] be accrued for an indefinite period of time (*i.e.*, there is no set time limit past any particular date of evaluation for which monitoring costs are not to be accrued)."  As Defendant Graham well knew, this representation was inconsistent with the parties' original "methodology and assumptions" set forth in, among other things, the *NL EMS Inc. Cash Flow Analysis* and an internal NL memorandum dated January 22, 1997, which detailed NL's methodology for estimating future monitoring costs and which was referenced in the Deloitte Valuation Report as containing the parties' "methodology and

assumptions" for calculating remaining monitoring costs and which estimated monitoring costs only until 2012.

195.    On or about June 28, 2005, Defendant Graham further represented that *no* monitoring savings had been achieved from 1998 to 2005.  Defendant Graham's representations were false and fraudulent, and flatly inconsistent with NL's prior representations, including representations to the IRS in the course of its tax audit.   As Defendant Graham well knew, NL represented to the IRS during the audit of its 1998 capital loss that NL EMS had achieved more than $10 million in savings of monitoring costs as of June 30, 2003.  NL further represented to the IRS that Plaintiffs were entitled to 39% of every dollar in cost savings that was not spent on monitoring, out of the $30.7 million in estimated monitoring costs that the parties had agreed on in June 1998.  As Defendant Graham also well knew, according to NL's own figures, as of March 31, 2005, NL EMS had spent significantly less than half of the $30.7 million allocated for monitoring costs in the parties' original cost estimates.   In truth and in fact, as Defendant Graham knew, NL EMS had achieved substantial monitoring cost savings of well in excess of $10 million during the period June 1, 1998 to March 31, 2005.  Defendant Graham's fraudulent overstatement of NL EMS's remaining monitoring costs, in violation of the "methodology and assumptions" required by the Restated Certificate, deprived Plaintiffs of the full value of their shares, in an amount to be determined at trial.

### 2.    Discount Rate

196.    Defendant Graham also fraudulently overvalued the remaining expenses associated with environmental liabilities assigned to NL EMS by intentionally applying an artificially low discount rate for calculating the net present value of those expenses.  As reflected in the *NL EMS, Inc. Cash Flow Analysis*, all parties agreed in June 1998 to use a 7.2% discount rate as the basis for determining the net present value of NL EMS's remaining Liabilities.  As

Defendant well knew, the Restated Certificate requires Defendant NL EMS to use "same methodology and assumptions," including the discount rate, in calculating the present value of NL EMS's remaining Liabilities upon redemption.  Contrary to this requirement, and in violation his fiduciary and other duties to Plaintiffs under applicable New Jersey law, Defendant Graham employed a substantially lower discount rate of 2.7% and thereby substantially overstated the net present value of NL EMS's remaining Liabilities.

197.   Defendant Graham's representation on June 28, 2005 that a 2.7% discount rate was appropriate under the terms of the Restated Certificate was false and fraudulent, and contrary to NL EMS's financial statements, which were provided to PricewaterhouseCoopers and used as part of the basis for the financial statements of NL submitted to the SEC.  Each of NL EMS's yearly financial statements for 1998 through 2003 stated that the "estimated future expenditures are discounted to present value using a discount rate of 7.2%."  Only in the year-end 2004 statement did NL EMS eliminate reference to the 7.2% discount rate.  As alleged herein, Defendants Graham and Swalwell fraudulently refused to provide Plaintiffs with copies of NL EMS's year-end 2004 financial statements until after they had given notice of their intention to "put" their shares.

198.   Defendant Graham's use of a 2.7% discount rate fraudulently reduced NL EMS's Current Corporation Value by an amount to be determined at trial.

C.     **Defendants' Fraudulent Assignment of Liabilities to NL EMS**

199.   On or about June 28, 2005, Defendant Graham knowingly and fraudulently overstated the net present value of NL EMS's remaining Liabilities, and thereby reduced the Formula Value of Plaintiffs' NL EMS shares, by improperly recording future expenses of NL on NL EMS's books and records.  On or about September 2004, Defendant Hardy fraudulently represented to Plaintiff Casey that there was no limit to NL EMS's responsibility for a particular

site until it was completely remediated and released from further action by the applicable regulatory authority.  As Defendant Hardy well knew, these statements were false and fraudulent, and contradicted the Assignment Agreement, which defines the environmental liabilities and sets forth the specific action items for which NL EMS is responsible.  As part of the scheme to deprive Plaintiffs of the full value of their NL EMS shares, Defendant Graham, in concert with Defendant Hardy, fraudulently included as remaining Liabilities of NL EMS, expenses that were the legal responsibility of NL, in connection with various sites, including but not limited to the Pedricktown Superfund site.

200.    Defendant Graham's fraudulent assignment of environmental liabilities of NL to NL EMS fraudulently reduced NL EMS's current corporation value by an amount to be determined at trial.

**D.    Fraudulent Understatement of the Value of Valhi Stock**

201.    The Restated Certificate provides that the "fair market value" of the Valhi stock will be counted toward the value of Plaintiffs' Class D and Class E shares, subject to a "collar" of not more than 120% and not less than 80% of "the per share closing price of Valhi Securities as of the business day immediately preceding the date of the first issuance of Class D [or Class E] Voting Preferred Stock [*i.e.*, May 29, 1998 or June 3, 1998, respectively], increased at a rate of 6.4% per annum."  The valuation methodology set forth in the Restated Certificate refers to the "fair market value" and "per share closing price of Valhi Securities," and makes no reference to any discount for imputed income or capital gains taxes.

202.    On or about June 28, 2005, Defendant Graham knowingly and fraudulently understated the equity value of NL EMS by falsely asserting that the fair market value of NL EMS's Valhi stock should be discounted by a supposed 40.85% federal and state corporate income tax.  The subtraction of state and federal income taxes from the appreciation on NL

EMS's Valhi stock is inconsistent with the Restated Certificate's requirement that the NL EMS follow the "same methodology and assumptions as used in the *NL EMS, Inc. Cash Flow Analysis*."  The full market value of the Valhi stock, undiscounted by any imputed tax liability, was included as part of the $104.2 million in assets that "[r]epresente[d] the present value of all contingent liabilities."  Had the parties agreed that capital gains or income taxes would reduce the net appreciation on the Valhi stock, additional assets would have had to be transferred in order to cover the shortfall at the time of the formation of NL EMS.

203.    Defendant Graham's fraudulent reduction in the value of the Valhi stock based on an estimated 40.85% income tax rate on the appreciation of the Valhi stock fraudulently reduced NL EMS's Current Corporation Value by $3,542,105.

### INTERFERENCE WITH PLAINTIFFS' RIGHT TO REVIEW BY DELOITTE

204.    Finally, Defendants Lindquist and Graham further sought to execute the scheme to defraud Plaintiffs by seeking to deprive Plaintiffs of their right to challenge the fraudulent calculation of the value of their shares.  Under the Restated Certificate, Plaintiffs have the unilateral right to seek an independent review by Deloitte of NL EMS's Formula Valuation. Specifically, the Restated Certificate provides that "*if requested by any holder of Class D [or Class E] Voting Preferred Stock*, [the Current Corporation Valuation] determination shall be reviewed by Deloitte & Touche LLP."  Despite the clear terms of the Restated Certificate, Defendants Graham and Lindquist, on behalf of NL, Contran, and Valhi, sought to obtain Deloitte's endorsement of their fraudulent valuation of NL EMS through a series of secret, *ex parte* communications with Deloitte in which they provided materially false information to Deloitte, including but not limited to the Lindquist Memorandum.

205.    At the June 28, 2005 meeting of the NL EMS Board of Directors, Defendant Graham first informed Plaintiffs that, beginning on or after June 7, 2005, he and Defendant

92

Lindquist held extensive discussions with members of Deloitte's valuation group.  In fact, Plaintiffs believe that Defendants Graham and Lindquist's discussions with Deloitte with respect to the valuation of NL EMS had begun well before June 7, 2005, without any disclosure to Plaintiffs, and despite Plaintiffs' specific request to Defendant Graham to provide information about the valuation process.  At the June 28, 2005 Board meeting, Plaintiffs objected vociferously to NL and NL EMS's preemptive, *ex parte* discussions with Deloitte, notified Defendant Graham and the rest of the NL EMS Board that they viewed these discussions as violative of the Restated Certificate, and demanded further information regarding the nature and substance of these discussions.

206.    Despite Plaintiffs' clear objections at the June 28 Board meeting, and contrary to the clear terms of the Restated Certificate, on the very next day, June 29, 2005, Defendant Graham nevertheless notified Plaintiffs that he was engaging Deloitte to conduct a review of NL EMS's Formula Valuation.  In an effort to secure Deloitte's approval of NL EMS's Formula Valuation, in or about June or July 2005, Defendants Graham and Lindquist delivered the fraudulent Lindquist Memorandum to Deloitte.  As alleged herein, the Lindquist Memorandum contains numerous statements that Defendants Graham and Lindquist knew to be false and fraudulent.  Defendants Graham and Lindquist also reiterated these false statements in discussions with Deloitte in or around June and July 2005.

207.    Based solely upon these fraudulent statements by Defendants Graham and Lindquist, and without any opportunity for Plaintiffs to be heard, Deloitte prepared an internal memorandum that concluded that "the liability of NL EMS to NL under the Tax Sharing Agreement, to the extent such liability was paid before the Measurement Date, reduces the Gross Assets of NL EMS," and therefore "the Current Corporation Valuation will be reduced by any

payment made by NL EMS pursuant to the Tax Sharing Agreement before the Measurement Date."  Moreover, Deloitte's file memorandum further observed, gratuitously, that "the Tax Sharing Agreement appears to be a reasonable means of implementing the incidence of taxation among the parties," without addressing the existence of an obvious conflict of interest between NL and NL EMS and the obvious unfairness of the Closing Agreement and Tax Sharing Agreement to NL EMS.  Although the Deloitte file memorandum was dated July 25, 2005, it was not disclosed to Plaintiffs until in or about September 2005.

208.    In a letter dated July 25, 2005, still believing that their right to an unbiased review by Deloitte could be preserved, Plaintiffs made a request to Deloitte for inspection of all records of communications that had occurred between NL, NL EMS, and Deloitte relating to the Current Corporation Value.  By letter dated August 22, 2005, Deloitte responded to Plaintiffs' inquiries by stating that it would not value the NL EMS Class D or Class E shares "or perform further services in connection with either."  By letter dated August 25, 2005, Deloitte reiterated that it "[did] not expect to have any further involvement in this matter," and further demanded that Plaintiffs cease all further communications with Deloitte, including even copying Deloitte on correspondence with NL and NL EMS about valuation issues.  Thus, by August 2005, in furtherance of the scheme to defraud, Defendants Graham and Lindquist had successfully interfered with and irretrievably impaired Plaintiffs' right to review by Deloitte of their grossly improper and self-serving Formula Valuation, thus necessitating this lawsuit.

## CLAIMS FOR RELIEF

### COUNT ONE

(RICO Conspiracy)
(Title 18, United States Code, Section 1962(d))
(All Defendants)

209.    Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

210.    Defendants are each "persons" as that term is defined in 18 U.S.C. § 1961(3).

211.    The Simmons Enterprise, as defined herein, constitutes a union or group of individuals associated in fact and thus qualifies as an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

212.    Each of the Defendants was employed by or associated with the Simmons Enterprise, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

213.    From no later than December 2002 until no earlier than June 2005, Defendants conspired to conduct and participate, directly and indirectly, in the affairs of the Simmons Enterprise through a pattern of "racketeering activity" as that term is defined in 18 U.S.C. § 1961(1) by knowingly agreeing to commit or to promote the commission of at least two indictable acts within ten years, including, as set forth in Count Two, acts of wire and mail fraud in violation of 18 U.S.C. §§ 1341 & 1343 and money laundering in violation of 18 U.S.C. § 1957.

214.    It was the objective of the Simmons Enterprise, which Defendants knowingly and purposefully agreed to promote, to obtain by fraud and false pretenses, for its own benefit, the assets of NL EMS, to fraudulently reduce the value of Plaintiffs' Class D and Class E shares of NL EMS, and thereby to reduce the cash that the Simmons Enterprise would be required to pay

95

Plaintiffs upon redemption of those shares. Each act of racketeering activity had a similar purpose, involved the same or similar participants and methods of commission, and had similar effects on similar victims. Moreover, each act of racketeering activity had a similar purpose, involved the same or similar participants and methods of commission, and had similar effects on similar victims as past racketeering acts against other victims and constitutes the regular way the Simmons Enterprise conducts business. The conduct that Defendants conspired to engage in thus constitutes a "pattern of racketeering activity" as that term is defined in 18 U.S.C. § 1961(5).

215. Plaintiffs were injured in their business or property as a direct and proximate result of the pattern of racketeering activity that Defendants conspired to engage in and promote. Specifically, Plaintiffs were deprived of the full economic value of their Class D and Class E shares of NL EMS, in the amount of no less than $40 million.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for threefold the damages sustained, in an amount to be determined at trial, and the costs of suit, including attorneys' fees, in accordance with 18 U.S.C. § 1964(c), prejudgment interest, appropriate equitable relief in accordance with 18 U.S.C. § 1964(a), and for any other relief that the Court deems just and proper in this matter.

## COUNT TWO

(Conduct of Enterprise Through Pattern of Racketeering Activity)
(Title 18, United States Code, Section 1962(c))
(All Defendants Except Simmons, Watson, Brown, and Hafer)

216. Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

217. Defendants are each "persons" as that term is defined in 18 U.S.C. § 1961(3).

218.    The Simmons Enterprise, as defined herein, constitutes a union or group of individuals associated in fact and thus qualifies as an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

219.    Each of the Defendants was employed by or associated with the Simmons Enterprise, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

220.    From no later than December 2002 until no earlier than June 2005, Defendants (except Simmons, Watson, Brown, and Hafer) conducted and participated, directly and indirectly, in the conduct of the affairs of the Simmons Enterprise through a pattern of "racketeering activity" as that term is defined in 18 U.S.C. § 1961(1) by engaging in at least two indictable acts within ten years, including, as set forth herein, acts mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and money laundering in violation of 18 U.S.C. § 1957.

221.    As alleged herein, Defendants (except Simmons, Watson, Brown, and Hafer) unlawfully, knowingly, and willfully devised and intended to devise a scheme and artifice to defraud Plaintiffs, and to obtain by means of false and fraudulent pretenses, representations, and promises, money and property belonging to Plaintiffs, including but not limited to:

a.  full and timely cash payments to Plaintiffs upon redemption of their Class D and Class E shares of NL EMS, calculated in accordance with the terms of the Restated Certificate;

b.  the full equity value of Plaintiffs' Class D and Class E shares of NL EMS;

c.  the full scope of rights and benefits pertaining to Plaintiffs' ownership of the Class D and Class E shares of NL EMS;

d.  assets of NL EMS, including but not limited to cash, credits, and tax benefits, including deductions and net operating losses;

97

e.  timely, complete, and truthful information about the assets and liabilities of NL EMS, including information relating to the valuation of those assets and liabilities for the purpose of calculating the equity value of NL EMS in accordance with the Restated Certificate;

f.  timely, complete, and truthful financial and accounting information about the performance, operations, and value of NL EMS;

g.  timely, complete, and truthful information concerning transactions effected by, with, for, or on behalf of NL EMS that affected the equity value of NL EMS, including information concerning positions taken purportedly on behalf of NL EMS in settlement discussions with the IRS;

h.  timely, complete, and truthful information about transactions between entities within the Simmons Enterprise that had the direct or indirect effect of enriching the Simmons Enterprise to the detriment of NL EMS;

i.  timely, complete, and truthful information about the facts and circumstances surrounding the IRS audit of NL, NL EMS, and other entities within the Simmons Enterprise;

j.  timely, complete, and truthful information necessary to enable Plaintiffs to discharge their duties as, directors, officers, and shareholders of NL EMS to oversee the management of NL EMS, and to prevent economic and other injuries to Plaintiffs' interests and to the interests of NL EMS; and

k.  the right to honest services, including those of the directors, officers, and agents of NL EMS.

222.   For the purpose of executing and attempting to execute the scheme and artifice to defraud, Defendants (except Simmons, Watson, Brown, and Hafer) caused to be delivered by United States mail, or private or commercial interstate carrier, according to the direction thereon, mail, matter, or things, including, as set forth below:

| Racketeering Act | Approximate Date | Mailing | Primary Defendant(s) |
|---|---|---|---|
| 1 | January 17, 2003 | January 2003 NL EMS Board of Directors materials sent to Plaintiffs by Federal Express | Hardy, NL EMS |

| 2-4 | October 15, 2003 | Letter sent by Federal Express to Plaintiff Murphy and by U.S. mail to Plaintiffs Martin and Casey announcing NL's election of Defendant Swalwell to NL EMS Board | Graham |
|---|---|---|---|
| 5 | April 7, 2005 | Letter sent by Defendant Graham (Texas) to Plaintiff Murphy (Virginia) stating that Graham "[did] not know of any specific action requiring a formal meeting of the Board of Directors at this time" | Graham |
| 6-8 | June 3, 2005 | Materials sent to Plaintiffs individually by Federal Express for June 7, 2005 NL EMS Board meeting, including the June 3, 2005 Lindquist Memorandum, the Closing Agreement, and the Tax Sharing Agreement | Lindquist, Graham, Hardy, Luttmer |
| 9-11 | June 24, 2005 | Materials sent to Plaintiffs individually by Federal Express for the June 28, 2005 NL EMS Board meeting, including the fraudulent Formula Valuation | Graham, Hardy, Lindquist, Luttmer, Swalwell |
| 12-14 | June 29, 2005 | Letters to Plaintiffs individually via Federal Express regarding $3.1 million in charges fraudulently recorded on NL EMS books and records | Graham, Swalwell |
| 15 | July 22, 2005 | Letter sent to Plaintiff Murphy by Federal Express setting forth transmittal instructions for submitting IRCC's Class D shares | Graham, St. Wrba |

223.   For the purpose of executing and attempting to execute the scheme or artifice to defraud, Defendants (except Simmons, Watson, Brown, and Hafer) transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate commerce writings, signs, signals, pictures, or sounds, including, as set forth below:

| Racketeering Act | Approximate Date | Transmission | Primary Defendant(s) |
|---|---|---|---|
| 16 | January 24, 2003 | E-mail from Karen Wilson (Texas) to Plaintiff Martin (Colorado) regarding NL EMS deduction for Granite City expenses | NL |
| 17 | February 5, 2003 | E-mail from Karen Wilson (Texas) to Plaintiff Murphy (Virginia) stating that Morrison & Foerster only represented NL | Hardy |
| 18 | October 15, 2003 | Letter sent by facsimile to Plaintiffs Martin and Casey announcing NL's election of Defendant Swalwell to NL EMS Board | Graham |
| 19 | March 11, 2004 | Facsimile from Contran tax employee (Texas) to Plaintiffs requesting consent to appoint Defendant Luttmer as Tax Director | Contran |
| 20 | May 13, 2005 | E-mail from Graham (Texas) to Plaintiffs Martin (Colorado) and Casey stating that 2004 financial statements were not yet prepared | Graham |
| 21 | June 28, 2005 | Attendance at June 28, 2005 NL EMS Board meeting by St. Wrba and Lindquist via interstate telephonic conference call | Lindquist, St. Wrba |

224.   In addition to the foregoing, for the purpose of executing and attempting to execute the scheme and artifice to defraud, Defendants (except Simmons, Watson, Brown, and Hafer) routinely communicated among themselves, with others in the Simmons Enterprise, and with third parties, including government agencies such as the IRS, SEC, and NJDEP, by causing to be delivered by United States mail, or private or commercial interstate carrier, according to the direction thereon, mail, matter, or things, in violation of 18 U.S.C. § 1341, and by transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate commerce writings, signs, signals, pictures, or sounds, in violation of 18 U.S.C. § 1343.

225.   Defendants (except Simmons, Watson, Brown, and Hafer) knowingly engaged or attempted to engage in a monetary transaction in the United States, in or affecting interstate commerce, in criminally derived property of a value greater than $10,000, which was derived from specified unlawful activity, to wit, mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of 18 U.S.C. § 1343, as set forth below:

| Racketeering Act | Approximate Date | Transaction | Primary Defendant(s) |
|---|---|---|---|
| 22 | April 11, 2005 | Transfer of $20.8 million from NL to Internal Revenue Service | NL |

226.   Defendants (except Simmons, Watson, Brown, and Hafer) aided, abetted, counseled, commanded, induced, or procured, and did willfully cause, the commission of the racketeering acts alleged herein, and are thus liable as principals for the racketeering acts alleged herein pursuant to 18 U.S.C. § 2.

227.   It was the objective of the Simmons Enterprise to obtain by fraud and false pretenses, for its own benefit, the assets of NL EMS, to fraudulently reduce the value of Plaintiffs' Class D and Class E Preferred shares of NL EMS, and thereby to reduce the cash that

the Simmons Enterprise would be required to pay Plaintiffs upon redemption of those shares. Each act of racketeering activity had a similar purpose, involved the same or similar participants and methods of commission, and had similar effects on similar victims.  Moreover, each act of racketeering activity had a similar purpose, involved the same or similar participants and methods of commission, and had similar effects on similar victims as past racketeering acts against other victims and constitutes the regular way the Simmons Enterprise conducts business. Defendants' conduct thus constitutes a "pattern of racketeering activity" as that term is defined in 18 U.S.C. § 1961(5).

228.   Plaintiffs were injured in their business or property as a direct and proximate result of Defendants' pattern of racketeering activity.  Specifically, Plaintiffs were deprived of the full economic value of their Class D and Class E shares of NL EMS, in the amount of no less than $40 million.

WHEREFORE, Plaintiffs demand judgment against Defendants (except Simmons, Watson, Brown, and Hafer), jointly and severally, for threefold the damages sustained, in an amount to be determined at trial, and the costs of suit, including attorneys' fees, in accordance with 18 U.S.C. § 1964(c), prejudgment interest, appropriate equitable relief in accordance with 18 U.S.C. § 1964(a), and for any other relief that the Court deems just and proper in this matter.

COUNT THREE

(Racketeering Conspiracy)
(Title 2C, New Jersey Statutes, Chapter 41, Section 2(d))
(All Defendants)

229.   Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

102

230.    Defendants are each "persons" as that term is defined in N.J. Stat. Ann. 2C:41-1(b).

231.    The Simmons Enterprise, as defined herein, constitutes a union or group of affiliated corporations and individuals associated in fact and thus qualifies as an "enterprise" within the meaning of N.J. Stat. Ann. 2C:41-1(c).

232.    Each of the Defendants was employed by or associated with the Simmons Enterprise, an enterprise engaged in, and the activities of which affected, commerce within the meaning of N.J. Stat. Ann. 2C:41-1(h) and 2C:41-2(c).

233.    From no later than December 2002 until no earlier than June 2005, Defendants conspired to conduct and participate, directly and indirectly, in the enterprise through a pattern of "racketeering activity" as that term is defined in N.J. Stat. Ann. 2C:41-1(a) by knowingly agreeing to commit or to promote the commission of at least two indictable acts within ten years, including acts constituting "racketeering activity" as defined under federal law and incorporated by N.J. Stat. Ann. 2C:41-1(a)(2), to wit, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and money laundering in violation of § 1957, as set forth in Count Two; violations of chapter 20 of Title 2C of the New Jersey Statutes, as incorporated by N.J. Stat. Ann. 2C:41-1(a)(1)(n), including theft (N.J. Stat. Ann. 2C:20-2) and theft by deception (N.J. Stat. Ann. 2C:20-4); and violations of chapter 21 of Title 2C of the New Jersey Statutes, as incorporated by N.J.S.A 2C:41-1(a)(1)(o), including deceptive business practices (N.J. Stat. Ann. 2C:21-7), and misconduct by a corporate official (N.J. Stat. Ann. 2C:21-9).

234.    It was the objective of the Simmons Enterprise, which Defendants knowingly and purposefully agreed to promote, to obtain by fraud and false pretenses, for its own benefit, the assets of NL EMS, to fraudulently reduce the value of Plaintiffs' Class D and Class E Preferred

shares of NL EMS, and thereby to reduce the cash that the Simmons Enterprise would be required to pay Plaintiffs upon redemption of those shares.  Each act of racketeering activity had a similar purpose, involved the same or similar participants and methods of commission, and had similar effects on similar victims.  Moreover, each act of racketeering activity had a similar purpose, involved the same or similar participants and methods of commission, and had similar effects on similar victims as past acts against other victims and constitutes the regular way the Simmons Enterprise conducts business.  The conduct that Defendants conspired to engage in thus constitutes a "pattern of racketeering activity" as that term is defined in N.J. Stat. Ann. 2C:41-1(d).

235.    Plaintiffs were damaged in their business or property as a direct and proximate result of Defendants' pattern of racketeering activity.  Specifically, Plaintiffs were deprived of the full economic value of their Class D and Class E shares of NL EMS, in the amount of no less than $40 million.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for threefold the damages sustained, in an amount to be determined at trial, and the costs of suit, including attorneys' fees, costs of investigation, and all other litigation costs, in accordance with N.J. Stat. Ann. 2C:41-4(c), prejudgment interest, appropriate equitable relief in accordance with N.J. Stat. Ann. 2C:41-4(a), and for any other relief that the Court deems just and proper in this matter.

<u>COUNT FOUR</u>

(Conduct of Enterprise Through a Pattern of Racketeering Activity)
(Title 2C, New Jersey Statutes, Chapter 41, Section 2(c))
(All Defendants Except Simmons, Watson, Brown and Hafer)

236.    Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

237.    Defendants are each "persons" as that term is defined in N.J. Stat. Ann. 2C:41-1(b).

238.    The Simmons Enterprise, as defined herein, constitutes a union or group of affiliated corporations and individuals associated in fact and thus qualifies as an "enterprise" within the meaning of N.J. Stat. Ann. 2C:41-1(c).

239.    Each of the Defendants was employed by or associated with the Simmons Enterprise, an enterprise engaged in, and the activities of which affected, commerce within the meaning of N.J. Stat. Ann. 2C:41-1(h) & 2C:41-2(c).

240.    From no later than December 2002 until no earlier than June 2005, Defendants (except Simmons, Watson, Brown, and Hafer) conducted and participated, directly and indirectly, in the Simmons Enterprise through a pattern of "racketeering activity" as that term is defined in N.J. Stat. Ann. 2C:41-1(a) by engaging in at least two indictable acts within ten years, including, as set forth herein, acts constituting "racketeering activity" as defined under federal law and incorporated by N.J. Stat. Ann. 2C:41-1(d)(2), to wit, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and money laundering in violation of § 1957, as set forth in Count Two; violations of chapter 20 of Title 2C of the New Jersey Statutes, as incorporated by N.J. Stat. Ann. 2C:41-1(a)(1)(n), including theft (N.J. Stat. Ann. 2C:20-2) and theft by deception (N.J. Stat. Ann. 2C:20-4); and violations of chapter 21 of Title 2C of the New Jersey Statutes, as incorporated by N.J.S.A 2C:41-1(a)(1)(o), including deceptive

business practices (N.J. Stat. Ann. 2C:21-7), and misconduct by a corporate official (N.J. Stat. Ann. 2C:21-9).

241.    It was the objective of the Simmons Enterprise to obtain by fraud and false pretenses, for its own benefit, assets of NL EMS, to fraudulently reduce the value of Plaintiffs' Class D and Class E Preferred shares of NL EMS, and thereby to reduce the cash that the Simmons Enterprise would be required to pay Plaintiffs upon redemption of those shares.  Each act of racketeering activity had a similar purpose, involved the same or similar participants and methods of commission, and had similar effects on similar victims.  Moreover, each act of racketeering activity had a similar purpose, involved the same or similar participants and methods of commission, and had similar effects on similar victims as past racketeering acts against other victims and constitutes the regular way the Simmons Enterprise conducts business. Defendants' conduct thus constitutes a "pattern of racketeering activity" as that term is defined in N.J. Stat. Ann. 2C:41-1(d).

242.    Plaintiffs were damaged in their business or property as a direct and proximate result of Defendants' pattern of racketeering activity.  Specifically, Plaintiffs were deprived of the full economic value of their Class D and Class E shares of NL EMS, in the amount of no less than $40 million.

WHEREFORE, Plaintiffs demand judgment against Defendants (except Simmons, Watson, Brown, and Hafer), jointly and severally, for threefold the damages sustained, in an amount to be determined at trial, and the costs of suit, including attorneys' fees, costs of investigation, and all other litigation costs, in accordance with N.J. Stat. Ann. 2C:41-4(c), prejudgment interest, appropriate equitable relief in accordance with N.J. Stat. Ann. 2C:41-4(a), and for any other relief that the Court deems just and proper in this matter.

COUNT FIVE

(Minority Shareholder Oppression)
(Title 14A, New Jersey Statutes, Chapter 12, Section 7(1)(c))
(NL and the Director Defendants)

243.    Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as it fully set forth herein.

244.    NL EMS is and since at least June 1, 1998 has been a New Jersey corporation with fewer than 25 shareholders.

245.    Through the acts and omissions complained of herein, NL, as the controlling majority shareholder of NL EMS, acted fraudulently and illegally, mismanaged NL EMS, and acted oppressively and unfairly toward Plaintiffs, as shareholders, directors, and officers of NL EMS.

246.    Through the acts and omissions complained of herein, the Director Defendants, as the majority directors and officers of NL EMS, at the behest of NL, acted fraudulently and illegally, mismanaged NL EMS, abused their authority as directors and officers of NL EMS, and acted oppressively and unfairly toward Plaintiffs, as shareholders, directors, and officers of NL EMS.

247.    The actions of NL and the Director Defendants were taken arbitrarily, vexatiously, and not in good faith, and they constitute egregious and malicious conduct.

248.    As a result of the conduct set forth herein, Plaintiffs were deprived of their rights as shareholders, directors, and officers of NL EMS, including (without limitation) the rights enumerated in Paragraph 221, which is realleged and reincorporated as if fully set forth herein.

249.    Plaintiffs continue to have legal and beneficial interests in NL EMS as an ongoing corporation, with separate existence from NL, and in possession of valuable assets that are

subject to ongoing fraud, mismanagement, breach of fiduciary duty, and other unlawful conduct at the hands of NL and the Director Defendants.

WHEREFORE, Plaintiffs demand judgment against NL and the Director Defendants for relief pursuant to N.J. Stat. Ann. 14A:12-7, including equitable relief as well as damages, jointly and severally, in an amount to be determined at trial, together with interest, court costs, attorneys' fees, and punitive damages, and for any other relief that the Court deems just and proper in this matter.

## COUNT SIX

(Fraud)
(New Jersey Law)
(Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS)

250.    Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

251.    Defendants Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS made materially false statements, representations, and omissions of material facts to Plaintiffs as alleged herein.

252.    Defendants Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS acted with scienter, in that they either had actual knowledge of the falsity of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in failing to ascertain and disclose the true facts, even though such facts were available to them.

253.    The misrepresentations of Defendants Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS were material and made for the purpose and with the intent of inducing Plaintiffs to rely upon them to their detriment.

254.    Plaintiffs, unaware of the falsity of the statements, representations, and omissions of material fact of Defendants Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS, reasonably relied on them to their detriment.  Without limitation, Plaintiffs reasonably relied on these statements, representations, and omissions of material fact in that they devoted time, money, and resources to increasing the equity value of NL EMS, and forbore to take steps to defend their interests and the interests of NL EMS in the negotiation of the Closing Agreement and Tax Sharing Agreement.

255.    As a direct and proximate result of this unlawful conduct, Plaintiffs suffered damages.  Specifically, Plaintiffs were deprived of the full economic value of their Class D and Class E shares of NL EMS, in the amount of no less than $40 million.

WHEREFORE, Plaintiffs demand judgment against Defendants Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS, jointly and severally, for damages in an amount to be determined at trial, together with interest, court costs, punitive damages, and for any other relief that the Court deems just and proper in this matter, including appropriate equitable relief.

## COUNT SEVEN

(Breach of Fiduciary Duty)
(New Jersey Law)
(NL, Hardy, and the Director Defendants)

256.    Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

257.    NL, as controlling shareholder of NL EMS, and Defendant Hardy and the Director Defendants, as majority directors and officers of NL EMS, had fiduciary duties to NL EMS and to Plaintiffs as the minority shareholders and directors of NL EMS.  Among other things, NL, Hardy, and the Director Defendants were charged with the duties of utmost loyalty,

good faith, fair dealing, due care, full candor and disclosure, and due diligence for the protection of Plaintiffs' minority interests.

258.    NL, Hardy, and the Director Defendants breached their fiduciary duties to Plaintiffs by engaging in the acts and omissions complained of herein.  Without limitation, NL, Hardy, and the Director Defendants violated their duties under New Jersey law by causing NL EMS to retain conflicted counsel, Morrison & Foerster, without procuring separate representation for NL EMS in the IRS audit; by causing NL EMS to enter into self-dealing transactions with NL and Contran for the benefit of the Simmons Enterprise; employing a scheme and artifice to defraud Plaintiffs of the full value of their Class D and Class E shares; refusing to hold Board meetings and fraudulently representing that NL EMS had taken no action requiring such a meeting; refusing to prepare and provide financial statements to Plaintiffs despite their repeated requests; refusing to respond to requests for information regarding corporate governance; failing to keep adequate and accurate books and records; refusing to respect NL EMS as a separate bona fide corporation; and preparing a knowingly false and fraudulent valuation of Plaintiffs' Class D and Class E shares.

259.    As a direct and proximate result of NL, Hardy, and the Director Defendants' breach of their fiduciary duties, Plaintiffs suffered damages.  Specifically, Plaintiffs were deprived of the full economic value of their Class D and Class E shares of NL EMS, in the amount of no less than $40 million.

WHEREFORE, Plaintiffs demand judgment against NL, Hardy, and the Director Defendants, jointly and severally, for damages in an amount to be determined at trial, together with interest, court costs, punitive damages, and for any other relief that the Court deems just and proper in this matter.

## COUNT EIGHT

(Aiding and Abetting Fraud)
(New Jersey Law)
(All Defendants Except Simmons and Watson)

260.   Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

261.   Defendants Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS made material misrepresentations and omissions of material fact, having actual knowledge of the falsity of the misrepresentations and omissions of material facts set forth herein, or with reckless disregard for the truth in failing to ascertain and disclose the true facts, even though such facts were available to them, and with the purpose and with the intent of inducing Plaintiffs to rely upon them to their detriment.   Plaintiffs, unaware of the falsity of Defendants' statements, representations, and omissions of material fact, reasonably relied on them to their detriment.

262.   All Defendants (except Simmons and Watson) knew of the fraudulent misrepresentations and material omissions of Defendants Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS, and having such knowledge, knowingly and substantially assisted and participated in those acts of fraud.

263.   As a direct and proximate result of the fraudulent acts of Defendants Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS, which all Defendants (except Simmons and Watson) knowingly and substantially assisted, Plaintiffs suffered damages.   Specifically, Plaintiffs were deprived of the full economic value of their Class D and Class E shares of NL EMS, in the amount of no less than $40 million.

WHEREFORE, Plaintiffs demand judgment against Defendants (except Simmons and Watson), jointly and severally, for damages in an amount to be determined at trial, together with

interest, court costs, punitive damages, and for any other relief that the Court deems just and proper in this matter.


COUNT NINE

(Aiding and Abetting Breach of Fiduciary Duty)
(New Jersey Law)
(All Defendants Except Simmons and Watson)

264.    Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

265.    NL, as controlling shareholder of NL EMS, and Hardy and the Director Defendants, as majority directors and officers of NL EMS, had fiduciary duties to NL EMS and to Plaintiffs as the minority shareholders and directors of NL EMS.  In particular, NL, Hardy, and the Director Defendants were charged with the duties of utmost loyalty, good faith, fair dealing, due care, full candor and disclosure, and due diligence for the protection of Plaintiffs' minority interests.  NL, Hardy, and the Director Defendants breached their fiduciary duty to Plaintiffs by engaging in the acts and omissions complained of herein.

266.    All Defendants (except Simmons and Watson) knew of the breaches of fiduciary duty by NL, Hardy, and the Director Defendants and, having such knowledge, knowingly and substantially assisted and participated in those breaches of fiduciary duty.

267.    As a direct and proximate result of the breach of their fiduciary duties by NL, Hardy, and the Director Defendants, which all Defendants (except Simmons and Watson) knowingly and substantially assisted, Plaintiffs suffered damages.  Specifically, Plaintiffs were deprived of the full economic value of their Class D and Class E shares of NL EMS, in the amount of no less than $40 million.

WHEREFORE, Plaintiffs demand judgment against Defendants (except Simmons and Watson), jointly and severally, for damages in an amount to be determined at trial, together with interest, court costs, punitive damages, and for any other relief that the Court deems just and proper in this matter.

COUNT TEN

(Civil Conspiracy)
(New Jersey Law)
(All Defendants)

268.    Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

269.    NL, as controlling shareholder of NL EMS, and Hardy and the Director Defendants, as majority directors and officers of NL EMS, had fiduciary duties to NL EMS and to Plaintiffs as the minority shareholders and directors of NL EMS.  Among other things, NL, Hardy, and the Director Defendants were charged with the duties of utmost loyalty, good faith, fair dealing, due care, full candor and disclosure, and due diligence for the protection of Plaintiffs' minority interests.  NL, Hardy, and the Director Defendants breached their fiduciary duty to Plaintiffs by engaging in the acts and omissions complained of herein.

270.    Defendants Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS made material misrepresentations and omissions of material fact, having actual knowledge of the falsity of the misrepresentations and omissions of material facts set forth herein, or with reckless disregard for the truth in failing to ascertain and disclose the true facts, even though such facts were available to them, and with the purpose and with the intent of inducing Plaintiffs to rely upon them to their detriment.  Plaintiffs, unaware of the falsity of Defendants' statements, representations, and omissions of material fact, reasonably relied on them to their detriment.

113

271.    Defendants, consisting of a combination of two or more persons, knowingly and willingly entered into an agreement or confederation, each sharing a common unlawful purpose, or the common purpose of using unlawful means, to wit, promoting the breaches of fiduciary duty of NL, Hardy, and the Director Defendants, as well as the acts of fraudulent misrepresentation and material omissions of Defendants Lindquist, Hardy, Graham, Contran, Valhi, NL, and NL EMS.

272.    As a direct and proximate result of these breaches of fiduciary duty and fraudulent acts, which Defendants knowingly and willingly conspired, combined, and agreed to promote, Plaintiffs suffered damages.  Specifically, Plaintiffs were deprived of the full economic value of their Class D and Class E shares of NL EMS, in the amount of no less than $40 million.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for damages in an amount to be determined at trial, together with interest, court costs, punitive damages, and for any other relief that the Court deems just and proper in this matter.

## COUNT ELEVEN

(Breach of Contract)
(New Jersey Law)
(NL and NL EMS)

273.    Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

274.    Under section 3.3 of the Stockholder Agreement (dated June 1, 1998, as amended June 4, 1998), NL and NL EMS promised to adhere "in all material respects" to the provisions of NL EMS's Restated Certificate and By-Laws.  Defendants NL and NL EMS breached their duties to the Shareholder Plaintiffs under the Stockholder Agreement by, among other things, rendering a valuation of Shareholder Plaintiffs' Class D and Class E Preferred shares that was in

bad faith and patently inconsistent with the methodology prescribed in detail in the Restated Certificate, failing to secure protection of Plaintiffs as minority shareholders by obtaining approval of the Closing Agreement by disinterested directors, as required by NL EMS's By-Laws, and violating and interfering with Plaintiffs' unilateral right to Deloitte's independent reassessment of the value of their Class D and Class E Preferred shares by engaging in *ex parte* communications in which they provided Deloitte with selective and misleading information regarding the value of Shareholder Plaintiffs' shares.

275.    As a result of the conduct set forth herein, Plaintiffs suffered damages in that they were deprived of the full value of their Class D and Class E shares, and were deprived of significant legal fees as a result of the violation of their right to an impartial review by Deloitte, which necessitated this lawsuit.

WHEREFORE, Plaintiffs demand judgment against Defendants NL and NL EMS for damages, jointly and severally, in an amount to be determined at trial, together with interest, court costs, and for any other relief that the Court deems just and proper in this matter, including appropriate equitable relief.

COUNT TWELVE

(Tortious Interference With Economic Relations)
(New Jersey Law)
(Lindquist, Graham, Contran, Valhi, NL and NL EMS)

276.    Plaintiffs reallege and reincorporate the allegations of Paragraphs 1 through 208, as if fully set forth herein.

277.    Plaintiffs had a protectable right under the Restated Certificate to seek, at their exclusive election, an independent review of NL EMS's Initial Valuation by Deloitte.   That provision was included to safeguard the Plaintiffs' reasonable expectation of an independent

valuation by Deloitte given NL and NL EMS's obvious conflict of interest in the valuation process, and thereby to ensure that Plaintiffs received the full value of their Class D and Class E Preferred shares.

278.   After rendering a fraudulent Formula Valuation, in violation of the Restated Certificate, Defendants Graham and Lindquist, acting on behalf of Contran, Valhi, NL, and NL EMS, knowingly, intentionally and without justification or excuse interfered with Plaintiffs' right to an independent review by Deloitte.   Specifically, Defendants Graham and Lindquist preemptively sought Deloitte's review of its own valuation, and obtained Deloitte's fraudulently approval of aspects of that valuation through *ex parte* communications in which they provided Deloitte with selective and misleading information regarding the value of Plaintiffs' shares. Defendants' interference deprived Plaintiffs of the anticipated economic benefits of Deloitte's review, to wit, the full value of their shares using the appropriate methodology set forth in the Restated Certificate, and avoidance of the significant legal fees incurred in this lawsuit.

WHEREFORE, Plaintiffs demand judgment against Defendants Lindquist, Graham, Contran, Valhi, NL and NL EMS, jointly and severally, for damages in an amount to be determined at trial, together with interest, court costs, and for any other relief that the Court deems just and proper in this matter, including appropriate equitable relief.

Dated: March 31, 2006

Neil Cartusciello (NC 2460)
104 Mountainside Road
Mendham, NJ 07945
(973) 543-8200

Reid M. Figel
Derek T. Ho
Kellogg, Huber, Hansen, Todd,
   Evans & Figel, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20037
(202) 326-7900

Philip Karter
Miller & Chevalier Chartered
300 Conshohocken State Road
Suite 570
West Conshohocken, PA 19428
(610) 729-7820

*Attorneys for Plaintiffs*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, and in compliance with Rule 38.1 of the Local Rules of the District of New Jersey, Plaintiffs in the above-captioned action hereby request a trial by jury on all issues so triable.

Dated: March 31, 2006

Neil Cartusciello (NC 2460)
104 Mountainside Road
Mendham, NJ 07945
(973) 543-8200

Reid M. Figel
Derek T. Ho
Kellogg, Huber, Hansen, Todd,
  Evans & Figel, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20037
(202) 326-7900

Philip Karter
Miller & Chevalier Chartered
300 Conshohocken State Road
Suite 570
West Conshohocken, PA 19428
(610) 729-7820

*Attorneys for Plaintiffs*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Rule 11.2 of the Local Civil Rules for the United States District Court for the District of New Jersey, counsel for Plaintiffs certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Neil Cartusciello (NC 2460)
104 Mountainside Road
Mendham, NJ 07945
(973) 543-8200

Reid M. Figel
Derek T. Ho
Kellogg, Huber, Hansen, Todd,
    Evans & Figel, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, DC 20037
(202) 326-7900

Philip Karter
Miller & Chevalier Chartered
300 Conshohocken State Road
Suite 570
West Conshohocken, PA 19428
(610) 729-7820

*Attorneys for Plaintiffs*

119

**EXHIBIT A**
**LOCAL RULE 10.1 DISCLOSURE**

<u>Plaintiffs</u>

Plaintiff Michael J. Murphy resides at 9330 Georgetown Pike, Great Falls, Virginia, 22066.

Plaintiff Marcus A. Martin resides at 522 Highland Avenue, Boulder, Colorado, 80302.

Plaintiff Terry S. Casey resides at 14903 Timbershade Crossing, Magnolia, Texas, 77355.

Plaintiff Industrial Recovery Capital Holdings Co., a Delaware corporation, has its principal place of business at 11911 Freedom Drive, Suite 900, Reston, Virginia, 20190.

Plaintiff Highland Environmental Management, LLC, a Colorado corporation, has its principal place of business at 1630 30th Street, Suite 600, Boulder, Colorado, 80301.

Plaintiff Efficasey Environmental, LLC, a Texas corporation, has its principal place of business at 506 North Pine Street, Tomball, Texas, 77375.

<u>Defendants</u>

Defendant Harold C. Simmons resides at 5915 Deloache Avenue, Dallas, Texas, 75225.

Defendant William J. Lindquist resides at 3320 Overland Drive, Plano, Texas, 75023.

Defendant Steven L. Watson resides at 4631 Allencrest Lane, Dallas, Texas, 75244.

Defendant Robert D. Hardy resides at 24607 East Kingscrest Circle, Spring, Texas, 77389.

Defendant Robert D. Graham resides at 7058 Elmridge Drive, Dallas, Texas, 75240.

Defendant Kelly J. Luttmer resides at 821 Kings Canyon Court, Coppell, Texas, 75019.

Defendant John Allen St. Wrba resides at 4506 Wildgrove Court, Flower Mound, Texas, 75022.

Defendant Gregory M. Swalwell resides at 7915 Xavier Court, Dallas, Texas, 75218.

Defendant James W. Brown resides in or around Dallas, Texas, at an address unknown to Plaintiffs.  His business address is c/o NL Industries, Inc., Three Lincoln Centre, 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240.

Defendant Timothy C. Hafer resides at 6306 Warm Mist Lane, Dallas, Texas, 75248.

Defendant NL Industries, Inc., a New Jersey corporation, has its principal place of business at Three Lincoln Centre, 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240.

Defendant NL Environmental Management Services, Inc., a New Jersey corporation, has its principal place of business at Three Lincoln Centre, 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240.

Defendant Contran Corporation, a Delaware corporation, has its principal place of business at Three Lincoln Centre, 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240.

Defendant Valhi, Inc., a Delaware Corporation, has its principal place of business at Three Lincoln Centre, 5430 LBJ Freeway, Suite 1700, Dallas, Texas, 75240.