**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MICHAEL J. MURPHY, MARCUS A. MARTIN, TERRY S. CASEY, INDUSTRIAL RECOVERY CAPITAL HOLDINGS CO., HIGHLAND ENVIRONMENTAL MANAGEMENT LLC, and EFFICASEY ENVIRONMENTAL, LLC, | : : : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | **OPINION** |
| HAROLD C. SIMMONS, WILLIAM J. LINDQUIST, STEVEN L. WATSON, ROBERT D. HARDY, ROBERT D. GRAHAM, KELLY J. LUTTMER, JOHN ALLEN ST. WRBA, GREGORY M. SWALWELL, JAMES W. BROWN, TIMOTHY C. HAFER, NL INDUSTRIES, INC., NL ENVIRONMENTAL MANAGEMENT SERVICES, INC. CONTRAN CORPORATION, and VALHI, INC., | : : : : : : : : : : : : : | Civ. No. 06-1535 (WHW) |
| Defendants. | : : : | |

**Walls, Senior District Judge**

      Harold C. Simmons ("Simmons"), NL Industries, Inc. ("NL"), and NL Environmental

Management Services, Inc. ("NL EMS") (collectively "Defendants") move to disqualify the

counsel of Michael J. Murphy ("Murphy"), Marcus A. Martin ("Martin"), Terry S. Casey

("Casey"), Industrial Recovery Capital Holdings Co. ("IRCC"), Highland Environmental

NOT FOR PUBLICATION

Management, LLC ("Highland"), and Efficasey Environmental, LLC (collectively "Plaintiffs").

Defendants are represented by the law firm, Kellogg, Huber, Hansen, Todd, Evans & Figel,

P.L.L.C., ("Kellogg Huber") and by local counsel Neil Cartusciello, Esq.  This motion is decided

without oral argument pursuant to Fed. R. Civ. P. 78.


## FACTS AND PROCEDURAL HISTORY

1.      **Background of NL and Its Environmental Liabilities**

NL, formerly known as the National Lead Company, was first incorporated in New Jersey

in 1891.  See First Amended Complaint at ¶ 59 (Dkt. Entry 21, filed Jun. 15, 2006) ("Am.

Compl.").  NL's historical business operations, which included, among other things, lead mining,

lead processing, secondary lead smelting, and titanium dioxide manufacturing, caused substantial

environmental damage.  See id.  Thus, NL has been the subject of scores of environmental

lawsuits, as either a defendant or a Potentially Responsible Party ("PRP"), seeking to impose

financial responsibility on NL for the remediation (clean-up) of these sites under environmental

laws such as the federal Comprehensive Environmental Response, Compensation, and Liability

Act of 1980 ("CERCLA") (known as the "Superfund" law) and its state equivalents.  See id.

The evaluation and remediation of environmental liabilities such as those faced by NL is

inherently a joint legal and technical effort.  See Declaration of Michael J. Murphy ¶ 22

("Murphy Decl."); Declaration of Terry S. Casey ¶ 24 ("Casey Decl.").  The effective

management of environmental liabilities requires not only both legal and technical expertise, but

also that lawyers and environmental engineers work closely together and exchange information.

NOT FOR PUBLICATION

<u>See</u> Casey Decl. ¶ 24. This is because the government's case for potential liability under federal or state environmental laws typically claims contamination of one or more environmental media (suspected groundwater contamination or soil sampling results indicating unacceptable levels of pollutants). Almost invariably, these legal issues require the intensive involvement of a technical consultant with expertise in environmental remediation. Negotiations with the government are attended by both the legal and technical representatives of the PRP, and the result is usually some form of voluntary or compulsory governmental order. These orders are ostensibly legal documents but are actually full of technical information and requirements. Due to the joint technical and legal nature of the obligations imposed by these documents, it is imperative that both legal and technical experts are involved in their negotiation and finalization. The combined use of attorneys and technical experts working cooperatively to manage environmental liabilities is standard operating procedure within the liability management field. To effectively manage the liabilities, attorneys and technical experts are required to share information concerning the subject liabilities. <u>See</u> <u>id.</u>

### 2. Mr. Martin's Representation of NL and Mr. Simmons Before June 1998

Marcus Martin has been a licensed attorney since 1989. In 1994, when Martin was at the Denver law firm of Bartlit Beck Herman Palenchar & Scott ("Bartlit Beck"), NL and Bartlit Beck entered into a three-year fixed-fee contract ("NL/Bartlit Beck Contract") for the performance of environmental legal services. Martin was the Bartlit Beck attorney assigned to work on matters subject to the NL/Bartlit Beck Contract. <u>See</u> Declaration of Marcus A. Martin ¶ 9 ("Martin Decl."). Between 1994 and 1997, Martin spent over 2000 hours a year on NL's environmental

NOT FOR PUBLICATION

litigation matters.  Martin Decl. ¶ 21.  The NL/Bartlit Beck Contract was extended on a

month-to-month basis from 1997 until approximately June 1998.  Martin Decl. ¶ 12.  Martin

worked in conjunction with NL's in-house technical personnel to manage NL's environmental

liabilities.  See id. ¶ 10.

 Shortly after the NL contract expired, Martin joined the trial team representing Simmons

in the Simmons Family Trust Litigation, which involved allegations by two of Simmons'

daughters, Scheryle Patigian and Andrea Swanson, beneficiaries of certain Simmons Family

Trusts, that Simmons had violated his fiduciary duties to them as trustee.  See Declaration of

William J. Lindquist ¶ 2 ("Lindquist Decl.").  Barlit Beck was Simmon's lead counsel in

defending against all allegations by Simmon's daughters.  See id. ¶ 12.  From May to August of

1997, Martin billed approximately 130 hours on matters related to the Simmons Family Trust

Litigation.  Id. ¶ 15.

   **3.**  **Mr. Martin's Involvement with Messrs. Murphy and Casey in NL EMS**

 In 1997, NL began considering a restructuring plan in which NL would transfer the

responsibility for managing NL's environmental liabilities to a special purpose subsidiary, NL

EMS.  In addition, the plan contemplated that NL would transfer the financial responsibility for

certain defined remedial obligations to NL EMS and also contribute an amount of assets

calculated to equal the estimated present value of the future expenditures associated with those

obligations.  Then, NL would recruit environmental remediation experts, who would both

manage the transferred liabilities as "service providers" to NL EMS and purchase a minority

equity interest in NL EMS.  One of the dominant purposes of the special purpose entity was to

**NOT FOR PUBLICATION**

reduce the costs associated with NL's environmental liabilities by providing an "alignment of interests" among NL, the special purpose entity, and those responsible for managing those environmental liabilities. See Am. Compl. ¶¶ 8, 61-62; Casey Decl. ¶ 11; Martin Decl. ¶ 14. As a result of this arrangement, NL created a situation in which each of these service providers had a direct financial incentive to resolve NL EMS's assumed liabilities as cost efficiently as possible, a motivation to work closely together and share all relevant information related to these liabilities, and ultimately thereby to increase the equity value of NL EMS on behalf of NL and the minority shareholders of NL EMS. See Casey Decl. ¶ 22; Martin Decl. ¶ 14.

In January 1998, NL solicited requests for qualifications and expressions of interest from potential consultants interested in managing NL's liabilities. Because Martin and Casey were experts in environmental liability management, and were the personnel then-responsible for collectively managing the environmental liabilities that NL contemplated transferring to this special purpose subsidiary, NL asked them to assist in evaluating the qualifications and proposals of the prospective investors/service providers. Casey and Martin worked with others at NL to assist the potential investors/service providers in understanding and assessing all aspects, both legal and technical, of NL's environmental liabilities, as well to as provide other assistance as requested. See Casey Decl. ¶¶ 10, 12-13; Martin Decl. ¶ 15.

Because NL was dissatisfied with the potential investors and service providers who responded to the initial request for proposal, NL requested that Casey and Martin consider becoming the service providers and investors in the new subsidiary. See Casey Decl. ¶¶ 14-15. NL also solicited a third investor, Industrial Recovery Capital Holdings Company ("IRCC"),

**NOT FOR PUBLICATION**

whose founder and CEO is Murphy.[1]  IRCC proposed to team up with its affiliated company,

Environmental Strategies Corporation ("Environmental Strategies"), a leading environmental

consulting, management, and engineering firm. Environmental Strategies was also co-founded by

Murphy, and Murphy served as its CEO. See Murphy Decl. ¶¶ 2, 3, 8.  Throughout the

negotiations leading up to the formation of NL EMS, NL was represented by Mr. David Garten

("Garten"), NL's General Counsel, and also by separate outside counsel, Karen Chapman of the

law firm of Shearman & Howard in Denver.  Casey, Martin, and Murphy each retained separate

counsel.  See Casey Decl. ¶ 19; Martin Decl. ¶ 24; Murphy Decl. ¶ 15.

Martin formed a single-member company, Highland Environmental Management, LLC

("Highland"),[2] to provide legal services to NL and NL EMS.  See Martin IRS Interview p. 13:

23-25.  Under a Management Services Agreement ("MSA") with NL EMS dated June 1, 1998,

Martin received annual compensation of $600,000 (adjusted annually for inflation) and under a

similar MSA with NL dated June 25, 1998, Martin received annual compensation of $50,000

(adjusted annually for inflation).  See Declaration of Robert D. Graham ("Graham Decl.").  NL

EMS entered into an arrangement with Casey, a former NL employee, and his single-member

company, Efficasey Environmental, LLC ("Efficasey"),[3] to perform technical environmental

services and to become an equity investor in NL EMS.  See Am. Compl. ¶ 67.  Murphy, through

IRCC, invested in NL EMS and performed environmental services for NL EMS under a separate

---

[1] References to Murphy in this Opinion shall include both Murphy and IRCC.

[2] References to Martin in this Opinion shall include both Martin and Highland.

[3] References to Casey in this Opinion shall include both Casey and Efficasey.

NOT FOR PUBLICATION

agreement through Environmental Strategies.  See id. ¶ 66.

Immediately after they became minority shareholders, directors, and officers of NL EMS, Murphy, Martin, and Casey took over the day-to-day management of NL EMS and began working to resolve and manage the environmental liabilities that NL EMS had assumed from NL.

**4.     The Complaint**

The First Amended Complaint provides the following allegations: By about 2002, plaintiffs' efforts in managing NL EMS's environmental liabilities since 1998 had generated at least $30 million in cost savings in comparison to the parties' original estimates.  Am. Compl. ¶ 113.  Under the provisions of the Restated Certificate, NL EMS could be required to make payments, in cash, to plaintiffs in the amount of their 39% equity interest in NL EMS.  Id.  In December 2002, defendants came to appreciate that under the terms of the Restated Certificate, plaintiffs were entitled to receive a cash payment amounting to tens of millions of dollars upon redemption of their Class D and Class E shares.  Id. ¶ 115.   Defendants then conspired to devise and execute a scheme and artifice to unlawfully defraud plaintiffs and to obtain their money and property by fraudulently diverting most of the equity value of NL EMS to the Simmons Enterprise.  Id.  Plaintiffs brought charges of fraud, breach of fiduciary duty, and other corporate misconduct against the defendants.

**5.     Plaintiffs' Precautionary Actions to Prevent Ethics Violations**

From the outset of this litigation, plaintiffs' counsel were aware that defendants would seek to argue that a lawsuit by Martin, Murphy, and Casey raised potential issues for Martin under the applicable Rules of Professional Conduct ("NJ RPC"), as adopted by the New Jersey

NOT FOR PUBLICATION

Supreme Court.  About July 20, 2005, after the possibility of a dispute had emerged, Robert D.

Graham, who is (among other things) NL's current general counsel, notified Martin of his belief

that Martin had a potential conflict of interest in connection with the services he was obligated to

perform under the NL and NL EMS MSAs.  Promptly, on or about July 29, 2005, Martin retained

separate counsel, Hamilton P. Fox III ("Fox") of Sutherland Asbill & Brennan LLP, to advise

him on legal ethics matters.  In addition to having served more than seven years as a federal

prosecutor, Fox served as Chair of the D.C. Board on Professional Responsibility from January

1994 until August 1996, and he currently serves as Vice Chair of the D.C. Bar's Legal Ethics

Committee.  He was also a member and Chair of the D.C. Circuit's Committee on Admissions

and Grievances from 1996 until 2002.  See Declaration of Hamilton P. Fox III ¶¶ 3-5 ("Fox

Decl."); Martin Decl. ¶¶ 3-4.

Since August 1, 2005, Fox has been advising Martin concerning his obligations under the

applicable NJ RPC.  At all times, Fox has sought to ensure that Martin's communications with

the other plaintiffs and with counsel do not violate any ethical obligations that Martin has to his

former clients.  On the next business day after Fox was retained, August 1, 2005, as a

precautionary measure, all documents that Martin had delivered to Kellogg, Huber, Hansen,

Todd, Evans & Figel, P.L.L.C. ("Kellogg Huber") were transferred to Fox.  At that time, the

documents had been photocopied by Kellogg Huber, but had not yet been reviewed by any

attorney at Kellogg Huber.  Both the originals and the photocopies remain with Martin and Fox's

law firm, and they have not been reviewed by Kellogg Huber or other plaintiffs' counsel.  See

Fox Decl. ¶ 6.

NOT FOR PUBLICATION

    **6.**       **Motion to Disqualify Counsel**

Under the NJ RPC, an attorney is expressly permitted to sue his former client, on any matter, and to use any client confidences that he believes reasonably necessary to establish a legal claim against his former clients. See NJ RPC 1.6(d)(2). Defendants are not attempting to prohibit Martin from suing his former clients but rather seek to disqualify plaintiffs' counsel from jointly representing Martin, Murphy and Casey. Defendants argue that plaintiffs' counsel are in the untenable position of receiving confidential attorney-client information from Martin that they cannot appropriately share with Casey and Murphy. The joint representation of all plaintiffs has created an improper risk that defendants' confidences, imparted to Martin during his twelve years of representing them, will be inevitably revealed to Martin's co-plaintiffs and/or inevitably used to the defendants' disadvantage in violation of NJ RPC.

Because of the complexity of this motion to disqualify counsel, both defendants and plaintiffs have submitted expert reports, numerous declarations and exhibits. Defendants submitted an expert report and a rebuttal expert report from former New Jersey Supreme Court Justice Gary Stein. See Stein Opinion (Dkt. Entry 23-7, filed Jul. 14, 2006 "Stein Opinion"); Stein Rebuttal Opinion (Dkt. Entry 48-15, filed Dec. 20, 2006 "Stein Rebuttal Opinion"). Mr. Stein served as an Associate Justice to the New Jersey Supreme Court from January 11, 1985 to September 1, 2002. Stein Opinion, Ex. A.

Plaintiffs have submitted an expert report from Professor Geoffrey C. Hazard, who is the Trustee Professor of Law at University of Pennsylvania and Distinguished Professor of Law at Hastings College of Law, University of California. See Declaration of Professor Geoffrey C.

NOT FOR PUBLICATION

Hazard, Jr. (Dkt. Entry 34-1, filed Oct. 11, 2006 "Hazard Decl.").  Prof. Hazard has written

numerous books relating to legal practice and the legal profession, including Ethics in the

Practice of Law (1978); Law and Ethics of Lawyering (4th ed. 2000, with Susan Koniak, Roger

Cramton, and George Cohen); and The Law of Lawyering (3d Ed. 2001, with Wm. Hodes).


## STANDARD OF REVIEW

Federal courts have inherent authority to discipline attorneys appearing before them for

conduct deemed inconsistent with ethical standards.  In re Synder, 472 U.S. 634, 645 n.6 (1985).

The Rules of Professional Conduct, as adopted by the New Jersey Supreme Court, govern the

conduct of attorneys practicing before this Court.  L. Civ. R. 103.1; see ADP, Inc. v. PMJ Enter.,

Civ. A. No.: 06-2042, 2007 U.S. Dist. LEXIS 17808, at *9 (D.N.J. Mar. 14, 2007).  Because

disqualification of counsel can have far-reaching, even devastating implications, motions to

disqualify are generally disfavored.  Essex Chem. Corp. v. Hartford Acc. & Indem. Co., 993 F.

Supp. 241, 246 (D.N.J. 1998); Carlyle Towers Condo. Ass'n v. Crossland Sav., 944 F. Supp.

341, 345 (D.N.J. 1996).  Courts will decline to disqualify counsel unless "absolutely necessary."

Rohm & Haas Co. v. Am. Cyanamid Co., 187 F. Supp. 2d 221, 226 (D.N.J. 2001) (quoting

Alexander v. Primerica Holdings, Inc., 822 F. Supp. 1099, 1114 (D.N.J. 1993).  The party

seeking disqualification bears "the burden of proof."  Maldonado v. New Jersey, 225 F.R.D. 120,

136-37 (D.N.J. 2004); Alexander, 822 F. Supp. at 1114 (citing Evans v. Artek Sys. Corp., 715

F.2d 788, 791 (2d Cir. 1983)).  "'Disqualification questions are intensely fact-specific, and it is

essential to approach such problems with a keen sense of practicality as well as a precise picture

**NOT FOR PUBLICATION**

of the underlying facts.'"  Carlyle Towers, 944 F. Supp. at 345 (quoting Gould, Inc. v. Mitsui

Mining & Smelting Co., 738 F. Supp. 1121, 1124 (N.D. Ohio 1990)).

"[D]isqualification is justified when an attorney's continued participation will taint the

proceedings."  Essex County Jail Annex Inmates v. Treffinger, 18 F. Supp. 2d 418, 440 (D.N.J.

1998).  "[I]f there is any doubt as to the propriety of an attorney's representation of a client, such

doubt must be resolved in favor of disqualification."  Delso v. Trs. Ret. Plan Hourly Emp., Civ.

A. No. 04-3009, 2007 U.S. Dist. LEXIS 16643, at *15 (D.N.J. Mar. 5, 2007); see Maldonado,

225 F.R.D. at 136-37; Kaselaan & D'Angelo Assoc., Inc. v. D' Angelo, 144 F.R.D. 235, 238

(D.N.J. 1992).  A party seeking disqualification:

> [N]eed not show by direct evidence that [the former attorney] acquired
> information in the course of the previous litigation which is to be used in the
> pending action.  They only need to show that [the former attorney] might have
> acquired substantially related material.

Richardson v. Hamilton Int'l Corp., 469 F.2d 1382, 1385 (3d Cir. 1972); see also Reardon v.

Marlayne, Inc., 83 N.J. 460, 473 (1980) ("The presumption of access to and knowledge of

confidences may not be rebutted.").

The present motion is governed by Rule 1.6(d)(2) and Rule 1.9(a)-(c), which addresses

conflicts arising from attorney's representation of former clients.  Rule 1.6(d)(2) provides that "A

lawyer may reveal such information to the extent the lawyer reasonably believes necessary . . . to

establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the

client, or to establish a defense to a criminal charge, civil claim or disciplinary complaint against

the lawyer based upon the conduct in which the client was involved."  NJ RPC 1.6(d)(2).  Rule

1.9 provides in relevant part:

**NOT FOR PUBLICATION**

(a) A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client,

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer, while at the former firm, had personally acquired information protected by RPC 1.6 and RPC 1.9(c) that is material to the matter unless the former client gives informed consent, confirmed in writing.

Notwithstanding the other provisions of this paragraph, neither consent shall be sought from the client nor screening pursuant to RPC 1.10 permitted in any matter in which the attorney had sole or primary responsibility for the matter in the previous firm.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

NJ RPC 1.9(a)-(c).

Rule 1.9(a) is a prophylactic designed to protect against the disclosure of a former client's confidences. Rule 1.9(a) prevents a lawyer who has represented a former client from thereafter "represent[ing] another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client." NJ RPC 1.9(a).

On its own terms, neither Rule 1.6(d)(2) nor Rule 1.9 speaks to whether an attorney may

-12-

**NOT FOR PUBLICATION**

join with other plaintiffs to bring a claim against his or her former client.  No provision directly

addresses the question.  See Greig v. Macy's Northeast, Inc., 1 F. Supp. 2d 397 (D.N.J. 1998).

However, several courts in this Circuit have held that an attorney should not be able to join with

other co-plaintiffs in a controversy against a former client under circumstances in which Rule

1.9(a) would bar the attorney from representing a subsequent client.  See Richardson, 333 F.

Supp. at 1055, aff'd, 469 F.2d 1382 (3d Cir. 1972); Greig, 1 F. Supp. at 402; Pallon v. Roggio,

Nos. Civ. A. 04-3625 & Civ. A. 06-1068, 2006 WL 2466854, at *5-*6 (D.N.J. Aug. 24, 2006).

These courts that have applied Rule 1.9(a) to prevent lawyers from joining with others as

a party against a former client have done so on the grounds that a lawyer who sues his client in a

"substantially related" matter along with other co-plaintiffs may be tempted to reveal his former

client's confidences to his co-plaintiffs, just as he might if he were representing them as their

lawyer.  See Greig, 1 F. Supp. 2d at 402; Richardson, 333 F. Supp. at 1055.  Like Rule 1.6, the

core concern protected by Rule 1.9(a) is the protection of client confidences.  See Geoffrey C.

Hazard, Jr. & W. William Hodes, The Law of Lawyering § 13.3, at 13-7 (2005 Supp.) ("Hazard

& Hodes") ("[M]ost modern authority holds that 'substantial relationship' is itself essentially

shorthand for not abusing the former client's confidences.  Thus, even 'disloyalty' [to a former

client] is often permitted, if it does not involve adverse use of confidential information."); 

Carlyle Towers, 944 F. Supp. at 350 (noting that the "overarching concern of [New Jersey] courts

has been to protect client confidences").

-13-

**NOT FOR PUBLICATION**

## DISCUSSION

Defendants' motion to disqualify raises two discrete issues: (1) whether plaintiff Martin should retain counsel separate from plaintiffs Murphy and Casey; and (2) whether Kellogg Huber should be disqualified as counsel in this action.

First, the Court will examine whether Rule 1.9(a) prevents Martin from joining with other plaintiffs against his former clients.  Rule 1.9(a) prevents a lawyer who has represented a former client from thereafter "represent[ing] another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client." NJ RPC 1.9(a).  As stated earlier, Rule 1.9(a) may prevent a lawyer from joining with co-plaintiffs against former clients when there is a strong concern that the lawyer may disclose confidences of his former clients in the same or substantially related matter.  See Greig, 1 F. Supp. 2d at 402; Richardson, 333 F. Supp. at 1055.  Here, there are no questions that defendants are former clients of Martin and that Martin's co-plaintiffs have interests that are materially adverse to those former clients.  The issue is whether this action is substantially related to any of Martin's previous representations of his former clients.

As to whether the current representation involves the same or a matter substantially related to the former representations, the New Jersey Supreme Court's seminal opinion on the subject provides that "a substantial relationship between matters will exist where the adversity between the interests of the attorney's former and present clients . . . has created a climate for disclosure of relevant confidential information." Reardon, 416 A.2d at 859 (alteration in original, internal quotation marks omitted).  Such a "climate" exists when "the issues between the former

-14-

NOT FOR PUBLICATION

and present suits are practically the same or where there is a patently clear relationship between them."  Id.  As the Debevoise Committee, which recommended adoption of the NJ RPC to the New Jersey Supreme Court, wrote in its comments: "The underlying question is whether the lawyer was so involved in the matter that a subsequent representation can be justly regarded as a changing of sides in the matter."  Report of the New Jersey Supreme Court Committee on the Model Rules of Professional Conduct ("Debevoise Committee Report") (reprinted at Kevin Michels, New Jersey Attorney Ethics 1240 (2006 ed.)).

**A.      Substantial Relationship Test**

As an initial matter the plaintiffs state that "'before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client.'"  Bagdan v. Beck, 140 F.R.D. 660, 668 (D.N.J. 1991) (quoting Allegaert v. Perot, 565 F.2d 246, 250 (2d Cir.1977)).  As to Martin's involvement in the NL EMS matter, plaintiffs argue that defendants cannot show that Martin possesses any information related to his legal work that is confidential as to Murphy and Casey–that is, that defendants reasonably expected that any information they imparted to Martin would not be revealed to Murphy and Casey.  Rule 1.9(a) would not bar Martin from engaging in a subsequent representation on a "substantially related matter," and therefore does not, by analogy, bar joinder of Martin's claims on such a matter with those of other plaintiffs, unless the "movant shows" that the attorney was expected to keep information secret from the attorney's new clients.  See Host Marriott Corp. v. Fast Food Operators, Inc., 891 F. Supp. 1002, 1007-08 (D.N.J. 1995) (affirming

-15-

NOT FOR PUBLICATION

Bagdan's holding that Rule 1.9(a) is "inapplicable where the former client, a corporate entity, was aware that all information acquired during the representation would be shared with the board members of the corporation"); Spinello Cos. v. Metra Indus., Inc., No. Civ. A. 05-5075(SRC), 2006 WL 1722626, at *5 (D.N.J. June 22, 2006) (quoting Host Marriott).

Beginning in June 1998, when Martin, Murphy and Casey became the minority shareholders, directors, and co-managers of NL EMS, plaintiffs began communicating routinely by telephone, email, and facsimile (often several times a day) for the purpose of managing NL EMS's liabilities.  Martin shared legal advice, as well as confidential information relating to the resolution of NL EMS's environmental liabilities, as part of their collective effort.  Casey and Murphy routinely attended meetings related to NL EMS's legal matters.  Martin's legal advice to NL EMS on issues requiring NL EMS Board of Director approval was formulated jointly by Murphy and Casey, and then disclosed to the full NL EMS Board of Directors, including Martin, Murphy, and Casey.

Plaintiffs also argue that NL and NL EMS expressly authorized Martin to share current and historical information about NL EMS's environmental liabilities freely with Murphy and Casey.  The Management Services Agreement ("MSA") between Martin and NL EMS provides that Martin shall keep "confidential all non-public information obtained during the performance of the Services and shall not disclose such information to any Person *except in the course of performance of this Agreement to [NLE] attorneys, consultants, and other persons assisting with the Environmental Matters*."  Martin Decl. Ex. B, § 9.11 (emphasis added).  The Highland-EMS MSA also obligated Martin to provide legal services to NL EMS, "in connection with other

-16-

**NOT FOR PUBLICATION**

environmental service providers to be selected by [NL EMS]," "toward the mutual goal of reducing the assumed environmental liabilities and costs of [NL EMS] efficiently and cost effectively." Martin Decl. ¶¶ 32-33. The MSA called for "cooperat[ion] and coordinat[ion] with [NL EMS] and all other persons or entities working on the Environmental Matters from time to time" and for Martin to work cooperatively "with other service providers with respect to policies and procedures for resolution of the Environmental Matters." Id. Casey's company, Efficasey, had an MSA with NL EMS that contained substantially similar terms. See Casey Decl. ¶¶ 22-23.

Defendants advance several arguments and refer to many factual circumstances why the current action is substantially related to Martin's past representations of his former clients and that they expected all confidential communications between Martin and themselves remain confidential:

- information regarding the creation of NL EMS and plaintiffs' work on behalf thereof. Am. Compl. ¶¶ 61-81; 86-111;

- information regarding the IRS audit and the settlement thereof. Am. Compl. ¶¶ 114; 116-22; 125-27;

- information regarding the discussions with the Sayreville Borough Council and zoning issues. Am. Compl. ¶¶ 185-86;

- information regarding NL's submissions to NJDEP. Am. Compl. ¶ 191; and

- information regarding allocation of costs to NL EMS. Am. Compl. ¶ 200.

Defendants also cite to certain paragraphs in the First Amended Complaint about Martin's knowledge about Simmons from his representation of Simmons in the trust litigation as areas of

-17-

**NOT FOR PUBLICATION**

possible risk in Martin's violation of NJ RPC:

- Paragraph 35, concerning Simmons' gaining control of Contran;

- Paragraph 36, concerning Simmons' gaining control of Valhi;

- Paragraph 47, concerning Simmons' salary and political activities;

- Paragraphs 48 and 49, concerning Simmons' control of the trusts and the companies owned by the Trusts;

- Paragraph 50, concerning transactions among Contran and its subsidiaries;

- Paragraphs 52-57, concerning allegations of minority shareholder abuse;

- Paragraph 58, concerning allegations of self-dealing transactions.

Defendants argue that in addition to Martin's involvement in the specific matters described in the First Amended Complaint, Martin possesses significant knowledge about defendants' business and litigation practices because of his twelve-year attorney-client relationship with defendants. This is known as the playbook theory of attorney-client communications. Defendants state that Martin has gained extensive insight into NL's, NL EMS's and Simmons' business operations and finances, litigation philosophies, methods and procedures for defending claims, and attitudes towards settlement.

Defendants argue that the combination of Martin's specific and general involvement with defendants, and the knowledge he gained, evidence the substantial relationship between his former representations and the present litigation. Martin's maintenance of this suit jointly with his co-plaintiffs creates an unacceptable risk of improper disclosure or use of defendants' confidences, requiring disqualification of plaintiffs' counsel.

-18-

NOT FOR PUBLICATION

The Court agrees with defendants' position that not <u>all</u> confidential attorney-client information that defendants imparted to Martin was to be shared with Murphy and Casey and that Martin obtained confidential information that Murphy and Casey did not have.  Martin had hundreds of privileged communications with NL's general counsel, Robert D. Graham, without Casey or Murphy participating in those communications.  As example, in his supplemental declaration, Graham explained that, between July 2003 and September 2005, he had 970 email communications with Martin concerning NL and NL EMS matters, 230 of which were designated as "Privileged and Confidential" or "Attorney-Client Privileged Communication." <u>See</u> Supplemental Graham Decl. ¶ 5.  Casey was copied on only 30 of the 970 emails, and only 7 of the emails marked privileged or confidential.  <u>Id.</u>  Murphy was copied on only 1 of the 970 emails, and that email was not designated as privileged or confidential.  <u>Id.</u>  That defendants provided information separately to each plaintiff demonstrated that defendants intended to treat each plaintiff with different levels of confidentiality.  Otherwise defendants would have copied Murphy and Casey on all communications between Martin and defendants.

Furthermore, the Court's analysis of whether defendants have reasonable expectation that Martin would keep their communications confidential is not limited to Martin's involvement in the NL EMS matters.  The Court looks to all previous representations by Martin of defendants. Given the extensive twelve year attorney-client relationship between Martin and defendants, and that defendants have demonstrated that Martin has been involved in many legal matters not involving Casey or Murphy, defendants did have reasonable expectations that certain communications between Martin and defendants were to be kept confidential.  The Court finds

-19-

**NOT FOR PUBLICATION**

that the substantial relationship test is implicated in this action.

**B.      Whether Martin Should Retain Counsel Separate From Other Plaintiffs**

      **1.      NL and NL EMS Matters**

Plaintiffs argue that the NL toxic tort matters are not substantially related to this lawsuit because any previously undisclosed confidences of Martin have no bearing on plaintiffs' allegations of racketeering, fraud, breach of fiduciary duty, and corporate misconduct by the defendants.  Furthermore, the NL toxic tort matters for which Martin was responsible under the Highland-NL MSA relate to allegations of personal injury and diminution in private property values by individuals who were exposed to contamination–usually airbourne lead or other chemicals–allegedly spread by NL.  In contrast, NL EMS's environmental liabilities relate to government-initiated litigation demanding the clean-up of sites and the allocation of remedial costs.  See Martin Decl. ¶¶ 51-52.

Defendants believe that plaintiffs' view of Martin's involvement in the NL and NL EMS matters is disingenuously narrow.  Defendants list a litany of plaintiffs' failures to deny certain crucial facts with regards to the NL matters.  Plaintiffs do not deny that Martin represented NL on environmental matters both before and after the formation of NL EMS.  Plaintiffs do not deny that he handled many matters for NL in which Casey and Murphy were not involved.  Plaintiffs do not deny that Martin served as the primary lawyer to handle and manage all NL EMS environmental and litigation matters.  Plaintiffs do not deny that Martin possessed substantial privileged information relating to NL for the period before and during the formation of NL EMS. Martin claims that he started work on NL matters with Casey in 1995, which is one year after

**NOT FOR PUBLICATION**

Martin started work for NL.  <u>See</u> Martin's Decl. ¶¶ 9-10.

Plaintiffs do not deny that Martin worked on significant legal and environmental matters for NL after NL EMS was formed in 1998.  Murphy had no involvement in those NL matters. <u>See</u> Supp. Graham Decl. ¶¶ 7, 8, 10, 12.  Casey merely served as an environmental consultant to NL EMS, and had no role in developing legal strategies for NL, no right to access privileged information relating to NL, and no involvement at all in purely legal matters.  <u>See</u> <u>id.</u> ¶¶ 6, 12, 16, 20.

Defendants state that although plaintiffs argue that Casey and Murphy had access to the most privileged NL EMS information, Casey and Murphy did not receive much of the privileged or confidential information that Martin received.  Furthermore, plaintiffs' argument ignores the fact that Casey and Murphy are now former directors of NL EMS and no longer have any right to receive additional privileged or confidential information.  Even if Casey and Murphy had access during a certain period of time, they did not have access to all privileged information all of the time.

Defendants also argue that Martin's role of performing legal oversight of all NL environmental matters–including many matters the liabilities for which were never assumed by NL EMS–is directly related to the present litigation.  <u>See</u> Supp. Graham Decl. ¶¶ 21-24.  In the First Amended Complaint ¶¶ 159, 182, 195, and 196, plaintiffs accuse defendants of improperly charging in excess of $3 million of NL's monitoring costs for environmental liabilities to NL EMS, allegedly reducing the value of plaintiffs' interests in NL EMS.  As a lawyer handling all environmental matters for NL, Martin possesses privileged information relating to NL-specific

-21-

NOT FOR PUBLICATION

environmental matters that directly impacts the amount and allocation of those liabilities between

NL and NL EMS.  See Supp. Graham Decl. ¶ 23.

 In the First Amended Complaint ¶¶ 200 and 201, plaintiffs accuse defendants of

fraudulently assigning NL liabilities to NL EMS.  These allegations "invoke[] a substantial

portion of the privileged and confidential information concerning NL-only environmental

liabilities that was gained by Martin in his representation of NL and remains in Martin's

possession."  See Supp. Graham Decl. ¶¶ 24.  Defendants state as a matter-of-fact that Martin's

representation of NL extended far beyond the "toxic tort"matters.

 Defendants argue that plaintiffs failed to address the fact that Martin continued to receive

privileged NL and NL EMS information after Casey and Murphy were no longer directors of NL

EMS.  See Supp. Graham Decl. ¶ 19.  After June 2005, Murphy was not involved with NL EMS

and Casey was no longer a director of NL EMS.  Id.  Martin continued to receive privileged and

confidential information until his termination as a lawyer for NL and NL EMS in September

2005.

 According to defendants, this gap, along with others, demonstrate that Martin did in fact

have more privileged and confidential information about his former clients than Casey and

Murphy in both the NL and NL EMS environmental liabilities matters.  That plaintiffs hired Fox

indicates an awareness that there were real possibilities that Martin did have attorney-client

information at risk of improper disclosure.

 Fox has been engaged to review all substantive communications between Martin and

plaintiffs' counsel in connection with this lawsuit and to ensure that no information relating to

**NOT FOR PUBLICATION**

matters that Martin is obligated to keep confidential – including confidences related to the NL toxic tort cases and the Simmons Family Trust Litigation – is shared with Murphy, Casey, or plaintiffs' counsel or is otherwise inadvertently disclosed.  Hazard Decl. ¶ 28.   Prof. Hazard explained: "Mr. Fox's involvement . . . has helped to guard against the possibility of ethical contamination."  Id. ¶ 44.

Even Fox admits that there have already been a few instances in which he advised Martin to withhold information from his counsel and co-plaintiffs because it was unclear whether the privileged or confidential information Martin intended to share had previously been disclosed to Murphy or Casey.  See Fox Decl. ¶ 8.

The Court finds that there is evidence to suggest that Martin's representation of defendants in the NL matters, his representation of the defendants in the formation of NL EMS, certain communications between Martin and defendants not provided to Casey and Murphy in the NL EMS matter, and Martin's representation of NL EMS after Casey and Murphy had terminated their relationship with NL EMS are substantially similar to this action.  However, this suggestion is moderate and this evidence standing alone does not warrant the extreme remedy of disqualifying counsel.

### 2.      IRS Audit of NL

With respect to the IRS audit of NL's 1998 federal corporate income tax return, plaintiffs argue that Martin was not engaged by and did not act as counsel in this matter but served as a fact witness in support of NL's position in the tax audit.  NL was represented in the tax proceedings by Garten, NL's former general counsel, as well as by outside tax specialists at Morrison &

-23-

NOT FOR PUBLICATION

Foerster, LLP.  Plaintiffs state that Martin never obtained any information about the IRS audit in the context of an attorney-client relationship with any of the defendants.

Defendants did not address plaintiffs' argument in their reply brief.  Because it is undisputed that Martin did not serve as counsel for NL in the IRS audit of NL, Martin cannot be deemed as having represented defendants in that matter.  This is not basis for disqualification.

### 3.     The Simmons Family Trust Litigation

As to the Simmons Family Trust Litigation, plaintiffs say that Martin's involvement in the Simmons Family Trust Litigation is not substantially related because (1) the subject matter is "totally different" from the present lawsuit; (2) Martin had limited involvement in the earlier matter and thus limited access to client information; and (3) any confidential information obtained from an eight-year-old matter would necessarily be outdated and of very limited utility in the current one.

Plaintiffs stipulated that they will not make the allegations of misconduct in the Simmons Family Trust Litigation an issue here.  See Graham Decl. Ex. 4, at 4 (Letter from Reid M. Figel to Joseph A. Hayden (Jun. 15, 2006)).  By their First Amended Complaint, plaintiffs removed paragraph 58 from the Original Complaint that had listed factual allegations in the Simmons Family Trust Litigation.

Plaintiffs charge that the allegations in the First Amended Complaint were based not on Martin's disclosure of Simmons' confidences but rather from multiple public sources–including an authorized biography of Simmons, published judicial opinions, the SEC filings of Simmons' public companies, and public court records.  Given the breadth of information about Simmons

**NOT FOR PUBLICATION**

and his companies which is easily available in the public record, the risk that any information

obtained by Martin would be of any value to this lawsuit is extremely attenuated.

Defendants counter that by amending their Original Complaint, plaintiffs concede that the

Simmons Family Trust Litigation is arguably "substantially related" to this matter.  Even

plaintiff's expert witness, Prof. Hazard wrote that:

> Paragraph 58 of the initial complaint did make reference to this matter, lending
> support to the suggestion that Plaintiffs' counsel initially considered the Simmons
> Trust Litigation to be related to this litigation.

Hazard Decl. ¶ 39.  Furthermore, plaintiffs cannot avoid disqualification by amending their

pleadings to eliminate superficially any disqualifying conflicts.  Reardon, 83 N.J. at 468 n.1 (N.J.

1980).

Plaintiffs dedicate twelve paragraphs of the First Amended Complaint to explain the

"Background to the Racketeering Activities of the Simmons Enterprise," which covers

allegations against Simmons that extend over a period of several decades.  See Am. Compl. ¶¶

46-58.  Plaintiffs also allege: "The overarching purpose of the Simmons Enterprise is to enrich

Defendant Simmons and his family members who are the beneficiaries of the Simmons Family

Trust."  Am. Compl. ¶ 47.  Accordingly, plaintiffs place the Simmons Family Trusts at the heart

of the Simmons Enterprise.  Plaintiffs allege that Simmons has a "well-documented history of

abusing the rights of minority shareholders within the Simmons Enterprise." Am. Compl. ¶ 52.

Plaintiffs contend that the complaint in the present case "alleges conduct that is strikingly similar

to the foregoing conduct in which Defendant Simmons and other employees of the Simmons

Enterprise have conducted and participate in the affairs of the Simmons Enterprise by engaging

-25-

**NOT FOR PUBLICATION**

in a pattern of racketeering activity and other lawful acts against minority shareholders and others

to whom Simmons and his companies owed fiduciary duties." Am. Compl. ¶ 58.

In his declaration, William Lindquist (who worked closely with Martin's former firm in

connection with the Simmons Trust Litigation), Lindquist Decl. ¶ 10, identified several

paragraphs in the First Amended Complaint that raised allegations also raised in the Simmons

Trust Litigation.

- Paragraph 35, concerning Simmons' gaining control of Contran;

- Paragraph 36, concerning Simmons' gaining control of Valhi;

- Paragraph 47, concerning Simmons' salary and political activities;

- Paragraphs 48 and 49, concerning Simmons' control of the trusts and the
  companies owned by the Trusts;

- Paragraph 50, concerning transactions among Contran and its subsidiaries;

- Paragraphs 52-57, concerning allegations of minority shareholder abuse;

- Paragraph 58, concerning allegations of self-dealing transactions.

Defendants conclude that the Simmons Trusts and the privileged information Martin

received relating to those trusts continue to remain a central focus of plaintiffs' allegations even

following the amendment of their Original Complaint.

The Court disagrees with Defendants' characterization that the Simmons Family Trust

Litigation will remain a central focus of this action.  The Simmons Family Trust Litigation

occurred eight years before the commencement of this lawsuit and primarily concerned the

challenge to Simmons's trusteeship of the trusts for his daughters' benefit.  This action is based

**NOT FOR PUBLICATION**

on the allegations that NL and Simmons conspired to fraudulently divert the equity value of NL

EMS to the Simmons Enterprise.  The underlying factual and legal issues in this case are

different from the Simmons Family Trust Litigation.  The Court finds that although there is

evidence to suggest that the Simmons Family Trust Litigation is similar to this case in the sense

that Martin may have information about Simmons' pattern of abusing minority shareholders that

may be analogous, the evidence submitted does not suggest that the Simmons Family Trust

Litigation is "substantially related."

     **4.**       **Playbook Theory**

     Plaintiffs argue that defendants' reliance on the "playbook theory" is misplaced because

(1) such generalized information should not be considered independent grounds for finding a

substantial relationship under the NJ RPC; and (2) much of that generalized information is

publicly available or was already accessible to Murphy and Casey in the course of their tenure at

NL EMS.  Plaintiffs doubt whether New Jersey courts will continue to recognize the "playbook"

theory as a basis for disqualifying counsel.  Justice Stein's opinion in support of Defendants'

Motion refers to two New Jersey cases that seemed to adopt a modest form of that theory.  See

Stein Opinion at 33-34, 36 (citing Dewey v. R. J. Reynolds Tobacco Co., 109 N.J. 201 (N.J.

1988), and Cardona v. General Motors Corp., 942 F. Supp. 968 (D.N.J. 1996)).  Plaintiffs argue

that those cases "relied on the fact that, at the time they were decided, the New Jersey Rules

included an explicit 'appearance' of impropriety' standard in its version of Rule 1.9."  Hazard

Decl. ¶ 41.  That "appearance of impropriety" standard has since been eliminated and, without it,

the language of Rule 1.9 does not support the "playbook" rationale.  See Advisory Comm. on

**NOT FOR PUBLICATION**

Prof'l Ethics Op. No. 654 (Oct. 17, 1991) ("The language of RPC 1.9(a) . . . suggests that the matters themselves–the cases–must be substantially related.  This language contemplates a factual nexus between the case.").

Plaintiffs do not dispute that Martin has substantial information regarding defendants' legal strategies.  Rather, plaintiffs argue that the playbook theory is not supported by the New Jersey Rules of Professional Conduct.  See Plaintiff's Response at 56.  However, plaintiffs' reference to the Oct. 17, 1991 Advisory Comm. on Prof'l Ethics Op. that Rule 1.9 does not support the "playbook" rationale of a case decided in 1996 is unconvincing.  Cardona, 942 F. Supp. 968.  The Cardona court warned against placing too much emphasis on the Advisory Comm. on Prof'l Ethics Op. No. 654 (which is what plaintiffs rely on) because "Opinion No. 654, in its attempt to narrow the 'substantial relationship' test to instances of a 'factual nexus,' misconstrues Dewey, and is without support in the New Jersey case law.  In fact, the broad application of RPC 1.9 has been reaffirmed since the adoption of the Rules."  942 F. Supp. at 972 (citing Dewey, 109 N.J. 201).  The Cardona court also stated that while an opinion by the Advisory Comm. on Prof'l Ethics "is certainly persuasive, when it conflicts with a decision of a state court, it must give way."  Id.

Furthermore, plaintiffs' expert, Prof. Hazard, explains that although a broad application of the playbook theory is not always warranted, he acknowledges:

> courts have not infrequently taken a close look where playbook information blends into more specific factual information that could be put to adverse use.  Thus, even where matters are factually distinct, disqualification is sometimes ordered where a lawyer has represented a client in a series of matters that involve the same modus operandi and underlying factual base as the new matter.

-28-

NOT FOR PUBLICATION

See Hazard & Hordes § 13.7 at 13-21.  Furthermore Prof. Hazard recognizes that the playbook

theory is still viable.  He writes:

> Where a lawyer had earlier represented a client over a long period of time and
> with respect to a large variety of matters, it is often held that virtually any new
> matter undertaken for a new client against the former client is "substantially
> related" to the prior representation, and hence prohibited in the absence of
> informed consent.

Id. at 13-20.  In addition to the vast and undisputed nature of Martin's "playbook" knowledge,

Martin has attempted to plead a RICO claim against the defendants by accusing Simmons of

having a modus operandi of abusing minority shareholders.

The Cardona court considered that the former client's claims, litigation philosophy, and

methods and procedures for defending claims were known to the former attorney in its

determination that a substantial relationship existed.  See Cardona, 942 F. Supp. at 973.   Also, in

Steel v. Gen Motors Corp., the court held that disqualification was mandated to protect against

the use of such general information to the detriment of the former client.  912 F. Supp. 724, 739-

40 (D.N.J. 1995).  The court determined that NJ RPC 1.9(a)(2) contemplates:

> knowledge of the decision-making processes of [defendant's] personnel regarding
> legal claims, the internal workings of [defendant's] organization, the particular
> personalities, expectations, negotiating techniques, and management styles of
> [defendant's] personnel, historical and technical information regarding [defendant's
> products], and [defendant's] claims handling processes and procedures.

Id. at 739.

This Court finds that the playbook theory is applicable in this action.  Although plaintiffs

may be correct that each discrete past representation by Martin of defendants may not be

substantially related to this action to warrant disqualification, plaintiffs' expert, Prof. Hazard, is

-29-

**NOT FOR PUBLICATION**

correct that the "Rules of Professional Conduct are rules of reason." Hazard Decl. ¶ 32. The

playbook theory can be reasonably applied to this action. The <u>Cardona</u> court explained that:

> case law reveals that disqualification is proper when the 'similarity in the two representations is enough to raise a common-sense inference that what the lawyer learned from his former client will prove useful in his representation of another client whose interests are adverse to those of the former client.'

942 F. Supp. at 973 (quoting ABA/BNA Lawyer's Manual on Professional Conduct at 51:215

(1996)).

Martin has represented NL for a period of approximately twelve years, NL EMS for a

period of approximately seven years and Simmons personally in the Simmons Trust Litigation.

Martin is permitted under Rule 1.6 to "reveal such information to the extent the lawyer

reasonably believes necessary . . . to establish a claim" against a former client. NJ RPC

1.6(d)(2). However, it would be naive to trust that Martin will not share, consciously or sub-

consciously, with his co-plaintiffs any confidential information he has learned during his twelve

year attorney-client representation to their advantage in this action.

Plaintiff's expert, Prof. Hazard, wrote a telling opinion based on an assumption that this

Court does not share. Prof. Hazard wrote:

> I agree that, in many circumstances, a lawyer who is forced to sue his or her former client should be represented separately from other plaintiffs in order to limit the risk that the client's confidential information would unnecessarily be disseminated by the former lawyer to his or her co-plaintiffs. (Citation omitted.) However, in my opinion, that general rule simply does not apply in the factual circumstances of this case. Defendants actively authorized and encouraged Mr. Martin to share with his co-Plaintiffs in this case all current and historical confidential information related to the legal services he provided to NL and NL EMS concerning the environmental liabilities transferred to NL EMS . . .

Hazard Decl. ¶ 31. Defendants, with supporting affidavits, vehemently disagree that they

**NOT FOR PUBLICATION**

actively authorized and encouraged Martin to share <u>all current and historical confidential</u>

<u>information</u>.  If plaintiffs truly believed that defendants authorized the sharing of all current and

historical confidential information, plaintiffs would not have taken the precaution of hiring Fox

to review all substantive communications between Martin, co-plaintiffs and plaintiffs' counsel

and to attend all substantive meetings and telephonic conference calls among Martin, co-

plaintiffs and plaintiffs' counsel.  <u>See</u> Reid M. Figel's June 15, 2006 Letter to Joseph Hayden.

Martin, being an attorney, should be aware of his duty to his former clients.  Martin had

the choice to retain separate counsel from the beginning.  Instead, he chose joint representation

with his co-plaintiffs and retained separate counsel to guard against improper disclosure.  It is

common sense that if plaintiffs had two choices of reducing the risk of Martin disclosing

attorney-client privileged information, plaintiffs should take the more cautious approach.

By employing Fox, plaintiffs may be correct that at this time there has been no breach of

confidentiality by Martin or his counsel.  Nevertheless, the Court finds that plaintiffs' conduct,

by eliminating references to the Simmons Family Trust Litigation and hiring Fox, plaintiffs

acknowledge that there are real risks that Martin may disclose confidential information.  Former

clients "need not demonstrate that an actual breach of confidence occurred before disqualification

is warranted, but only a showing of the possibility of such a breach by virtue of the similarity of

representations."  <u>In re Cendant</u>, 124 F. Supp. 2d at 245; <u>see also</u> <u>Ackerman v. Nat'l Prop.</u>

<u>Analysts, Inc.</u>, 887 F. Supp. 510, 515-16 (S.D.N.Y. 1993).

The Court finds that there are enough similarities between all of Martin's previous

representations of NL, NL EMS and Simmons and this action that there are real risks of Martin

NOT FOR PUBLICATION

breaching his ethical duty to his former clients.  Put simply, Martin's extensive attorney-client relationship and this adverse case against his former client with joint representation have "created a climate for disclosure of relevant confidential information."  Reardon, 83 N.J. at 472.  The Court finds that all of Martin's past representations of defendants in the aggregate is substantially related to this action.  "[T]he meaning of 'substantially related' under RPC 1.9(a)(1) is broadly construed in New Jersey."  Kaselaan, 144 F.R.D. at 241.  If this Court were to permit Martin to be represented jointly with his co-plaintiffs, doubts will continue to arise concerning whether Martin improperly disclosed confidential information and whether Fox adequately guarded against such disclosure.  Such questions will only taint the proceeding.  Accordingly, the Court holds that Martin should retain counsel separate from his co-plaintiffs.

C.      **Disqualification of Kellogg Huber**

There are few cases on point where the court has disqualified the attorneys jointly representing a former attorney of the defendant and the opposing party of the same defendant. Although the facts in Greig v. Macy's Northeast are clearer for disqualifying counsel because the former attorney is involved in the same case against his former client, the reasoning is applicable here.  1 F. Supp. 2d 397.  The plaintiff in Greig fired her attorney in her racial discrimination case against Macy's Department Store.  Greig, 1 F. Supp. 2d at 401.  She then sued her former attorney for malpractice in the same suit against Macy's.  Id.  The former attorney retained the same law firm that was defending Macy's.  Id.  The court disqualified counsel that was jointly representing Macy's and the plaintiff's former lawyer.  Id. at 400-03.

The plaintiff's former attorney possessed confidential information of the plaintiff, and the

**NOT FOR PUBLICATION**

court found that the law firm which undertook the representation of him would inevitably learn that confidential and privileged information as part of its representation.  Greig, 1 F. Supp. 2d at 402 n.4.  The Greig court did not require proof of the sharing of such confidences by the former attorney with joint counsel, but instead applied the same reasoning as that of Rule 1.9 – that a moving party need only show the similarity of the representations.  Id. at 403.  The court censured the Amdur firm, stating that it should have been clear to them that the former attorney would be in danger of violating his duty of confidentiality to his former client by divulging such information to his former client's adversary.  Id. at 401.  "Pursuant to RPC 8.4(a), they should have abstained from assisting him in violating this duty."  Id.  The joint representation in Greig compelled disqualification.  Greig, 1 F. Supp. 2d at 402.

Similarly, here the Court will presume that Kellogg Huber has acquired confidential information regarding defendants from Martin which should not be shared with Martin's co-plaintiffs.  "Where the moving party has established that the matters are substantially related, the Court will presume that the attorney has acquired confidential information from the former client."  Essex Chemical, 993 F. Supp. at 246.  The presumption of access to and knowledge of confidences may not be rebutted.  Reardon, 83 N.J. at 473.  Although the presumption is that Martin has acquired confidential information from his former clients, courts in this district have imputed the acquisition of confidential information on the attorneys representing the attorney suing his former client.  See Greig, 1 F. Supp. 2d at 402.

This Court assumes that Martin's confidences have been revealed to Kellogg Huber.  There is evidence that plaintiffs' counsel drafted the Original Complaint with Martin's help

**NOT FOR PUBLICATION**

regarding the Simmons Family Trust Litigation.  Later plaintiffs attempted to eliminate all references to the Simmons Family Trust Litigation.  Also, after retaining Kellogg Huber, Martin delivered six boxes of documents to the firm.  See Fox Decl. ¶ 6.  Those documents were then copied.  See id.  After Fox was retained, Fox requested that these boxes be returned to Martin.  See id.  Although plaintiffs claim those documents were never reviewed by the firm, plaintiffs' claim will not destroy the presumption that they acquired Martin's confidences in some other fashion.  Greig, 1 F. Supp. 2d at 402 ("Where such substantially related matters are present . . . the court will assume that confidential information has passed between attorney and former client, notwithstanding the attorney's declarations to the contrary.") (emphasis added).  Plaintiffs' conduct raises the issue of whether Martin's six boxes are in fact confidential as to Casey and Murphy.

The combination of the presumption that Kellogg Huber has acquired confidential information from Martin and evidence suggesting the possibility that they did acquire confidential information from Martin is sufficient for this Court to disqualify Kellogg Huber from this action.  See Reardon, 83 N.J. at 469 (requiring "application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information received from a client during a previous relationship may subsequently be used to the client's disadvantage.").

**CONCLUSION**

Accordingly, the law firm of Kellogg Huber and local counsel Neil Cartusciello, Esq. are disqualified immediately from this action.  Martin and his company, Highland,  must obtain

**NOT FOR PUBLICATION**

counsel separate from his co-plaintiffs Murphy and Casey, and their respective companies, IRCC

and Efficasey.  Plaintiffs have thirty days from the date of this order to obtain new and separate

counsels.  Martin and Highland are prohibited from disclosing or sharing with anyone any

confidences or information learned by Martin in his previous representations of defendants

except as permitted by Rule 1.6(d).


January 3, 2008                                                          **s/ William H. Walls**

                                                                         United States Senior District Judge